# EXHIBIT A

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, dated as of April 28, 2010 (this "Loan Agreement"), is between Startech Environmental Corporation, a Colorado corporation, as debtor and debtor-in-possession ("STARTECH" or the "Borrower"), and Champion Energy, Inc., a California corporation, as lender (the "Lender").

## RECITALS

WHEREAS, on April 28, 2010 (the "Petition Date"), STARTECH filed a voluntary petition for relief under the Bankruptcy Code (such term and other capitalized terms used in these Recitals without definition have the meanings set forth in Section 1 of this Loan Agreement) with the United States Bankruptcy Court for the District of Connecticut (the "Court") under Case No. 10-50955 (hereinafter referred to as the "Chapter 11 Case"). STARTECH continues to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, STARTECH has requested that the Lender provide a revolving credit facility in an aggregate principal amount not exceeding $750,000 on a post-petition basis on the terms and conditions set forth herein; and

WHEREAS, the Lender is willing to provide such financing upon the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

**Section 1.     Defined Terms.**  As used in this Loan Agreement, the following terms shall have the following meanings:

"Advance" has the meaning ascribed in Section 2.2(b) hereof.

"Asset Purchase Agreement" means a purchase agreement for all or substantially all of the Borrower's Assets.

"Assets" means all assets related to STARTECH's Business.

"Availability Period" means the period from and including the Closing Date to but excluding the Maturity Date.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Budget" means the initial Budget annexed hereto as Exhibit A, as such Budget may be amended or modified with the prior written consent of the Lender.

1

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of California are authorized or required by law to close.

"Carve-Out" means the following fees and expenses in an amount not exceeding $170,000 that have accrued in Chapter 11 Case:

(a)     amounts payable pursuant to 28 U.S.C. § 1930(a); and

(b)     professional fees (other than success, completion or any other back-end fees) and expenses of attorneys retained by STARTECH or the Creditors' Committee appointed in the Chapter 11 Case pursuant to §§ 327 and 1103 of the Bankruptcy Code solely in connection with the Chapter 11 Case (except, in each case, to the extent that such fees and expenses were incurred in the prosecution of actions, claims, or causes of action against the Lender);

(c)     the payment of accruing state and federal withholding tax and sales tax (if any); and

(d)     the payment of any accrued but unpaid wages incurred prior to the delivery of the Carve-Out Trigger Notice, but solely to the extent the same are incurred in accordance with the Budget.

"Carve-Out Procedures" means the procedures related to the Carve-Out set forth in the Interim DIP Order and/or the Final DIP Order specifying the amounts payable and the terms related to such amounts in the event Lender issues a Carve-Out Trigger Notice (as defined in the orders).

"Chapter 11 Case" means the Chapter 11 Case as defined in the recital clauses of this Loan Agreement.

"Closing Date" means the date on which the conditions set forth in Section 3.1 are satisfied and the Lender shall have delivered written notice thereof to STARTECH.

"Collateral" means

(i)     all Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, other Goods, all money, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing;

(ii)     all copyrights, whether statutory or common law, registered or unregistered, domestic or foreign, including Borrower's registered copyrights and copyright registrations, all of Borrower's applications for copyright registrations, and all of Borrower's unregistered copyrights, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, together with all renewals and extensions of any copyrights, the right to recover for all past, present, and future infringements of any

copyrights, and all computer programs, computer databases, computer program flow diagrams, source codes, object codes and all tangible property embodying or incorporating any copyrights, and all other rights of every kind whatsoever accruing thereunder or pertaining thereto;

       (iii)    all patents and patent applications, domestic or foreign, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses, all rights to sue for past, present or future infringement thereof, all rights arising therefrom and pertaining thereto and all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof;

       (iv)    all state (including common law), federal and foreign trademarks, service marks and trade names, and applications for registration of such trademarks, service marks and trade names, all licenses relating to any of the foregoing and all income and royalties with respect to any licenses (including such marks, names and applications as described in Schedule C), whether registered or unregistered and wherever registered, all rights to sue for past, present or future infringement or unconsented use thereof, all rights arising therefrom and pertaining thereto and all reissues, extensions and renewals thereof,

       (v)    all trade secrets, trade dress, trade styles, logos, other source of business identifiers, mask-works, mask-work registrations, mask-work applications, software, confidential and proprietary information, customer lists, license rights, advertising materials, operating manuals, methods, processes, know-how, algorithms, formulae, databases, quality control procedures, product, service and technical specifications, operating, production and quality control manuals, sales literature, drawings, specifications, blue prints, descriptions, inventions, name plates, catalogs, internet websites, and internet domain names and associated URL addresses;

       (vi)    the entire goodwill of or associated with the businesses now or hereafter conducted by Borrower connected with and symbolized by any of the aforementioned properties and assets;

       (vii)    all Commercial Tort Claims (as defined in the UCC) associated with or arising out of any of the aforementioned properties and assets; provided, however, that Commercial Tort Claims shall not include any claims under Chapter 5 of the Bankruptcy Code ;

       (viii)    all Accounts, all payment intangibles, all intangible intellectual or other similar property and other general intangibles associated with or arising out of any of the aforementioned properties and assets and not otherwise described above, including all license payments and payments under insurance (whether or not Lender is the loss payee thereof) or any indemnity, warranty or guaranty payable by reason of loss or damage to or otherwise with respect to the foregoing Collateral;

       (ix)    all Equity Interests; and

(ix)    all products, Proceeds and supporting or guaranty obligations of or with respect to any and all of the foregoing Collateral.

