# EXHIBIT "A"

# AGREEMENT BETWEEN
# STARTECH ENVIRONMENTAL CORPORATION & GENERAL CAPITAL PARTNERS, LLC

**THIS AGREEMENT** (the "*Agreement*") is made this ___ day of May 2010 (the "*Effective Date*") by and between Startech Environmental Corporation located at 88 Danbury Road, Wilton, CT 06897 (the "*Company*"), and General Capital Partners, LLC, a Colorado limited liability company with offices at 600 17th Street, Suite 2350 South, Denver, CO 80202 ("*GCP*"). The Company and GCP are collectively referred to herein as the "*Parties*"; each of them is individually referred to herein as "*Party.*"

## R E C I T A L S

**WHEREAS**, the Company is an environment and energy industry company in business of production and sale of renewable energy and its proprietary processing equipment (collectively, the "*Assets*");

**WHEREAS**, the Company has on filing a voluntary petition for relief under Chapter 11 of the United States Code (the "*Bankruptcy Code*"), and wishes to retain GCP as the Company's professionals pursuant to sections 327 and 328(a) of the Bankruptcy Code and approval of the Bankruptcy Court;

**WHEREAS**, the Company is a publicly traded company in the business of the production and sale of renewable energy and its proprietary processing equipment;

**WHEREAS**, the Company may desire to raise capital in the form of debt or equity, for use by the Company as working capital or to restructure, or refinance, or facilitate a disposition of all or a portion of the Assets or Stock of the Company or to enter into a merger or joint venture or to ;

**WHEREAS**, the Company may desire to sell all or a portion of the Assets or Stock of the Company, or enter a merger or joint venture with another Partner, or purchase all or a portion of the Assets or Stock of another Company;

**WHEREAS,** GCP is an enterprise that specializes in, and has substantial experience with the provision of financial advisory and investment banking services to financially troubled companies including but not limited to: procurement of debt or equity capital, and the merger, acquisition, restructuring, or disposition of the Assets or Stock of going concerns; and

**WHEREAS,** the Company and GCP desire to enter into this Agreement which establishes both the services to be performed by GCP and the compensation to be paid to GCP for said services.

**NOW, THEREFORE,** in consideration of the promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and GCP hereby agree, subject to all the terms, covenants, conditions and provisions hereinafter set forth, as follows:

## ARTICLE I
## EXCLUSIVITY & RETENTION

1.1    Exclusivity.  The Company hereby retains GCP as its exclusive financial advisor and investment banker with respect to the evaluation of and pursuit of strategic options, contacting and negotiating with potential providers of debt or equity capital, or facilitating a merger, acquisition or disposition of all or a portion of the Assets or Stock of the Company.

1.2    Retention.  The term of this Agreement shall begin on the Date the Advisory Fee in section 4.2 is received by GCP and shall continue until the later of (i) one hundred and eighty (180) days after the Effective Date, (ii) the date on which a order is entered by the Bankruptcy Court confirming a plan of reorganization, (iii) the date on which an order is entered by the Bankruptcy Court dismissing the Company's Chapter 11 Case or (iv) the date on which an order is entered by the Bankruptcy Court approving a disposition of the Assets or Stock of the Company  (the "*Term*") or (v) the consummation of a Transaction or confirmation of a plan of reorganization or execution of a merger or joint venture agreement or material modification of an existing loan.

1.3    Contact with Potential Transaction Partners.  During the Term of this Agreement, the Company and their principals, managers, partners, employees, representatives, agents, or attorneys (collectively, the "*Company's Representatives*") agree that if the Company directly or indirectly contacts or approaches or is contacted  or approached by any individual or entity (collectively, "*Potential Transaction Partners*") whom the Company should reasonably believe may be interested in providing debt or equity financing to the Company, or acquiring all or a portion of the Assets or Stock of the Company, or entering into a merger or joint venture with the Company, or selling all or a portion of the Assets or Stock of another Company to the Company and the Company has not yet communicated the identity of and contact information for the Potential Transaction partner, that the Company will immediately alert GCP of such contact. Further, the Company acknowledges and understands that it is in the best interest of the Company that GCP maintain control of all communications with Potential Transaction Partners.  Therefore the Company and the Company's Representatives agree to provide GCP, within three (3) business days of such contact, the Potential Transaction Partner's contact information.