"Commitment" means the commitment of the Lender to make Loans hereunder, as such commitment may be reduced from time to time pursuant to Section 2.6(b).  The aggregate amount of the Lender's Commitment is $750,000.

"Borrower" has the meaning set forth in the introductory paragraph of this Loan Agreement.

"Court" has the meaning set forth in the recitals to this Loan Agreement.

"Creditors' Committee" means any statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to the Bankruptcy Code.

"Default Rate" has the meaning ascribed in Section 2.3(b) hereof.

"Equity Interests" means shares of capital stock, membership interests in a limited liability company, or other equity ownership interests in a Person or any other interest having the attributes of an equity ownership interest, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Excluded Taxes" means, with respect to the Lender, or any other recipient of any payment to be made by or on account of any obligation of STARTECH hereunder, (a) all income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or in which it is doing business, and (b) all taxes related to capital gains.

"Final DIP Order" means an order of the Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), approving this Loan Agreement and the other Loan Documents and authorizing STARTECH to borrow Loans hereunder, in form and substance satisfactory to the Lender in its sole discretion, and which shall not have been vacated, stayed, reversed or (except with the express written consent of the Lender) amended, supplemented or otherwise modified.

"Final Order" means an order, judgment or other decree of the Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review or rehearing has been waived or (b) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all guarantees by such Person of Indebtedness of others, (g) all capital lease obligations of such Person, and (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes in respect of interest payable by STARTECH to the Lender hereunder, other than Excluded Taxes.

"Interest Period" means, with respect to any Loan, the period commencing on the date of the borrowing of such Loan and ending on the numerically corresponding day in the calendar month that is one month thereafter; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.

"Interim DIP Order" means an order of the Court entered in the Chapter 11 Case after a interim hearing under Bankruptcy Rule 4001(e)(2), approving this Loan Agreement and the other Loan Documents and authorizing STARTECH to borrow Loans hereunder, in form and substance satisfactory to the Lender in its sole discretion, and which shall not have been vacated, stayed, reversed, or (except with the express written consent of the Lender), amended, supplemented or otherwise modified, except by the Final DIP Order.

"Lender" has the meaning set forth in the introductory paragraph of this Loan Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" means the principal amount of each borrowing made under this Loan Agreement or the principal amount outstanding of such borrowing.

"Loan Documents" means, collectively, this Loan Agreement, the Interim DIP Order or Final DIP Order (as applicable), and any other agreements, instruments, certificates, and documents relating to any of the foregoing documents, as the same may be amended, supplemented and/or otherwise modified from time to time in accordance with the terms thereof.

"Material Adverse Effect" means a material adverse effect on the business, assets or operations of STARTECH and its direct or indirect, parent, affiliate or subsidiaries taken as a whole; provided, however, Borrower and Lender both acknowledge and agree that Borrower is not operating at the time of this Agreement and that the interpretation of this provision will be made with that understanding.

"Maturity Date" means the earliest of (a) the date of termination in whole of the Commitment pursuant to Section 2.6(b); (b) the date ninety (90) days after the Petition Date; (c) the date thirty-five (35) days after the Closing Date if the Final DIP Order has not been entered by the Court by such date; (d) the first date on which all consideration to be paid or provided by the purchaser in any sale, transfer or other disposition of all or substantially all of the Assets pursuant to Section 363 of the Bankruptcy Code has been paid or provided; and (e) the date thirty (30) days after the date of the consummation of a plan of reorganization in the Chapter 11 Case, as specified in such plan or plans.

"STARTECH" has the meaning set forth in the introductory paragraph of this Loan Agreement.

"Obligations" means all obligations of every nature of STARTECH under the Loan Documents, including, without limitation, any liability of STARTECH on any claim, whether or not the right to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy, insolvency, reorganization or other similar proceeding. Without limiting the generality of the foregoing, the Obligations of STARTECH under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by STARTECH under any Loan Document and (b) the obligation to reimburse any amount in respect of any

of the foregoing that the Lender, in its sole discretion, may elect to pay or advance on behalf of STARTECH.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising under the laws of the United States of America or any state within the United States of America from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Loan Agreement.

"Person" means any individual, firm, sole proprietorship, partnership, joint venture, corporation, limited liability company, association, business enterprise trust, unincorporated organization, government or department or agency thereof, or other entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date" has the meaning set forth in the recitals to this Loan Agreement.

"Sale Transaction" means a sale, in one or a series of related transactions, of the business of Borrower as a going concern under Section 363 of the Bankruptcy Code and/or all or any substantial portion of the assets of Borrower. The purchase documents and all other relevant documents executed in connection with the Sale Transaction related to the Asset sale shall be in form and substance satisfactory to Lender if Lender is the ultimate purchaser of such assets.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

### Section 2.    Amount and Terms of Loans.

2.1    Commitment and Loans.

(a)    Subject to the terms and conditions hereof, the Lender agrees to make Loans consistent with the Budget to STARTECH from time to time during the Availability Period in an aggregate principal amount not to exceed the Lender's Commitment. Within the foregoing limits and subject to the terms and conditions set forth herein, STARTECH may borrow, prepay and reborrow the Loans.