## ARTICLE II
## GCP SERVICES & COMMENCEMENT

2.1    Financial Advisory Services.   GCP shall perform financial advisory or investment banking services (the "*Services*"), as follows:

>   (a) Preparation of a marketing program and materials which may include solicitation of indications of interest via electronic communication, advertising on the or print media, mailing letters, posting fliers, and telephone solicitation and any other methods as GCP and the Company deem appropriate;

>   (b) Negotiate with Company's existing lenders or indebtedness holders to obtain temporary payment forbearance agreements, interest rate modifications, term modifications, release or relaxation of loan covenants or other changes to existing financing agreements as GCP and the Company deem appropriate:

AGREEMENT BETWEEN STARTECH ENVIRONMENTAL CORPORATION AND GENERAL CAPITAL PARTNERS, LLC

(c) Construct, with the Company provided data and projections, pro-forma cash flow and profit and loss models, and any other financial models which GCP and Company deem appropriate;

(d) Collect a set of due diligence materials prepared by the Company or the Company's representatives, including but not limited to a summary description of Company's existing business and financial condition, financial reports, valuations or appraisals, advertising materials, entity formation and operating documents, tax returns, asset lists, leases, or any other materials which GCP and the Company deem appropriate (collectively, the "*Due Diligence Materials*");

(e) Establish, maintain, and update, a secured, password-protected virtual data room (the "*VDR*") containing the Due Diligence Materials;

(f) Contact Potential Transaction Partners and attempt, on a best efforts basis, who may be interested in providing debt or equity financing to, or acquiring the Assets or Stock of, or entering into a merger or joint venture with, or selling the Assets or Stock of another Company to the Company;

(g) Obtain and maintain a file copy of an executed non-disclosure and confidentiality agreement (the "*NDCA*") from all interested Potential Transaction Partners;

(h) Provide access to and monitor the activity of all Potential Transaction Partners which have properly executed a NDCA to the VDR;

(i) Respond to requests from Potential Transaction Partners for any additional due diligence materials, management interviews, or site visits;

(j) Advise the Company regarding the interest and capacity of Potential Transaction Partners;

(k) Assist the Company in obtaining and evaluating letters of intent, memorandums of understanding, term sheets, or any other indications of interest from Potential Transaction Partners;

(j) Assist the Company, Company's counsel and Company's other professionals in negotiating, coordinating and consummating a transaction for the provision of debt or equity financing to the Company, or acquiring the Assets or Stock of the Company, or entering into a merger or joint venture with the Company, or selling the Assets or Stock of another Company to the Company; and

(l) Inform the Company of GCP's services and activities hereunder with periodic reports via electronic mail, voice conversations, or personal meetings on a schedule which GCP and the Company deem appropriate.

## ARTICLE III
## GROSS VALUE, VALUATION AND TRANSACTION

3.1  <u>Gross Value</u>.  If a transaction is consummated under this Agreement the term Gross Value (the "*Gross Value*") as used in this Agreement shall be the sum of all cash and non-cash consideration plus assumed liabilities that includes the aggregate consideration received by the Company, and holders of any secured, priority, or unsecured claims against the Company for the purpose of providing debt or equity financing to the Company, or acquiring all or a portion of the Assets or Stock of the Company, or entering into a merger or joint venture with the Company, or selling all or a portion of the Assets or Stock of another Company to the Company.  The Gross Value includes but is not limited to:

    (a) All cash received as consideration for a Transaction;

    (b)  All stock, equity interests, membership interests, and or partnership interests received as consideration for a Transaction;

    (c) All payments made in installments received as consideration for a Transaction;

    (d) All promissory notes, securities and other property received as consideration for a Transaction;

    (e) Any liabilities, including all debt and guarantees assumed, or refinanced on-balance sheet and off-balance sheet, less any Cash transferred to Buyer received as consideration for a Transaction;