(b)    Anything contained in this Loan Agreement to the contrary notwithstanding, (1) in no event shall (A) the aggregate principal amount of the Loans at any time outstanding exceed the lesser of (x) the Commitment and (y) the amount permitted to be outstanding hereunder pursuant to the Interim DIP Order or Final DIP Order, as applicable, in each case as the foregoing limits may be in effect from time to time and (ii) STARTECH agrees to immediately prepay the Loans in the amounts and at the times as may be necessary to comply with the foregoing clause (1).

2.2    Procedure for Loan Borrowing.

7

(a)     To request a borrowing, STARTECH shall notify the Lender of such request by telephone not later than 11:00 a.m., Pacific Time on Tuesday of each week. Each such telephonic borrowing request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Lender of a written borrowing request. Each such telephonic and written borrowing request shall specify the following information: (1) the aggregate amount of the requested borrowing; (ii) the date of such borrowing, which shall be a Business Day during the Availability Period; and (iii) wire transfer instructions of STARTECH's account to which proceeds of such borrowing are to be disbursed.

(b)     Subject to the satisfaction of the conditions set forth in Section 3 and the other terms and conditions hereof (including the Budget), the Lender shall make each Loan hereunder on Thursday of each week by wire transfer in immediately available funds by 1:00 p.m., Pacific Time, to the account of STARTECH designated by it for such purpose to the Lender pursuant to Section 2.2(a)(iii) (each, an "Advance").

(c)     Notwithstanding clause (a) above, STARTECH hereby requests a borrowing in the aggregate principal amount of [$_____ ] (the "Initial Borrowing") to be made on the date the Interim DIP Order is approved by the Court and, subject to the satisfaction of the other conditions in Section 3.1, the Lender agrees to make a Loan to STARTECH in such amount, the proceeds of which shall be disbursed to STARTECH's account as notified to the Lender.

2.3     Interest Rate.

(a)     The unpaid principal amount of each Loan shall bear interest, for the period from the date of the borrowing of such Loan until the date such Loan shall be paid in full, at a rate per annum equal to eight per cent (8%), such interest to be paid in accordance with Section 2.7.

(b)     So long as an Event of Default has occurred and is continuing under Section 5.1 (a) or so long as any other Event of Default has occurred and is continuing and at the election of Lender confirmed by written notice from Lender to Borrower, and without further notice, motion or application to, hearing before, or order from the Bankruptcy Court, the interest rates applicable to the Loan shall be increased by eight percentage points (8%) per annum above the rates of interest otherwise applicable hereunder unless Lender elects to impose a smaller increase (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

2.4     Computation of Interest and Fees. Interest on the Loan shall be calculated based on monthly compounding as of the first day of each month following the date of the Initial Borrowing.

2.5     Prepayment.  STARTECH may, at any time and from time to time, prepay any Loan, in whole or in part, without premium or penalty, subject to its providing the Lender with at least two (2) Business Day prior written notice of such prepayment.

2.6     Termination and Reduction of Commitment.

(a)     Scheduled Termination.  Unless previously terminated pursuant to the terms hereof, the Commitment shall terminate on the Maturity Date.

(b)     Voluntary Termination or Reduction.  STARTECH may at any time terminate, or from time to time reduce, the Commitment; provided that (1) each reduction of the Commitment shall be in an amount that is an integral multiple of $10,000 and not less than $100,000 and (ii) STARTECH shall not terminate or reduce the Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.1(b), the aggregate principal amount of outstanding Loans would exceed the total Commitment.

(c)     Notice of Voluntary Termination or Reduction.  STARTECH shall notify the Lender of any election to terminate or reduce the Commitment under paragraph (b) of this Section at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Each notice delivered by STARTECH pursuant to this Section shall be irrevocable.  Any termination or reduction of the Commitment shall be permanent.

2.7     Repayment.  All unpaid principal of and all accrued but unpaid interest, fees and expenses on the Loan shall be payable to the Lender in full in cash on the Maturity Date.

2.8     Taxes.  STARTECH shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

2.9     Use of Proceeds.  The proceeds of the Loans shall be applied, subject to the Budget in all respects, solely to (a) provide liquidity for STARTECH to fund working capital for its post-petition business operations and (b) pay fees and expenses in connection with this Loan Agreement and the administration of the Chapter 11 Case; provided that no portion of the Loans shall be used, directly or indirectly, by STARTECH, any official committee, or any person or entity, as applicable, to (1) make any payment or prepayment that is prohibited under this Loan Agreement; (ii) make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; or (iii) to prosecute any claims or causes of action against Lender, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code.

2.10     Grant of Security.

(a)     As security for the prompt and complete payment and performance of the Obligations when due (whether due because of stated maturity,

9

acceleration, mandatory prepayment, or otherwise) and to induce the Lender to make the Loan, the Borrower grants to the Lender for the benefit of the Lender a continuing security interest in the Collateral. The security created under this Loan Agreement is continuing security for the irrevocable and indefeasible payment in full of the Obligations, regardless of any intermediate payment or discharge in whole or in part.

        (b)    Pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, the security interest provided for herein will constitute, upon entry of the Interim DIP Order by the Court, (i) a first-priority, valid, binding, enforceable and perfected Lien on the Assets and any Collateral not subject to a validly perfected lien as of the Petition Date, and (ii) a junior, valid, binding, enforceable and perfected Lien on all other Collateral, except as otherwise provided in the Interim DIP Order or the Final DIP Order, as applicable, and

        (c)    subject only to the Carve-Out.