    (f) Any contingent payments received as consideration for a Transaction;

    (g) Any interest or other payments actually received on or in respect of debt;

    (h) Any other payment actually received on or in respect to the equity interests (including, without limitation to the following, shareholder or membership interests) in the Company;

    (i) Any consideration payable under consulting agreements or non-compete agreements received as consideration for a Transaction;

    (j) Any assignment of leases, whether real or personal property received as consideration for a Transaction;

    (k) Any release from or assumption of bonds received as consideration for a Transaction;

    (l) Any credit bid tendered by a secured creditor of the Company while in relief under Chapter 11 of the Bankruptcy Code, pursuant to 11 U.S.C. § 363(k) of the Bankruptcy Code or Article 9 of the UCC, or a foreclosure proceeding or any other credit bid received as consideration for any Transaction; and

    (m) Any other consideration received by the Company in conjunction with this transaction.

3.2     No Deductions of Transaction Costs.  The fees of GCP, and all other closing costs or adjustments, including adjustments or payments of whatever kind to lien holders, secured parties, mortgagees or otherwise shall not be deducted when computing Gross Value or the fee to be paid GCP.

3.3     Valuation.  For purposes of calculating the Gross Value received, any non-cash distributions shall be valued as follows and consistent with:

(a) Publicly traded securities shall be valued at the average of their closing prices, as reported in The Wall Street Journal, for the five (5) trading days prior to the closing of the contemplated Transaction whereby such securities are exchanged as consideration, unless the value of such securities is disclosed in a court approved disclosure statement in support of a confirmed Chapter 11 plan, in the event that the Company files a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, the securities will then be valued based on such disclosure statement;

(b) Any other non-cash distributions shall be valued at the fair market value thereof on the day prior to closing as determined in good faith by the Company and GCP; and

(c) If the parties are unable to agree upon the value of any other property, its value will be determined by settled in accordance with Section 7.6.

3.4     Transaction.  As used herein the term Transaction (the "*Transaction*") shall include any transaction or series of transactions, which includes but is not limited to any merger, consolidation, business combination, or other transaction or series of transactions which is consummated and provides debt or equity financing to the Company, or where all or a portion of the Assets or Stock of the Company are acquired by a Purchaser, or where the Company enters into a merger or joint venture with a Purchaser or a Partner, or where all or a portion of the Assets or Stock of another Company are acquired by the Company.

3.5     The Purchaser or Partner.  As used herein the term Purchaser or Partner (the "*Purchaser*" or "*Partner*" or "*Lender*") shall include any person, group of persons, partnership, corporation or other entity including, without limitation, existing creditors, employees, affiliates, or shareholders which provides debt or equity financing to the Company, or where all or a portion of the Assets or Stock of the Company are acquired by a Purchaser, or where the Company enters into a merger or joint venture with a Purchaser or a Partner, or where all or a portion of the Assets or Stock of another Company are acquired from a Purchaser by the Company.

**ARTICLE IV**
**PAYMENT TERMS**

4.1     Expenses. In addition to the fees described below, and regardless of whether or not any transaction contemplated by this Agreement shall be proposed or consummated, the Company agrees, subject to bankruptcy court approval, to promptly reimburse GCP, on a monthly basis, for all out-of-pocket Expenses (the "*Expenses*") reasonably incurred by GCP in connection with the matters contemplated by this Agreement. Any single Expense which exceeds $1,000 shall be approved by the Company before any purchase. Expenses may include, without limitation: copy, facsimile and telephone charges, travel and accommodation charges, marketing and shipping

charges, and implementation and enforcement of the Agreement.  Expenses shall not include attorneys' fees for any party to this agreement or any third party beneficiary of this agreement. All Expenses will be payable within five (5) days of receipt of the bill there for.

      4.1.1    Phase One Environmental. *(Intentionally Omitted)*

4.2    Advisory Fee.  GCP shall be paid a single Advisory Fee (the "*Advisory Fee*") in the amount of Fifty Thousand Dollars ($50,000). The Advisory Fee shall be due in full upon the Effective Date of this Agreement.