    2.11   <u>Superpriority Nature of Obligations</u>.  All Obligations under the Loan Documents shall constitute allowed administrative expense claims in the Chapter 11 Case against STARTECH with a priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 503(b), 507(a), 507(b) and 726 of the Bankruptcy Code; provided that, the priority status of the Obligations and the Liens securing the same shall be subject to the Carve-Out and the superpriority status shall be subject to pari passu treatment with respect to proceeds of any claims under Chapter 5 of the Bankruptcy Code.

    2.12   <u>Indemnity</u>.

        (a)    Borrower shall indemnify and hold harmless Lender and its respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of the Obligations and credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all environmental liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided that Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct. No Indemnified Person shall be responsible or liable to any other party to the Loan Document, any successor,

assignee or third-party beneficiary of such person or any other person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of the Obligations and credit having been extended, suspended or terminated under any Loan Document or as a result of any other transaction contemplated hereunder or thereunder.

2.13   Single Loan. The Loan to Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of that Borrower secured, until the Maturity Date, by all of the Collateral.

2.14   Application and Allocation of Payments.

(a)   All payments made whether consisting of proceeds of Collateral or otherwise and received when an Event of Default has occurred and is continuing or following the Commitment Termination Date shall be applied to amounts in the following order: (1) to Fees; (2) to interest on the Loan, ratably in proportion to the interest accrued as to the Loan; (3) to principal payments on the Loan; (4) to all other Obligations; and (5) to Borrower, its successors and assigns, or as a court of competent jurisdiction may direct.

(b)   Lender is authorized to, and at its sole election may, charge to the Loan balance on behalf of Borrower and cause to be paid all Fees, expenses, charges, costs and interest and principal, other than principal of the Loan, owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due. At Lender's option and to the extent permitted by law, any charges so made shall constitute part of the Loan hereunder.

2.15   Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court; provided, however, that, at the closing of the Sale Transaction with respect to the Assets, Lender may, in its sole discretion, elect to credit all or any portion of the Obligations due hereunder against the purchase price payable by Lender (or any designated Affiliate thereof) to Borrower for the Assets pursuant to the terms of such Asset Purchase Agreement.

2.16   Fees. On the date of the Initial Borrowing hereunder, Borrower shall pay to Lender a transaction fee in the amount of $35,000; provided, however, that Lender expressly agrees that this transaction fee shall not be used by Lender as any portion of Lender's credit bid for the Assets pursuant to the terms of the Asset Purchase Agreement or in any auction contemplated by such agreement and in the event Lender is the successful purchaser of the Assets, then Lender shall waive the fee.

**Section 3.**     **Conditions Precedent to Loans**

3.1     <u>Conditions to the Occurrence of the Closing Date</u>.  The obligations of the Lender to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived by the Lender, in its sole discretion):

(a)     <u>Interim DIP Order</u>.  The Interim DIP Order shall have been entered by the Court.

(b)     <u>Pleadings</u>.  No Final Order shall have been entered (i) dismissing or converting the Chapter 11 Case to a Chapter 7 Case, (ii) appointing a Chapter 11 trustee in the Chapter 11 Case, (iii) appointing an examiner having enlarged powers relating to the operation of the business of STARTECH (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (iv) except for the granting of a super-priority lien to the Prepetition Lender, granting a super-priority claim or a Lien *pari passu* or senior to that of Lender granted pursuant hereto, including the Interim DIP Order, other than in respect of the Carve-Out, (v) staying, reversing, vacating, or otherwise modifying the Interim DIP Order without the prior written consent of the Lender, or (vi) granting relief from the automatic stay (or any other injunction having similar effect) so as to allow a third party to proceed against any material property or assets of STARTECH.

3.2     <u>Conditions to Each Borrowing of a Loan</u>.  The obligation of the Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of the following conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of STARTECH set forth in this Loan Agreement shall be true and correct in all material respects on and as of the date of such borrowing.

(b)     <u>Events of Default</u>.  At the time of and immediately after giving effect to such borrowing, no Event of Default shall have occurred and be continuing.

(c)     <u>Budget</u>.  No Material Budget Deviation shall have occurred, unless promptly cured, as provided herein, or as consented to by Lender.

(d)     <u>Final DIP Order</u>.  With respect to each borrowing other than those authorized pursuant to the Interim DIP Order, the Final DIP Order shall have been entered by the Court.

(e)     <u>Asset Purchase Agreement</u>.   With respect to each borrowing other than the Initial Borrowing set forth in Section 2.2(c), the Borrower and the Lender shall have made good faith efforts to finalize the terms of the Asset Purchase Agreement related to a sale of the Business and the Assets, and the Borrower shall have filed a motion with the Court to approve bidding procedures with respect to such Asset Purchase Agreement.

**Section 4.     Representations and Warranties of the Borrower.**

STARTECH hereby represents and warrants to Lender as of the date hereof and as of the Closing Date as follows:

4.1     Organization.  STARTECH is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and, subject to compliance with any applicable provisions of the Bankruptcy Code, has full power and authority to own its own properties and to carry on its business as currently conducted. STARTECH is in material compliance with all applicable orders of the Court.