*4.3* Reorganization or Loan Modification Transaction Fee. *(Intentionally Omitted)*

4.4    Sale Transaction Fee.  Upon the consummation of a Sales Transaction (as defined in Section 3.4) GCP shall receive a "Sales Transaction Fee" calculated as 25% of the Gross Value above the Champion Engineering Inc. initial stalking horse bid (the "Champion Stalking Horse Bid"). If a Sale Transaction occurs for the amount of the initial Champion Stalking Horse Bid or less, GCP shall not be entitled to any Sales Transaction Fee. GCP's Sales Transaction Fee is to be capped at, and shall not exceed $375,000 the Advisory Fee shall not operate to reduce the Sales Transaction Fee.

> **Example:** Assume Sale price is $2,000,000 and the Champion Stalking Horse Bid is $1,500,000 then GCP shall receive a Sale Transaction fee calculated as follows: $2,000,000 – $1,500,000= $500,000 x 25% = $125,000

4.5    Stalking Horse Bidder. *(Intentionally Omitted)*

4.6    Payment of the Reorganization, Financing and/or Sale Transaction Fee.  The Reorganization, Financing and/or Sale Transaction Fee shall be paid in cash at the realization or settlement and closing of any Reorganization, Financing or Sale Transaction resulting in Gross Value received by the Company or the Company's Affiliates.  The Company's execution of this Agreement shall authorize any escrow agent or counsel to pay to GCP its Reorganization, Financing or Sale Transaction Fee directly from the Gross Value received at the of the closing of any Transaction, subject to the approval of the bankruptcy court. The Expenses and the Reorganization, Financing or Sale Transaction Fee shall be carved out of the Gross Value directly or indirectly received by the Company, all creditors and their successors and assigns, and all other parties in interest.

      4.6.1    In the event of bankruptcy, the Company's execution of this Agreement, the Bankruptcy Court's approval of this Agreement, and the Bankruptcy Court's approval of the Transaction, any escrow agent or counsel shall be authorized to pay to GCP their Fee directly from the proceeds of the Transaction contemplated by this Agreement at the time of the closing of the sale transaction, this payment shall be subsequently reviewed by the Bankruptcy Court in accordance with section 328(a) of the U.S. Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Court Rules.

4.7    Payment of Expenses.  The Expenses incurred by GCP from the Effective Date of this Agreement shall be reimbursed to GCP in accordance with Section 4.1. The Expenses to be paid by the Company are separate and in addition to any Advisory Fee, Transaction Fee and/or Interim Financing Fee collected by GCP.

4.8     Third-Party Broker.  If GCP determines that additional Third-party Brokers representing a Purchaser has added value to a Transaction, then GCP reserves the sole right to determine whether the broker may be entitled to compensation to be paid out of the GCP Transaction Fee. GCP will consider all reasonable co-broker arrangements. This compensation will not be an additional fee paid by the Company. Any Third-Party Broker engaged by GCP on behalf of a Purchaser shall agree to indemnify and hold harmless GCP and the Company from any claims arising from any act or omission by Purchaser in conjunction with this Transaction.

4.9     Transaction Tail.  In the event this Agreement expires or is terminated, GCP shall be entitled to receive its Transaction Fee from any Transaction that results in Gross Value within twelve (12) months from the date of expiration or termination of this Agreement (the "*Tail Period*"), provided that the Transaction involves a Purchaser, or an affiliate of a Purchaser whose introduction to purchase opportunities regarding the Assets can be proven from the efforts of GCP during the time this Agreement was in effect. In the event that this Agreement should terminate, GCP shall provide to the Company a list of all parties contacted.

## ARTICLE V
## TERMINATION

5.1     Termination.  Either party to this Agreement may terminate this Agreement prior to the expiration of the Term with twenty (20) days written notice to the Company.

5.2     Termination by Foreclosure or Judgment.  This Agreement may be terminated prior to the expiration of the Term by a foreclosure or other court judgment in which the Company losses control of the Assets, in or out of Bankruptcy court.