4.2     Authority, Binding Effect.  Upon entry of the Interim DIP Order or the Final DIP Order, as the case may be, STARTECH has full corporate power and authority to execute and deliver the Loan Documents to which it is a party and to perform its obligations under such documents.  The execution, delivery and performance by STARTECH of the Loan Documents to which it is a party (a) have been duly and validly authorized by all necessary action by the board of directors of STARTECH and (b) have been, or by the Closing Date will be, duly authorized by the Court.  The Loan Documents to which STARTECH is a party have been duly and validly executed and delivered by STARTECH and constitute the legal, valid and binding obligations of STARTECH enforceable against STARTECH in accordance with their terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity.

4.3     No Conflicts.  The execution, delivery and performance by STARTECH of the Loan Documents to which it is a party does not and will not:

(a)     conflict with or result in a violation or breach of any of the terms, conditions or provisions of its certificate of incorporation or formation or by-laws, as applicable, or an applicable order of the Court; or

(b)     result in a violation or breach of any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in the United States of America, any foreign country, or any domestic or foreign state, county, city or other political subdivision or of any governmental or regulatory authority, applicable to STARTECH or any of its assets and properties; or

(c)     require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for the Court and (1) Hart-Scott-Rodino and other filings under antitrust and related laws and regulations and filings pursuant to Exon-Florio laws and related regulations, (ii) filings such as have been obtained or made and are in full force and effect, and (iii) other filings, consents, approvals or registrations, as to which the failure to make or obtain such filings, consents, approvals or registrations would

13

not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

4.4    Chapter 11 Case. The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final DIP Order has been given as identified in the Certificate of Service filed with the Court.

4.5    The Orders. On the date of the making of the initial Loans hereunder, the Interim DIP Order will have been entered. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations of STARTECH hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Court.

4.6    Budget.

(a)    Borrower has prepared and delivered to Lender an initial eight (8) week Budget, annexed hereto as Exhibit A. The initial Budget has been thoroughly reviewed by Borrower and its management and sets forth for the periods covered thereby, among other things, projected weekly operating cash disbursements for each week commencing with the week ending May 7, 2010 (collectively, the "Projected Information"). In addition to the initial Budget, Borrower shall thereafter deliver to Lender periodic updates to the Budget, which updated Budgets shall be acceptable to Lender in its sole discretion.

(b)    Borrower acknowledges, confirms and agrees that commencing with the trailing two (2) week period ending on May 14, 2010 ("Week 2"), and for the trailing two (2) week period ending on the Saturday of each week thereafter, the actual weekly cash disbursements during such period shall not have a negative deviation from the relevant Projected Information for such period set forth in the Budget of more than twenty percent (20%) in the aggregate; provided that any positive deviation in any period or the aggregate Projected Information for a two week period, may be applied to the corresponding period or aggregate Projected Information, as the case may be, for the following two week period.

(c)    By no later than 5:00 p.m. (Pacific time) on the Wednesday (or, if not a Business Day, on the next Business Day thereafter) of every other week commencing on Week 2, Borrower shall furnish to Lender, in form and substance satisfactory to Lender, a report that sets forth for the immediately preceding two-week period the actual cash disbursements in comparison to the Projected Information for such periods set forth in the Budget on a cumulative, weekly roll-forward basis, together with a certification from the chief financial officer of Borrower that no Material Budget Deviation has occurred, except as permitted in this Agreement. Each such updated Budget shall be in form and substance satisfactory to Lender and approved by Lender in its reasonable discretion.

14

(d)    Borrower hereby confirms, acknowledges and agrees that (i) a failure to maintain the minimum deviations in the Budget as set forth in Section 4.6 (b) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver any Budget or any reports with respect to any Budget, in form and substance satisfactory to Lender, as provided in Section 4.6(c) hereof, shall constitute an Event of Default.  Notwithstanding any approval by Lender of the initial Budget or any subsequent or amended Budget(s), Lender will not, and shall not be required to, provide any Advances to Borrower pursuant to the Budget, but shall only provide the Loan in accordance with the terms and conditions set forth in the Loan Agreement and the Interim Order and Final Order.  Lender is relying upon Borrower's delivery of, and compliance with, the Budget in accordance with this Section 4.6 in determining to enter into the post-petition financing arrangements provided for herein.

**Section 5.    Events of Default and Remedies.**

5.1    Events of Default.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to Borrower, and subject to Section 5.2(b), the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    failure to make any payment of principal of or interest on the Loan or any other amount payable hereunder when due according to the terms hereof and such default shall continue unremedied for five (5) Business Days;

(b)    any representation or warranty made by or on behalf of STARTECH in this Loan Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been inaccurate in any material respect when made and, if such inaccuracy is susceptible to being cured, such inaccuracy shall continue unremedied for a period of 30 days after the earlier of actual knowledge by a senior officer of STARTECH of such inaccuracy or written notice thereof from the Lender;

(c)    STARTECH shall fail to observe or perform any covenant, condition or agreement contained in this Loan Agreement or any Loan Document and such failure shall continue unremedied for a period of 10 days after the earlier of actual knowledge by a senior officer of STARTECH of such failure or written notice thereof from the Lender delivered in accordance with Section 10.8;

(d)    with respect to the Chapter 11 Case, the entry of an order authorizing STARTECH in the Chapter 11 Case to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code with priority senior or *pari passu* to any Obligations hereunder; (b) appointing an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner having enlarged powers relating to the operation of the business of STARTECH (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) in the Chapter 11 Case; (c) without the prior written consent of the Lender, dismissing