5.3     Effect of Termination; Termination Fee. Except as set forth in Article IV and Article V, in the event of termination of this Agreement as provided in this Article V, then this Agreement shall forthwith become void and there shall be no liability or obligation on the part of either Party or its respective affiliates, officers, directors or stockholders; provided, however that the Company shall be obligated to reimburse GCP for Expenses and that the Tail Period shall be in effect, as provided in Article IV, unless the termination has been found to be "for cause".

## ARTICLE VI
## BANKRUPTCY PROCEEDINGS

6.1     Bankruptcy Court Retention.  The Company shall file a motion (the "Retention Motion") seeking entry of an order (the "Retention Order") approving this Agreement and authorizing the Company to retain GCP pursuant to the terms of this Agreement, as professional persons pursuant to sections 327 and 328(a) of the Bankruptcy Code, the Bankruptcy Rules, applicable local rules and orders of the Bankruptcy Court.  In the event of a conflict in the terms of the Retention Order, the Retention Motion and this Agreement, then the terms of this Retention Order shall control. GCP reserves the right to, and may, terminate its obligations under this Agreement, upon written notice to the Companys' Counsel if the Bankruptcy Court enters an order that is inconsistent with this Agreement or which deletes key provision of the same.  Insofar as the Company is able to affect bankruptcy proceedings, any Retention Order shall contain language that all of GCP's fees

as set forth in Article IV, shall be paid from any Gross Value received by the bankruptcy estate, subject to the terms of this Agreement.

6.2     Bankruptcy Conversion.  In the event that the Company files a Chapter 7 Bankruptcy proceeding or if a Chapter 11 proceeding is converted to a Chapter 7 proceeding, any Trustee so appointed shall not be bound by the terms of this Agreement, but GCP reserve their rights hereunder to assert that any post-petition services provided by GCP to the Company substantially benefited the bankruptcy estate.

## ARTICLE XII
## MISCELLANEOUS AND GENERAL

7.1     Notices.  Any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be deemed delivered upon actual receipt and shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, reputable overnight courier, or by facsimile transmission confirmed by phone as follows:

If intended for Startech Environmental Corporation:

Zeisler and Zeisler
Attn: Craig Lifland
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605
Email: clifland@zeislaw.com
Fax: (203) 368-4234

If intended for GCP:

General Capital Partners, LLC
Attn: J. Gregory Barrow
600 Seventeenth Street, Suite 2350 South
Denver, Colorado 80202
Email: jgb@generalcapitalpartners.com
Fax: (720) 200-4501
Or other such addresses or entities as any of the parties hereto may from time to time direct by service of notice on the other parties.

7.2     Representations and Warranties by the Company.  The Company represents and warrants to GCP that to the best of its knowledge and belief the Materials and Information ("*Information*") regarding the business and financial condition of the Company does not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Company shall advise GCP promptly of the occurrence of any event or any other change prior to a Transaction or Interim Financing which could reasonably be expected to result in the Information containing any untrue statement of material fact or omitting to state any material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

7.3     Assignment.  Neither Party may assign any or all of its rights or interest contained herein without first obtaining the other Party's written consent, which may be withheld in such other Party's discretion.

7.4     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties regarding the Transaction contemplated herein, and there are no other terms, covenants, conditions, provisions, warranties, representations or statements, oral or otherwise, of any kind whatsoever.  Any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Agreement in whole or in part unless such agreement is in writing and signed by the Party against whom enforcement of the change, modifications, discharge or abandonment is sought.

7.5     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be original, but such counterparts together shall constitute one and the same instrument.

7.6     Governing Law.  This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without regard to the principles of conflicts of law thereof that would defer to or result in the application of the substantive laws of any other jurisdiction.  The parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "Bankruptcy Period"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith, the implementation and enforcement hereof or thereof or the breach hereof or thereof.  The parties further agree that, following the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute may be brought against any of the parties exclusively in the United States District Court of Colorado, and each of the parties hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including, without limitation, any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions.  Each party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

7.7     Severability.  If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

7.8     Press Announcements.  GCP may use the name and logo of the Company and briefly describe the services it provided to Company in publications and/or marketing materials prepared and distributed by GCP at any time after the completion or public announcement of the closing of a Transaction.