15

the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (d) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral or (y) with respect to any Lien of, or the granting of any Lien on any Collateral or any other property or assets of STARTECH to, any State or local environmental or regulatory agency or authority; (e) without the prior written consent of the Lender, amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim DIP Order, the Final DIP Order or this Loan Agreement or any other Loan Document or any of the Lender's rights, benefits, privileges or remedies under the Interim DIP Order, the Final DIP Order, this Loan Agreement or any other Loan Document; or (f) approving, or there shall arise, any other administrative expense claim (other than those specifically referred to in the definition of "Carve-Out" in Section 1) having any priority over, or being *pari passu* with, the administrative expense priority of the Obligations in respect of the Chapter 11 Case;

(e)     any money judgment, writ or warrant of attachment, or similar process involving (1) an amount in any individual case in excess of two-hundred fifty thousand dollars ($250,000) or (ii) an amount in the aggregate at any time in excess of two-hundred fifty thousand dollars ($250,000) (in either case to the extent not covered by insurance as to which the insurance company has not declined coverage) is, after the Petition Date, entered or filed against the Borrower or any of its respective assets and remains undischarged, unvacated, unbonded or unstayed for a period of twenty (20) days or in any event later than five (5) Business Days prior to the date of any proposed sale thereunder, unless any of the foregoing occurred as a result of an action taken in violation of the automatic stay;

(f)     any order, judgment or decree is entered against the Borrower decreeing the dissolution or split up of the Borrower and such order remains undischarged or unstayed for a period in excess of five (5) days;

(g)     any of the Loan Documents for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or the Borrower denies that it has any further liability under any Loan Documents to which it is party, or gives notice to such effect;

(h)     a Material Budget Deviation shall have occurred; or

(i)     the failure by Borrower to comply with any of the covenants set forth on Schedule S hereto;

(j)     the occurrence of any of the following in the Chapter 11 Case:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, in each case, by the Borrower in the Chapter 11 Case, or the entry of any order by the

16

Bankruptcy Court in the Chapter 11 Case to grant any Lien upon or affecting any Collateral;

(ii)     the entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization that does not contain a provision for repayment in full in cash of all of the Obligations under this Loan Agreement on or before the effective date of such plan or plans;

(iii)     the sale without the Lender's consent, of all or substantially all of the Assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the Obligations, except as otherwise provided herein;

(iv)     the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Loan Agreement or the other Loan Documents; or

(v)     the termination or modification of exclusivity as to the proposal of any reorganization plan.

5.2     Remedies.

(a)     If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the Loan facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Event of Default is continuing.  If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b)     If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court:  (1) terminate the Loan facility with respect to further Advances; (ii) reduce the Commitment from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iv) subject to the rights of the Prepetition Lender, exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice,

application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon three (3) Business Days' prior written notice to Borrower, counsel for the Committee and the United States Trustee and as set forth in the Interim Order or Final Order (when applicable). Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents, Borrower shall use commercially reasonable efforts to assist Lender in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to Lender.

       5.3    <u>Waivers by Borrower</u>. Except as otherwise provided for in this Agreement or by applicable law, Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

      **Section 6.**    **Affirmative Covenants.** So long as the Loan remains outstanding, or prior to or on the date specified below, as applicable, STARTECH hereby covenants with Lender:

       6.1    <u>Payment of Obligations</u>.

         (a)    STARTECH will pay its post-petition obligations set forth in and up to and in accordance with the amounts set forth in the Budget (subject to any deviations permitted pursuant to Section 4.6(b)).

         (b)    STARTECH shall not (1) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Indebtedness or other pre-Petition Date obligations of such Person, (ii) pay any interest on any Prepetition Indebtedness of such Person (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to any provision of the Bankruptcy Code, or apply to the Court for the authority to do any of the foregoing; provided that (a) STARTECH may make payments provided for within the Carve-Out, (b) STARTECH may pay any post-Petition Date expense incurred in the ordinary course of business including usual and customary post-Petition Date employee salaries and benefits in accordance with the Budget, and (c) STARTECH may make payments to such other claimants and in such amounts as may be approved by the Court.

6.2     Legal Existence. STARTECH will maintain its legal existence, good standing, and the rights, licenses and franchises necessary for the operation of its business.

6.3     Bankruptcy Pleadings. Promptly after the same is available, STARTECH shall furnish or cause to be furnished to counsel for the Lender in unredacted form all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of STARTECH with the Court or the United States Trustee in the Chapter 11 Case.

6.4     Sale Transaction.

(a)     Borrower shall comply with each of the covenants contained on Schedule S upon the terms and at the times as provided for therein.

(b)     Borrower shall provide Lender with a right of first negotiation to become the "stalking horse" bidder with respect to any Sale Transaction or other transaction concerning the Business or the Assets.

6.5     Compliance with Laws. Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

6.6     Further Assurances.

(a)     STARTECH will execute and file with the Court any and all further documents, financing statements, agreements, and instruments, that may be required under any applicable law, or that Lender may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Loan Documents or the validity or priority of any such Lien, all at the expense of STARTECH.