7.9     No Assurances.  By signing this Agreement, the Company and the estate expressly acknowledge that GCP does not guarantee, warrant or otherwise provide assurance that Company will be able to implement or consummate any Transaction.

7.10    Captions.  The heading included in this Agreement are for the convenience and reference only and are not part of this Agreement and shall not in any way control, define, limit or add to the terms and conditions hereof.

7.11    Further Assurances.  At any time or from time to time after the Closing, without further consideration, the Company shall, at the request of GCP, execute and deliver such further instruments and document as GCP may reasonably request as may be reasonably necessary to evidence or effect the consummation of the transactions contemplated by this Agreement.

7.12    Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean "including without limitation".

7.13    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.  Neither party may assign its rights or interests hereunder without providing the other party with prior written notice; provided, however, that GCP shall be entitled to assign its rights under this agreement to an entity wholly-owned by it.  Neither party may delegate all or any of its obligations or duties hereunder, without the prior written consent of the other party.

7.14    Fees and Expenses.  The Company and GCP shall each bear their own expenses, including but not limited to legal fees, incident to the negotiation and preparation of this Agreement and the consummation of the transactions contemplated hereby.

7.15    Confidentiality.  GCP and the Company agree that they will hold in confidence all information, data and documents obtained by them or any of their representatives from any representative, officer or employee of each other, and that none of them nor any of their representatives will disclose any such information, data or documents to any third party, except Webster financial Corporation, and none of them will discuss this Agreement or the transactions contemplated hereby with any party other than officers, employees, agents and representatives of the party or their legal counsel, financing sources deemed necessary to the completion of the transactions described herein.

7.16    Indemnify/Hold Harmless. The Company agrees to indemnify and hold GCP, its affiliates and any permitted subcontractors ("US") and its owners, officers and employees harmless from and against any and all claims, liabilities, losses, damages and expenses (including, without limitation, attorneys fee) (collectively, "Losses") related to or arising out of the engagement of GCP or the provision of the Services by GCP, except to the extent such Losses arise, in whole or in part, out of the gross negligence, willful misconduct, breach of this Agreement, or otherwise due solely to the indemnified party's actions or inactions.  The Company shall not be obligated to fund more than one defense counsel firm at any one time for all indemnified persons.

7.17    <u>Survival</u>.    The parties' representations, warranties and obligations contained in this Agreement shall survive the Closing.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**STARTECH ENVIRONMENTAL CORPORATION**


By: _____    Title:_____Date: _____
Joseph F. Longo                            Chief Executive Officer


**GENERAL CAPITAL PARTNERS, LLC**


By: _____    Title: _____ Date: _____
J. Gregory Barrow

**Exhibit A**

**CORPORATE RESOLUTION**

**RESOLVED**, that the President of Startech Environmental Corporation is empowered, and directed to sell, mortgage, lease, or convey any and all property or stock of said Corporation, on such terms as they may deem advisable, and the said President is directed to execute all deeds, mortgages, releases, lease, or other instruments necessary to carry into effect the sales, mortgages, or leases as herein provided.

**RESOLVED**, that _____ the President of said Corporation is hereby authorized and directed, with full and complete authority, to perform any necessary act to enter into an Agreement with **General Capital Partners, LLC** for the sale, lease, or exchange of certain Assets or Stock (as further defined in the Agreement between Startech Environmental Corporation and General Capital Partners, LLC) of said Corporation.

**IN WITNESS THEREOF**, the undersigned Corporation has caused this application to be executed in its name by its President, attested by its Secretary this ____ day of April, 2010.

(Corporate Seal)

**ATTEST:**

By: _____

**STATE OF** _____     {
                                   {SS**:**
**COUNTY OF**_____    {

On this _____ day of _____, 2010, before me, the undersigned Notary Public, personally appeared _____ and _____, known personally to me to be the Secretary of _____, authorized to do so, executed the forgoing instrument for the sole purpose contained therein. **IN WITNESS WHEREOF**, I have hereunto set my hand and official seal.

**Exhibit B**

Bylaws of Startech Environmental Corporation