(b)     If any material assets are acquired by STARTECH after the Closing Date (other than assets constituting Collateral hereunder that become subject to the Lien of the Lender upon acquisition thereof and the proceeds of claims or causes of action that are excluded from the Liens granted to the Lender in accordance with Section 2.10(a) of this Loan Agreement), STARTECH will notify Lender thereof, and STARTECH agrees that such assets will be subject to a Lien securing the Obligations and will execute such documents as shall be necessary or reasonably requested by Lender to grant and perfect such Liens, including the documents described in paragraph (a) of this Section 6.6, all at the expense of STARTECH.

(c)     STARTECH agrees to modify the automatic stay to permit the creation and perfection of Lender's Liens and the enforcement of the Lender's default-related rights and remedies in accordance with this Loan Agreement, the other Loan Documents and applicable law.

**Section 7.    Negative Covenants.**  So long as the Loan remains outstanding, or before or on the date specified below, as applicable, STARTECH hereby covenants with the Lender:

7.1    <u>Indebtedness and Other Obligations</u>.  STARTECH will not, without prior written consent of the Lender, create, incur, assume or permit to exist any post-petition Indebtedness, except Indebtedness created under the Loan Documents, Indebtedness in compliance with the Budget and Indebtedness to satisfy the Obligations under this Loan Agreement.  Furthermore, no Indebtedness incurred in compliance with the Budget shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the super-priority administrative expense claims of Lender, as set forth herein and in the Interim DIP Order and the Final DIP Order.

7.2    <u>Liens</u>.  STARTECH will not, without prior written consent of the Lender, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)    Liens created under the Loan Documents;

(b)    Liens to secure Indebtedness permitted by Section 7.1 of this Loan Agreement;

(c)    Liens to secure the Indebtedness of the Prepetition Lender; or

(d)    Liens to satisfy the Obligations under this Loan Agreement that are junior to the Liens identified in paragraphs (a) and (b) of this Section 7.2.

**Section 8.    Usury.**  Notwithstanding any provision to the contrary hereunder, if the rate of interest payable pursuant to this Loan Agreement is limited by law, the rate payable hereunder shall be the lesser of. (a) the rate set forth in this Loan Agreement and (b) the maximum rate permitted by law.  If interest is paid hereunder in excess of the maximum rate of interest permitted by law, any interest so paid that exceeds such maximum rate shall automatically be deemed to be a payment of principal and shall automatically be applied in reduction of the principal due under this Loan Agreement to the extent of such excess.

**Section 9.    Assignment; Withholding.**

9.1    The provisions of this Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that STARTECH may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender {and any attempted assignment or transfer by STARTECH without such consent shall be null and void).

9.2    The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Loan Agreement.  Subject to notification of an assignment,

the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Loan Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Loan Agreement. STARTECH hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment. Any assignment or transfer by the Lender of rights or obligations under this Loan Agreement that does not comply with this Section shall be treated for purposes of this Loan Agreement as a sale by the Lender of a participation in such rights and obligations. Notwithstanding anything to the contrary herein, the Lender may freely pledge and collaterally assign any of its rights, titles and interests in any Loan Documents without the consent of STARTECH and without the requirement to notify STARTECH of such pledge or collateral assignment (it being understood that any such pledge would be subject to the applicable provisions of Article 9, Part 4 of the California Uniform Commercial Code).

### Section 10.    Miscellaneous

10.1    <u>Complete Agreement; Modification of Agreement</u>. This Loan Agreement, the other Loan Documents, the Interim DIP Order and the Final DIP Order represent the final agreement between the parties with respect to the matters addressed hereby and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreement of the parties and may not be modified, altered or amended except as set forth in Section 10.2 of this Loan Agreement.

10.2    <u>Amendments</u>. Neither this Loan Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in a writing signed by STARTECH and the Lender. Any such amendment, supplement or modification shall be binding upon STARTECH and the Lender and any assignees of the Lender. In the case of any waiver, STARTECH and Lender shall be restored to their former position and rights hereunder and under any other Loan Documents, and any Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

10.3    <u>No Waiver</u>. Lender's failure, at any time or times, to require strict performance by STARTECH of any provision of this Loan Agreement or any other Loan Document shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of Sections 5 and 10.2 of this Loan Agreement, none of the undertakings, agreements, warranties, covenants and representations of STARTECH contained in this Agreement or any of the other Loan Documents and no Event of Default by STARTECH shall be deemed to have been suspended or waived by the Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender, and directed to STARTECH specifying such suspension or waiver.

10.4    Severability.  Wherever possible, each provision of this Loan Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Loan Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

10.5    Conflict of Terms.  IF ANY PROVISION IN THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT CONFLICTS WITH ANY PROVISION IN THE INTERIM FINANCING ORDER OR THE FINAL FINANCING ORDER, THE PROVISION IN THE INTERIM DIP ORDER OR THE FINAL DIP ORDER SHALL GOVERN AND CONTROL.

10.6    Confidentiality.  STARTECH and the Lender shall take reasonable precautions, in accordance with their customary procedures for handling confidential information of the same nature, to maintain the confidentiality of all non-public information obtained pursuant to the requirements of this Loan Agreement or any other Loan Document but may, in any event, make disclosures (a) reasonably required by any permitted transferee, assignee or participant in connection with the contemplated transfer or assignment of any of the Loan, provided that such transferee, assignee or participant agrees in writing to comply with the provisions of this Section 10.6, or (b) as required or requested by any governmental agency or representative thereof or as required pursuant to legal process, or (c) to its attorneys and accountants, or (d) as otherwise required by law, or (e) in connection with litigation involving STARTECH or the Lender.

10.7    Governing Law.  This Loan Agreement shall be governed by, and construed in accordance with, the law of the State of California and the Bankruptcy Code, as applicable, without regard to the choice of law provisions thereof.  Subject to the jurisdiction of the Court, the parties hereto irrevocably and unconditionally submit to the nonexclusive jurisdiction of the United States Bankruptcy Court of the Central District of California, and any relevant appellate court, in any suits arising hereunder or under any other Loan Document.

10.8    Notices.

(a)    Addresses.  All notices, demands, requests, directions and other communications required or expressly authorized to be made by this Loan Agreement shall, whether or not specified to be in writing but unless otherwise expressly specified to be given by any other means, be given in writing and addressed to the party to be notified and sent to the address or facsimile number indicated on the signature page hereof.  Except for requests for waivers, permissions or consents, and responses to such requests, transmission by electronic mail shall not be sufficient or effective to transmit any such notice under this clause (a).

22

(b)     Effectiveness.  All communications described in clause (a) of this Section 10.8 above and all other notices, demands, requests directions and other communications made in connection with this Loan Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, when deposited in the mails, and (iv) if delivered by facsimile, upon sender's receipt of confirmation of proper transmission.  Communications permitted to occur by electronic mail shall be deemed to have been received when the electronic mail is acknowledged, responded to, or forwarded.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

10.9   Survival of Representations, Warranties and Covenants.  The representations, warranties and covenants contained in this Loan Agreement shall survive the Closing Date.

10.10   Costs; Attorney's Fees.  STARTECH shall pay at Maturity, or if incurred after Maturity within twelve (12) Business Days after demand therefor, (i) all the costs and expenses incurred by the Lender, including the fees and disbursements of counsel to the Lender, in connection with the negotiation of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), the administration of any of the Loan Documents, and any amendments, modifications or waivers of the provisions hereof and thereof, (ii) all costs and expenses of the Lender, including the fees and disbursements of counsel to the Lender, in connection with the Chapter 11 Case arising from the Petition Date through and including the Maturity Date and (iii) all costs and expenses incurred by the Lender, including the costs and expenses of collection and attorneys' fees of counsel selected by the Lender, for the purpose of enforcing the terms of this Loan Agreement and other Loan Documents or protecting the Lender's interest hereunder or thereunder.

10.11   Parties Including Trustees; Court Proceeding.  This Loan Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender, and the assigns, transferees and endorsees of the Lender.  The security interests and Liens created in or pursuant to this Loan Agreement and the other Loan Documents shall be and remain valid and perfected, and the claims of the Lender hereunder valid and enforceable in accordance with the terms hereof, notwithstanding the discharge of STARTECH pursuant to 11 U.S.C. § 1141, the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Case or any subsequent Chapter 7 case or the release of any Collateral from the property of STARTECH. The security interests and Liens created in or pursuant to this Loan Agreements and the other Loan Documents shall be and remain valid and perfected without the necessity that the Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.  This Loan Agreement, the claims of the Lender hereunder, and all security interests or Liens created hereby or pursuant hereto or by or pursuant to any other Loan Document shall at all times be binding upon STARTECH, the estate of STARTECH and any

23

trustee appointed in any Chapter 7 case, or any other successor in interest to STARTECH. This Loan Agreement shall not be subject to Section 365 of the Bankruptcy Code.

10.12   Counterparts.  This Loan Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.13   Entire Agreement.  This Loan Agreement (including any Exhibits hereto), the other Loan Documents, the Interim DIP Order and the Final DIP Order represent the final agreement between the parties with respect to the matters addressed hereby and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreement of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

(Signature pages follow)

**"STARTECH":**

Startech Environmental Corporation, a
Colorado corporation,
as debtor and debtor-in-possession


By: _____
Name:
Title:

Address for Notices:

Startech Environmental Corp.
88 Danbury Road
Wilton, CT 06897

**"Lender":**

Champion Energy, Inc., a California
Corporation


By: _____
Name:
Title:

Address for Notices:

Champion Energy, Inc.
412 Kato Terrace
Fremont, CA 94539

## SCHEDULE S

        (a)     On or before fifteen (15) days from the Petition Date, Borrower shall have entered into a stalking horse bid for a Sale Transaction covering the sale of the Assets that will result in Borrower's receipt of cash in an amount sufficient to pay the Obligations (or, if Lender so desires in its sole discretion, the amount of the Obligations, except as provided in § 2.16, shall be permitted to be credit bid on a dollar-for-dollar basis in the Sale Transaction selling the Assets).

        (b)     On or before , forty (40) days from the Petition Date the Bankruptcy Court shall have approved and entered a sales procedures order with respect to the Sale Transactions (the "Bid Procedures Order"), which such order shall be in form and substance satisfactory to Lender.

        (c)     On or before seventy-five (75) days from the Petition Date, Borrower shall receive the approval from the Bankruptcy Court for the Sale Transactions of the Assets and the order approving the Sale Transaction covering the Assets shall be in form and substance satisfactory to the Lender.

        (d)     On or before ninety (90) days from the Petition Date, the Asset Purchase Agreement and all other relevant documents in connection with the Sale Transaction related to the Business or the Assets shall have been executed and such Sale Transaction consummated.

12455192.7