# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| STARTECH ENVIRONMENTAL | : CASE NO. 10-50955 (AHWS) |
| CORPORATION, | : |
| | : |
| Debtor-in-Possession. | : |
| | : |

## MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR AN ORDER (i) AUTHORIZING AND APPROVING FORM OF PURCHASE AGREEMENT, (ii)AUTHORIZING AND APPROVING BIDDING PROCEDURES, (iii) SCHEDULING AN AUCTION, (iv) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (v) GRANTING RELATED RELIEF, ALL IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

Startech Environmental Corporation, the above-captioned Debtor and Debtor-in-possession (the "Debtor" or "Startech") by and through its undersigned counsel, hereby submits this Motion for an Order (i) Authorizing and Approving Form of Purchase Agreement, (ii) Authorizing and Approving Bidding Procedures, (iii) Scheduling an Auction, (iv) Approving the Form and Manner of Notice Thereof, and (v) Granting Related Relief, all in Connection with the Sale of Substantially All of the Debtor's Assets (the "Bidding Procedures Motion").  In support of this Bidding Procedures Motion, the Debtor respectfully represents as follows:

## INTRODUCTION

1.      On April 28, 2010 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  Pursuant to sections 1107 and 1108 of the Bankruptcy

Code, the Debtor has managed its property and assets as a debtor in possession. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's chapter 11 case and this Motion are proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a) and 363(b).

## I.  BACKGROUND INFORMATION

4.      Startech Environmental Corporation is a publicly traded environmental technology company commercializing its proprietary plasma processing technology known as the Plasma Converter™ that achieves closed-loop elemental recycling. The System irreversibly destroys hazardous and non-hazardous waste and industrial by-products while converting them into useful commercial products. These products include a rich synthesis gas called PCG (Plasma Converter Gas™), surplus energy for power, chemical industry feedstocks, metals and silicates for use and for sale. Startech operates from its facilities in Bristol, CT with offices in Wilton, CT. At year end in 2009, the Debtor had 16 employees, however, as of the filing date, the Debtor has 4 employees.

5.      From the onset, the Debtor's chapter 11 case has suffered from no cash from operations and only minimal funding from a potential purchaser. The Debtor entered chapter 11 with an agreement for debtor-in-possession financing with Champion Energy ("Champion") for amounts which were not expected to exceed $750,000.00. At the same time, the Debtor anticipated executing an asset purchase agreement with Champion, subject to higher and better offers, and that Champion would fund the Debtor's minimal operations during a marketing

period headed by a court approved investment banker.  Unfortunately, at the early stages of this

case, Champion only funded approximately $55,000.00, and subsequently and additional

$60,000 (approx.).  These amounts were nowhere near necessary to meet the Debtor's everyday

operating expenses, including, but not limited to, payroll, insurance, and most importantly rent

due the Debtor's landlords in Wilton, Connecticut, for its corporate offices, and for two facilities

in Bristol, Connecticut, where the majority of the Debtor's hard assets are located.

6. Consequently, numerous stay relief motions were filed by the Debtor's landlords,

which (i) resulted in the Debtor having to vacate its Wilton, Connecticut headquarters; and (ii)

resulted in the Debtor agreeing to a deadline of October 24, 2010, or the landlord for its facilities

at 190 Century Drive, Bristol, Connecticut, where the majority of the Debtor's assets are located,

would be free to execute on a judgment of eviction entered in a state court.  Through negotiations

between the Debtor and the Century Drive landlord, the Debtor has obtained an additional

extension of time to early February, 2011, to consummate a sale in exchange for the $60,000

payment referred to above.

7. At the onset of the case, the Debtor retained General Capital Partners, LLC,

("GCP"), an investment banking firm specializing in the sale of assets for distressed entities

seeking potential purchasers of the Debtor's assets.  During the summer and the fall months of

2010, the Debtor and GCP spent significant periods of time negotiating with numerous potential

purchasers, including one purchase which signed a letter of intent, but failed to execute an Asset

Purchase Agreement.  Because the Debtors have run out of time (and funding) and have until

February 8, 2011 to consummate a sale in accordance with the recent agreement with the Bristol

Landlord, the Debtor now seeks an order setting certain procedures to govern an open auction for

the sale of its assets free and clear of liens, claims , interests and encumbrances.  In addition, GCP continues to market and solicit offers for the Assets.

## II.    RELIEF REQUESTED

8.    The Debtor proposes to sell substantially all of its assets to a successful bidder ("Buyer") upon terms and conditions more fully set forth in the Asset Purchase Agreement and exhibits annexed thereto (the "Purchase Agreement"), substantially in the form attached hereto as Exhibit 1.  By this Motion, the Debtor seeks to have the Court approve the form of Purchase Agreement, and bidding procedures for the conduct of the auction of substantially all of the Debtor's assets.

### Approval of Form of Purchase Agreement

9.    As set forth in the Purchase Agreement, the successful Buyer will acquire those assets of the Debtor described in the Purchase Agreement (collectively, the "Assets").  The minimum purchase price for the Assets, shall be Two Million Dollars ($2,000,000.00) in cash payable at closing, (the "Reserve Price").  The Purchase Agreement also provides for a Two Hundred Fifty Thousand Dollar ($250,000.00) deposit payable as set forth below.

10.    The Debtor requests that this Court approve the form and provisions of the Purchase Agreement as fair and reasonable and to require qualified bidders to execute the Purchase Agreement.  The Debtor seeks an approved form of Purchase Agreement to market the Assets in a meaningful way so as to allow potential bidders to know what form of agreement has been approved by the Court in advance such that they will have greater confidence in submitting bids, especially where such bidders may request the Debtor to vary certain terms of the Purchase Agreement to accommodate their bid.

### Approval of Bidding Procedures; Auction; Credit Bid; Marketing Efforts

11.    The Debtor proposes to hold an auction (the "Auction") pursuant to the bidding procedures (the "Bidding Procedures") which are attached hereto as <u>Exhibit 2</u> and which the Debtor now seeks to have the Court approve.

12.    The Bidding Procedures permit bidders to bid on the Assets, in a full and fair manner, and allow the Debtor to promptly review, analyze and compare all Qualifying Bids to determine which bid is the highest and best offer for the Assets.  The Debtor believes that the Bidding Procedures will foster competitive bidding and ultimately maximize the return on the Assets.  The Bidding Procedures should therefore be approved.

13.    In brief summary, the Bidding Procedures provide for a process in connection with the sale of the Assets; however, the Bidding Procedures should be consulted for the complete terms and conditions contained therein and the specific procedures to be followed for submitting a counteroffer.  The Auction is conditioned on the receipt of Qualifying Bids (as defined in the Bidding Procedures and described herein) no later than 5:00 p.m., Eastern Standard Time on such date set by this Court, by the Debtor's counsel, Zeisler & Zeisler, P.C., with copies to those specified in the Bidding Procedures.  If any Qualifying Bids are received, an Auction will be held on or before January 21, 2011, at 10:00 a.m. Eastern Standard Time, at the offices of Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, CT 06605.

14.    As set forth in the Bidding Procedures, any party that desires to timely consummate the purchase of the Assets for an amount that is equal to or higher and better than the amount set forth in the Purchase Agreement, shall submit an offer as provided in the Bidding Procedures.  A "Qualifying Bid" is a written offer that:

(a)      provides that the offeror offers to purchase all or substantially all of the Assets upon terms and conditions substantially as set forth in the Purchase Agreement, and provides a blackline version of the Purchase Agreement to reflect any changes;

(b)      results in a value to the Debtor in its business judgment that is more than the "Reserve Price" which is Two Million Dollars ($2,000,000) (a "Qualifying Bid Amount");

(c)      does not provide for any payment to the offeror of a break-up fee, expense reimbursement or similar type of fee or payment;

(d)      is accompanied by a duly executed form of Purchase Agreement;

(e)      is accompanied by a deposit in the amount of $250,000, payable in immediately available funds (the "Deposit"), to be held by the Debtor's counsel to secure the Qualifying Bid, which Deposit, subject to the provisions of the Bidding Procedures, shall be refunded to the offeror if the offeror's Qualifying Bid is not accepted by the Debtor as the highest and best offer for the Assets, or next highest offer;

(f)      identifies with particularity any executory contract and unexpired lease to be assumed and assigned to the offeror at closing including provisions for assumption of any cure amounts;

(g)      contains financial and other information sufficient to enable the Debtor, in its business judgment, to evaluate and confirm the offeror's financial wherewithal to consummate the purchase of the Assets, including evidence reasonably satisfactory to the Debtor that the offeror has financial resources available and sufficient to finance the purchase of the Assets, and financial and other information sufficient to provide adequate assurance of future performance under § 365 of the Bankruptcy Codes if required;

(h)      does not contain any due diligence, financing or other contingencies of any kind;

(i)      fully discloses the identity of the offeror or any entity participating in the competing offer;

(j)      provides that the offeror consents to the jurisdiction of the Bankruptcy Court; and

(k)      provides for a closing of the purchase and sale of the Assets no later than January 31, 2011; and

(l)      is in conformity with the Purchase Agreement.

15.     The Debtor may, in its business judgment, at any time prior to the Sale Hearing, continue the Auction from time to time, adjourn the Auction and re-open the Auction, upon notice to any Qualifying Bidders, without further notice to the Bankruptcy Court or any other parties, and the Debtor may establish, by announcement at the Auction, such modified or additional bidding procedures as the Debtor deems appropriate based on the circumstances, provided that such modifications or changes, other than the Reserve Price, shall not materially alter the bidding procedures set forth herein.

16.     If the Debtor does not receive a Qualifying Bid by the deadline established in the bidding procedures, the Debtor may cancel the Auction and/or modify the Reserve Price.

17.     In the exercise of its sound business judgment, the Debtor believes that an orderly sale of substantially all of its assets is necessary to maximize value to its estate.  The Bidding Procedures are designed to foster a competitive bidding process, which the Debtor believes will generate the highest and best offer for the Assets.

18.     By this Motion, the Debtor submits that the relief requested herein is in the best interests of its estate and creditors because the Bidding Procedures, in conjunction with the Debtor's overall marketing efforts, will enable the Debtor to maximize the value of the Assets. Based upon the circumstances of this case, the Debtor submits that an accelerated sale process is required.  As set forth above, the Debtor has limited time to satisfy the conditions of court approved orders regarding payment of rent to the landlord of the Bristol facilities where the Debtor's assets are located.  Due to the Debtor's lack of funding, it is imperative that an expedited sale process be approved.

19.      Under the timetable set forth herein, all entities interested in submitting Bids will have a reasonable opportunity under these extenuating circumstances to make inquiries and

formulate their Bids.  Furthermore, a copy of this Motion was served upon: (a) the Office of the

United States Trustee, (b) each of the twenty largest Unsecured Creditors; (c) counsel to secured

creditors and landlords; (d) all parties requesting notice pursuant to Rule 2002; and (e) all parties

known to have an interest in acquiring the assets of the estate (collectively, the "Notice Parties").

Upon the filing of this Motion, the Motion was served upon the Notice Parties, including all such

potentially interested entities, providing notice of, inter alia, the bid deadline, the Auction, and

the Sale Hearing.   Accordingly, timely notice of the Bidding Procedures and the Auction has

been given to those entities most likely to consider a Bid on the Debtor's assets.

**Scheduling of the Auction and Sale Hearing.**

20.     Pursuant to the Bid Procedures, the Debtor requests that the Court enter an order

scheduling a deadline for the submission of bids, the Auction and the hearing to approve the sale

of the Assets.  The Debtor requests the Court to order that:

(i)     Bids shall be due on January 19, 2011 at 5:00 p.m. and delivered to the parties

specified in the Bidding Procedures; and

(ii)    The Auction shall be held on January 21, 2011 at 10:00 a.m. at the offices of

Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, CT 06605; and

(iii)   The hearing to approve the Sale of the Assets shall be held at such date and time

within the following five (5) business days after the Auction subject to the

availability of the Court.

**Notice**

21.     Attached hereto as Exhibit 3 is a proposed Notice of Auction.  The Debtor

proposes to send the Notice of Auction to all creditors and parties-in-interest, all equity holders

of the Debtor as of the filing date, any party that has expired an interest in buying the Assets, and

direct anyone interested in full copies of pleadings and agreements to the website for the Bankruptcy Court for the District of Connecticut.

WHEREFORE, the Debtor respectfully requests that entry of an order, substantially in the form attached hereto: (i) approving the form of the Purchase Agreement, (ii) approving the Bidding Procedures, (iii) scheduling the Auction, (iv) approving the form and manner of notice hereof; and (v) granting such other relief as is just and proper.

Dated this 2nd day of December, 2010 at Bridgeport, Connecticut.

The Debtor, Startech Environmental Corporation

By:       _/s/Craig I. Lifland_____
          Craig I. Lifland, Esq. (ct00976)
          Zeisler & Zeisler, P.C.
          558 Clinton Avenue
          Bridgeport, CT  06605
          Tel: 203-368-4234 / Fax: 203-367-9678
          Email:  clifland@zeislaw.com
          ATTORNEY FOR DEBTOR
          AND DEBTOR-IN-POSSESSION

# EXHIBIT 1

## PURCHASE AGREEMENT

# ASSET PURCHASE AGREEMENT

(To be Executed in Duplicate)

By and Between


STARTECH ENVIRONMENTAL CORPORATION
SELLER


and


_____
PURCHASER

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made as of the date of the last signature hereto by and between **STARTECH ENVIRONMENTAL CORPORATION**, a Colorado corporation with an address c/o Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, Connecticut 06605 (hereinafter referred to as the "Seller") and _____, a _____ entity organized under the laws of _____, whose principal place of business address is _____ (hereinafter referred to as the "Purchaser").

## RECITALS

**WHEREAS**, the Seller owns and desires to sell, and the Purchaser desires to purchase, those certain Assets (as defined below), for the consideration and on the terms and conditions set forth in this Agreement; and

**WHEREAS**, on April 28, 2010, the Seller filed a voluntary bankruptcy petition (the "Bankruptcy Case'') under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut (the ''Bankruptcy Court''); and

**WHEREAS**, as a result of the Bankruptcy Case, any sale and purchase of the Assets is to be effectuated pursuant to an order of the Bankruptcy Court under Section 363 of the Bankruptcy Code approving such transaction (the "Sale Order'') ; and

**WHEREAS**, subject to the entry of the Sale Order, Seller shall sell and Purchaser shall acquire the Assets in accordance with the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, agreements, representations and warranties set out below, the parties hereby covenant and agree as follows:

1. **PURCHASE AND SALE OF ASSETS.** On the terms and conditions of this Agreement, and subject to entry of the Sale Order, Seller agrees to sell, convey, assign, transfer and deliver possession to the Purchaser, at the Bristol Facilities (as hereinafter defined), and the Purchaser agrees to purchase and acquire from Seller, on the Closing Date, all of Seller's right, title and interest in and to the Assets (other than the Excluded Assets (defined below), which Assets shall be, effective as of the Closing, pursuant to Section 363 of the Bankruptcy Code, free and clear of all liens, claims, security interests and encumbrances, all for the Purchase Price set forth herein. As used in this Agreement, "Assets" means all of the following properties and assets of the Seller, of every kind and description (whether real, personal, mixed, tangible or intangible), wherever located (but not including the Excluded Assets):

        (a)        all inventory, goods, merchandise, stock in trade, raw materials, work in progress and finished goods owned by Seller as of the Closing ("Inventory");

(b)    all computer hardware owned by the Seller as set forth on **Schedule 1(b)** attached hereto and made a part hereof ("Computer Hardware");

(c)    all computer software, including, without limitation, application software, object codes and source codes owned by Seller as set forth on **Schedule 1(c)** attached hereto and made a part hereof ("Computer Software");

(d)    all rights, title and interest of Seller in and to intellectual property of every nature, whether registered or unregistered consisting of whatever copyrights, patents, patent rights, trade-marks, service marks, trade names and certification marks are set forth in **Schedule 1(d)** attached hereto and made a part hereof, together with all applications, trade secrets, proprietary manufacturing information and know-how, unpatented blue prints, drawings and designs, processes, prototypes and technology for any of the foregoing  ("Intellectual Property");

(e)    all machinery, plant, equipment, parts, fixtures, tools and accessories of Seller as set forth on **Schedule 1(e)** attached hereto and made a part hereof ("Manufacturing Equipment");

(f)    all office equipment and furniture owned by Seller as set forth on **Schedule 1(f)** attached hereto and made a part hereof ("Office Equipment");

(g)    such other equipment, furniture, furnishings, accessories, motors, tools, utensils, supplies as set forth on **Schedule 1(g)** attached hereto and made a part hereof ("Other Company Assets" which, together with the Inventory, Computer Hardware, Manufacturing Equipment and Office Equipment are hereinafter, collectively the "Tangible Assets");

(h)    all of Seller's right, title and interest in and obligations under those certain contracts and agreements set forth on **Schedule 1(h)** attached hereto and made a part hereof ("Assumed Contracts"); and

(i)    all files, books and records of Seller directly related to the Assets together with all warranties, guaranties and the like of manufacturers, contractors and suppliers pertaining to any of the Assets (to the extent assignable).

2.    **EXCLUDED ASSETS.**  Any provision of this Agreement to the contrary notwithstanding, the following (collectively, the "Excluded Assets") shall not be included in the Assets and shall not be conveyed or assigned by Seller to Purchaser pursuant to this Agreement:

(a)    all cash and cash equivalents of Seller as of the Closing Date including, without limitation, all cash on hand or in banks or other depositories, (including the cash in the Seller's subsidiaries) and all marketable securities, certificates of deposit, lockboxes and other time deposits;

(b)    all contracts, leases, use and occupancy agreements and other agreements

13

of Seller other than the Assumed Contracts (collectively, the "Contracts") and all rights with respect thereto;

(c)     all accounts receivable, all credits and benefits including, without limitation, any tax credits, insurance benefits, indemnification rights, escrows and prepaid expenses related to any of the Assets arising prior to the Closing Date or otherwise related to any of the Excluded Assets;

(d)     all insurance policies of Seller, and the proceeds thereof;

(e)     the name of the Seller or any variation thereof;

(f)     all books and records of Seller not directly related to the Assets;

(g)     the corporate seals, certificate of incorporation, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization of the Seller;

(h)     the assets listed on **Schedule 2(h)** attached hereto and made a part hereof;

(i)     all rights, actions, causes of action, claims and proceedings arising from or related to the Excluded Assets and all claims and actions arising under Sections 544 through 553, inclusive, of the Bankruptcy Code, against any pre-petition creditor of the Seller with the exception of any claim against Purchaser; and

(j)     all other rights, interests, properties or assets of Seller not specifically set forth in Section 1 above.

3.      **CONSIDERATION.**

(a)     The purchase price for the Assets, subject to adjustment pursuant to Section 12 below, equals the sum of the minimum base price of **Two Million Dollars ($2,000,000),** PLUS the additional price of _____ _____($_____) **Dollars**, for a          TOTAL          purchase          price          of _____($_____) **Dollars** (collectively, the "Purchase Price"), which the Purchaser agrees to pay as follows:

(i)     A deposit herewith in the form of a bank or  certified          check payable to the order of the        Seller's      attorney      as      trustee ("Deposit"):                                          $   250,000.00

(ii)    At the Closing, at Seller's option, by bank or certified check drawn on a Connecticut bank, or by wire transfer:                                 $ _____.00

PURCHASE PRICE:                             $ _____.00

14

(b)   The Deposit paid hereunder shall be held by Seller's counsel in trust, in a non-interest bearing account pending the Closing or earlier termination of this Agreement.  The Deposit shall be: (i) paid to Seller at the Closing, to be credited against the Purchase Price, or (ii) returned to Purchaser upon the termination of this Agreement, for reasons other than Purchaser's default hereunder, or (iii) if said termination is due to Purchaser's default, to the Seller as liquidated damages pursuant to Section 19 hereof.

4.   **CLOSING.**  The Closing shall take place at the offices of Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, Connecticut or at such other place as the parties may agree upon, at 10:00 a.m. on or before January 31, 2011 (the "Closing" or "Closing Date").  Subject to compliance with the terms and conditions of this Agreement and the approval of the Bankruptcy Court, the transfer of the Assets to the Purchaser shall be deemed to take effect as of the Closing. The Closing shall be deemed effective as of _____ am/pm on the Closing Date ("Effective Time").

5.   **NON-CONTINGENT AGREEMENT.**  There are no contingencies whatsoever to the obligations set forth in this Agreement.

6.   **AS IS / WHERE IS.**  THE ASSETS ARE BEING SOLD BY SELLER AND ACCEPTED BY PURCHASER IN THEIR "AS IS, WHERE IS AND WITH ALL FAULTS" CONDITION, WITH NO RIGHT OF SETOFF OR REDUCTION IN THE PURCHASE PRICE.  EXCEPT FOR THE REPRESENTATION AS TO OWNERSHIP SET FORTH IN SECTION 8(a)(iv) HEREOF, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE ASSETS.  NO STATUTORY OR OTHER IMPLIED WARRANTIES AS TO THE CONDITION OF OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS SHALL BE IMPLIED AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY. WITHOUT LIMITING THE FOREGOING, PURCHASER ACKNOWLEDGES THAT THE SELLER HAS MADE NO REPRESENTATION OR WARRANTY CONCERNING (1) ANY USE TO WHICH THE ASSETS MAY BE PUT, (2) ANY FUTURE REVENUE, COSTS, EXPENDITURES, CASH FLOW, RESULTS FROM OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ASSETS, (3) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER, OR (4) THE CONDITION OF THE ASSETS.  THE PURCHASER AGREES THAT IT HAS INSPECTED THE ASSETS, IS SATISFIED THEREWITH AND AGREES TO ACCEPT AT CLOSING THE ASSETS IN THEIR PRESENT CONDITION ON THIS "AS IS, WHERE IS, WITH ALL FAULTS" BASIS, REASONABLE WEAR AND TEAR EXCEPTED.  THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.

7.   **ASSUMED LIABILITIES.**  In connection with its acquisition of the Assets, Purchaser shall assume all liabilities and obligations of Seller arising under the Assumed Contracts ("Assumed Liabilities).  In addition, on and effective as of the Closing Date, the Purchaser shall assume : (a) any  and all liability for sales, use or other similar tax arising after the transfer of the Assets; and (b) the costs of compliance with all applicable Environmental

Laws relating to disposal waste and of hazardous materials caused by the dismantling and/or removal of Assets after the Closing, as further discussed in Section 18 hereof and all liability related to any such dismantling and/or removal.

    8.    **REPRESENTATIONS.**

    (a)    <u>Seller Representations</u>.   The Seller represents and warrants to the Purchaser as follows:

    (i)    Seller is duly organized, validly existing and in good standing under the laws of Colorado and has all requisite power and authority to own its properties and assets.

    (ii)    The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by Seller pursuant to this Agreement, and the completion and performance of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Seller, and this Agreement constitutes a legal, valid and binding obligation of the Seller subject to the approval of the Bankruptcy Court.

    (iii)    Neither the execution nor the delivery of this Agreement nor the completion and performance of the transaction contemplated herein will violate the Seller's certificate of incorporation or bylaws or result in the creation or imposition of any lien or encumbrance in favor of any third party with respect to any of the Assets.

    (iv)    Seller holds full right, title and interest in the Assets which Assets shall be transferred to Purchaser on the Closing Date, pursuant to the Sale Order and Section 363 of the Bankruptcy Code, free and clear of all mortgages, liens, pledges, security interests and easements.

    (b)    <u>Purchaser's Representations</u>**.**  The Purchaser represents and warrants to Seller that:

    (i)    Purchaser is duly organized, validly existing and in good standing under the laws of _____ and has all requisite power and authority to own its properties and assets and conduct its business in the manner in which such business is now being conducted and has full power and capacity to enter into this Agreement, carry out the transactions contemplated herein, and duly observe and perform all its obligations contained herein.

    (ii)    The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered

by the Purchaser pursuant to this Agreement, and the completion and performance of the transactions contemplated hereby or thereby have been duly authorized by all necessary corporate action on the part of the Purchaser, and this Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligation of the Purchaser enforceable in accordance with its terms.

(iii)     Neither the execution and delivery of this Agreement nor the completion and performance of the transaction contemplated herein will violate the Purchaser's certificate or articles of formation or other governing documents or the terms or conditions of any agreement, encumbrance, indenture, contract or instrument to which the Purchaser is a party or by which it is bound.

(iv)     Purchaser has the financial resources to consummate this transaction in accordance with the terms of this Agreement and to make the payments required of the Purchaser when such payments are due.

(c)     <u>Survival of Representations</u>. Unless otherwise specifically set forth herein as surviving the Closing or termination of this Agreement, each and every representation and warranty set forth in this Agreement shall terminate as of the Closing (or earlier upon termination of this Agreement) and thereafter be of no further force and effect.

(d)     <u>No Other Representations</u>.  Purchaser agrees that, except as set forth in Section 8(a) above, this transaction is made without representations, warranties, promises or guaranties of any kind by Seller or any agent, attorney or consultant of Seller.  The Purchaser has been advised to verify, independently, any information it deems important.  The Purchaser has used the information provided in connection with these matters only as an aid to assist it in its own investigation of the Assets prior to entering into this Agreement. The provisions of this Subsection (d) shall survive the Closing.

9.     **RISK OF LOSS.**   The risk of loss or damage by fire or other casualty to the Assets is assumed by the Seller until the Closing and shall pass to Purchaser at the Closing. Throughout the period from the date of this Agreement until the Closing, Seller shall continue to carry existing fire and extended coverage insurance on the Assets.  In the event that loss or damage does occur prior to Closing, the Seller shall be allowed, at its option, a reasonable time thereafter, not to exceed thirty (30) days from such loss or damage, within which to repair or replace such loss or damage.  In the event that the Seller does not repair or replace such loss or damage within said time (or gives written notice to Purchaser that it does not intend to do so), the Purchaser shall have the option of:

(a)     terminating this Agreement, in which shall be paid to the Purchaser and all

further claims and obligations between the parties hereto by reason of this Agreement shall be released and discharged (except to the extent this Agreement provides that any such obligation specifically survives); or

(b)     closing on the purchase of the Assets in accordance with this Agreement and with no reduction in Purchase Price but receiving the benefit of all insurance monies recovered or recoverable by Seller on account of such loss or damage (to the extent such sums are attributable to the loss or damage to Assets included in this sale), less the amount of any monies actually expended by the Seller on said repair or replacement or in processing said claim.

10.     **WHEN SELLER BOUND.**   Execution and delivery of this Agreement by Purchaser and the delivery thereof to the Seller, together with the Deposit shall have no binding force and effect on Seller unless and until the Seller has executed this Agreement and a counterpart thereof has been delivered to Purchaser.

11.     **BROKER(S).**   The Purchaser hereby agrees that no broker or agent has brought the Assets to the Purchaser's attention nor negotiated the sale of the Assets nor is entitled to a commission other than Seller's investment banker, General Capital Partners**.**  This Agreement is consummated by the Seller in reliance on the foregoing representation of the Purchaser.  As such, the Purchaser hereby agrees to indemnify and hold harmless the Seller against any liability by reason of any claim of any other broker or agent for a commission on account of this sale, said indemnity to include all costs of defending any such claim, including reasonable attorney's fees.  In the event of any such claim, Seller shall properly notify Purchaser.  The provisions of this Section shall survive the Closing.

12.     **ADJUSTMENT.**   Personal property taxes, sales and use taxes and any use and occupancy or related payments due with respect to the Bristol Facilities (defined below) and all other matters commonly adjusted at the time of closing shall be apportioned between the Seller and Purchaser over the physical period for which levied at the time of Closing.  Any errors or omissions in computing the apportionment or other adjustments at the Closing shall be corrected within a reasonable time following the Closing.  The provisions of this Section shall survive the Closing.

13.     **ALLOCATION.**   Within thirty (30) days after the Closing, Purchaser shall prepare an allocation schedule which shall allocate the Purchase Price in accordance with the applicable provisions of the Internal Revenue Code, as amended and the regulations thereunder ("Closing Allocation''). The Closing Allocation shall be binding upon the Purchaser and the Seller for all tax purposes.  After the Closing, the parties shall make consistent use of such Closing Allocations in all filings, declarations and reports with the Internal Revenue Service in respect thereof and in all proceedings related thereto.  Neither party shall take any position contrary to the Closing Allocation in any tax return, filing, proceeding or contest.

14.     **CONDITIONS TO CLOSING.**

(a)     The obligation of the Purchaser to complete the purchase of the Assets

18

contemplated by this Agreement is subject to: (i) the representations and warranties of Seller contained in this Agreement being true and correct in all material aspects as of the Closing with the same effect as though such representations and warranties had been made on the Closing Date; (ii) Seller having performed or observed, in all material respects, the covenants and obligations to be performed or observed by Seller on or before the Closing pursuant to this Agreement; (iii)  (iv) Seller having executed all applicable Transfer Documents (defined below); and (v) the Bankruptcy Court having entered the Sale Order, in form and substance reasonably acceptable to the Purchaser and the Seller and not been stayed pending any appeal.

(b)     The obligation of the Seller to complete the sale of the Assets contemplated by this Agreement is subject to the fulfillment of the following conditions: (i) the representations and warranties of the Purchaser contained in this Agreement being true and correct in all material respects as of the Closing with the same effect as though such representations and warranties had been made on the Closing Date; (ii) Purchaser having performed or observed, in all material respects, all of the covenants and obligations to be performed or observed by Purchaser on or before the Closing pursuant to this Agreement; (iii) Purchaser having executed all applicable Transfer Documents; (iv) the Bankruptcy Court having entered the Sale Order in form and substance reasonably acceptable to the Purchaser and the Seller and not been stayed pending any appeal; and (v) Purchaser having delivered the Purchase Price.

15.     **CLOSING TRANSACTIONS.**

(a)     At the Closing, the Seller shall deliver the following to the Purchaser:

(i)     an executed bill of sale conveying the Assets to Purchaser, "as is", "where is", in form  substantially as set forth on **Exhibit A** attached hereto ("Bill of Sale");

(ii)    an executed Intellectual Property Assignment and Assumption Agreement assigning the Intellectual Property of Seller to Purchaser, "as is", "where is," in form substantially as set forth on **Exhibit B** attached hereto ("IP Assignment");

(iii)   an executed Assignment and Assumption Agreement with respect to the Assets in form substantially as set forth on **Exhibit C** attached hereto ("Assignment and Assumption", which together with the Bill of Sale and IP Assignments are hereinafter, collectively, the "Transfer Documents");

(iv)    a mutually agreed upon closing statement reflecting the payment, adjustment and disbursement of the Purchase Price ("Closing

Statement"); and

  (v)  a certified copy of the Sale Order.

 (b)  At the Closing, the Purchaser shall deliver the following to the Seller:

  (i)  the Purchase Price (less the Deposit previously paid and subject to the adjustments set forth herein);

  (ii)  executed Transfer Documents, as applicable;

  (iii)  the Closing Statement; and

  (iv)  such other documents reasonably necessary to effectuate the transaction in accordance with this Agreement.

16.  **CONCURRENT DELIVERY.** It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

17.  **BRISTOL FACILITIES.** The Tangible Assets are currently located at two leased facilities in Bristol, Connecticut, one located at 190 Century Drive ("Century Drive Facility"), and the other at 575 Broad Street ("Broad Street Facility" which, together with the Century Drive Facility are hereinafter, collectively, the "Bristol Facilities"). The Bristol Facilities are not owned by Seller but are rather used by Seller pursuant to certain use and occupancy or other agreements with the facility owners as discussed below.

 (a)  <u>Century Drive Facility</u>. Seller currently occupies the Century Drive Facility pursuant to certain orders entered in the Bankruptcy Case under which Seller has paid WE 190 Century Drive, LLC ("Century Owner") for access to the Century Drive Facility up to and including January 31, 2011. If the Closing occurs prior to that date, the Purchase Price shall be adjusted in Seller's favor based on a per diem from the Closing Date to January 31, 2011. It shall be Purchaser's obligation, at its sole cost and expense , to deal directly with the Century Owner for any access to the Century Drive Facility beyond the Closing Date.

 (b)  <u>Broad Street Facility</u>. Seller currently occupies the Broad Street Facility pursuant to a settlement reached with Gaski Realty, Inc. ("Broad Street Owner") in the Bankruptcy Case under which Seller has agreed to pay $49,471.25 on or before January 15, 2011, with a per diem thereafter of $192.50, for access to the Broad Street Facility. Seller acknowledges and agrees that it shall be responsible for all payments thereunder up to the Closing Date and Purchaser acknowledges and agrees that it shall be responsible for all payments thereafter. It shall be Purchaser's obligation, at its sole cost and expense, to deal directly with the Broad Street Owner

for any access to the Broad Street Facility beyond the Closing Date.

18. **REMOVAL OF ASSETS.**

(a)     The Purchaser will be responsible for the dismantling and removal of the Assets from the Bristol Facilities or wherever located, at Purchaser's expense ("Removal").  Purchaser covenants and agrees that it will cause all such dismantling and removal to be performed in a good and workmanlike manner and in accordance with all applicable Laws including, without limitation, all Environmental Laws (as defined below). Purchaser acknowledges that Seller has disclosed to Purchaser that there are certain Assets, including as described on **Schedule 18** attached hereto and made a part hereof, that may contain Hazardous Substances (as defined below).   Purchaser hereby covenants and agrees that, in conjunction with the dismantling and/or removal of any Assets from the Bristol Facilities or any other location, Purchaser shall cause, at Purchaser's sole cost and expense, all Hazardous Substances contained in or arising pertaining to the Assets to be removed and disposed of in accordance with all applicable Environmental Laws ('Environmental Compliance").  Purchaser acknowledges and agrees that Seller shall not be liable for any Environmental Compliance nor for any personal injury or tort caused by or resulting from the Removal or the Environmental Compliance (including, without limitation, any personal injury to any employee, agent, or representative of Purchaser), or for any damage to the Bristol Facilities or any other location caused thereby.   Purchaser agrees, for itself and its successors and assigns,  to  indemnify and hold Seller, its officers, directors, shareholders, agents, representatives, successors and assigns harmless with respect to any and all claims, actions, causes of action, loss, damage, costs and expense (including, without limitation, reasonable attorneys fees) arising pursuant to the Removal and the Environmental Compliance.  The provisions of this Section shall survive the Closing.

(b)     As used in this Agreement "Law" means any statute, law, ordinance, regulation, rule, policy, code, order, other requirement or rule of law of any federal, state, local or foreign government and all agencies thereof. As used in this Agreement,  "Environmental Law" means any and all federal, state, provincial, local and foreign statutes, Laws, regulations, ordinances, orders, common law, and similar provisions currently in existence and applicable and having the force or effect of law, concerning public health or safety, worker health or safety, pollution or protection of the environment, including, but not limited to, the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Resource Conservation Recovery Act, 42 U.S.C. §6901 et seq. ("RCRA"), the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq. ("CERCLA") and any and all other laws

21

which govern: (i) the existence, cleanup, removal and/or remedy of contamination or threat of contamination on or about owned or leased real property; (ii) the emission or discharge of Hazardous Substance into the environment; (iii) the control of Hazardous Substance; or (iv) the use, generation, transport, treatment, storage, disposal, removal, recycling, handling or recovery of Hazardous Substance, including building materials. Also as used in this Agreement, "<u>Hazardous Substance</u>" means any material or substance: (i) which is defined as a "hazardous substance," "pollutant" or "contaminant" pursuant to CERCLA and regulations promulgated thereunder; (ii) containing gasoline, oil, diesel fuel or other petroleum products, or fractions thereof; (iii) which is defined as a "hazardous waste" pursuant to RCRA and regulations promulgated thereunder; (iv) containing polychlorinated biphenyls (PCBs); (v) containing asbestos; (vi) which is radioactive; (vii) which is biologically hazardous; (viii) the presence of which requires investigation or remediation under any Law; (ix) which is defined as a "hazardous waste", "hazardous substance", "pollutant" or "contaminant" or other such terms used to define a substance having an adverse effect on the environment under any Law; or (x) any toxic, explosive, dangerous, corrosive or otherwise hazardous substance, material or waste which is regulated by any governmental authority.

19.    **DEFAULT.**  In the event Purchaser: (a) defaults in its obligations hereunder, (b) fails to complete the Closing by the Closing Date (time being of the essence), or (c) otherwise indicates it is unable or unwilling to perform its obligations hereunder and Seller stands ready to perform Seller's obligations, Seller's remedy shall be the right to terminate this Agreement by written notice to Purchaser and retain the Deposit as reasonable liquidated damages for Purchaser's inability or unwillingness to perform.  It is the intention of the parties hereto to make advanced provision on the date of the Agreement for such event in order to avoid controversy, delay and expense, and to specify now a reasonable amount agreeable for compensation to the Seller for loses which may not be readily ascertainable or quantifiable, such as any which might be necessary to place Seller in the position Seller would have been in had Purchaser timely performed its obligations hereunder.

20.    **PURCHASER'S SOLE REMEDY.**  Notwithstanding anything herein to the contrary, Purchaser's sole and exclusive remedy for any default by Seller in its obligations under this Agreement or for Seller's failure to complete the Closing by the Closing Date or for otherwise indicating its unwillingness or inability to perform its obligations hereunder or for any other reason, is to terminate this Agreement.  Upon such termination and provided the Deposit shall be returned to Purchaser, and all rights and obligations of the parties hereunder shall terminate.

21.    **INDIVISIBLE TRANSACTION.**    The sale of the Assets to Purchaser constitutes a single, indivisible transaction, and are intended to be sold to the Purchaser as a single, indivisible group of Assets.

22.    **SURVIVAL.**  Other than as expressly set forth in this Agreement, the delivery

and acceptance of the Transfer Documents herein described shall be deemed to constitute Seller's full compliance with all the terms, conditions, covenants and agreements contained herein or made in connection with this transaction.  No Seller obligations shall survive the Closing except as expressly set forth herein.

23.     **NOTICES.**  All notices under this Agreement shall be in writing and shall be deemed delivered, when delivered personally, or the next business day if sent by reputable overnight courier, or three days from when deposited in the U.S. Mail if sent by registered or certified mail, return receipt requested, to the following addresses:

Seller:        Startech Environmental Corporation
                c/o Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT  06605
Attention: Craig I. Lifland

        Purchaser:      _____
_____
_____
_____
_____.

24.     **MISCELLANEOUS.**

(a)     <u>Legal and Other Fees and Expenses</u>.  Unless otherwise specifically provided herein, the parties will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement and the completion of the transactions contemplated herein.

(b)     <u>Further Assurances</u>.  Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement and the transactions arising pursuant hereto.

(c)     <u>Time of the Essence</u>.  Time shall be of the essence of this Agreement.

(d)     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the Seller and the Purchaser pertaining to the purchase and sale of the Assets and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Seller and the Purchaser and there are no warranties, representations, covenants, obligations or agreements between the Seller (or any affiliate thereof) and the Purchaser except as set forth in this Agreement.

(e)     <u>Assignment</u>.  Except upon the prior written consent of the Seller, Purchaser may not assign any of its rights or obligations under or in

respect of this Agreement, and any purported assignment without such prior consent shall be void and of no force or effect.

(f)     <u>Invalidity</u>.  Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

(g)     <u>Waiver and Amendment</u>.  Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver. No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement nor a continuing waiver unless otherwise expressly provided.

(h)     <u>Captions</u>.  The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(i)     <u>Counterparts</u>.  This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

(j)     <u>Enurement</u>.  This Agreement will enure to the benefit of and will be binding upon the parties and their respective successors and assigns. Notwithstanding the foregoing, nothing contained herein shall be deemed to waive Purchaser's obligations under Section 24(e) hereof.

(k)     <u>No Third Party Beneficiaries</u>.  This Agreement is not intended to confer upon any Person other than the parties hereto and their successors, any rights or remedies under or by reason of this Agreement.

(l)     <u>Governing Law; Jurisdiction and Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut.  Notwithstanding the foregoing, prior to the closing of the Bankruptcy Case the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court in Connecticut, and each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably

waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.

**[ SIGNATURES TO FOLLOW ON NEXT PAGE ]**

**IN WITNESS WHEREOF,** the parties to these presence have hereunder set their hands and seals as to the date next to their signatures.

**SELLER:**

_____          **STARTECH ENVIRONMENTAL CORPORATION**

_____    By:   _____
                                           Name: _____

Its: _____
Date: _____

**PURCHASER:**

_____          _____

_____    By:   _____

Name: _____
Its: _____
Date: _____

**STATE OF**               )
                                ) **ss.** _____

**COUNTY OF**          )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of **STARTECH ENVIRONMENTAL CORPORATION,** a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public: 
My Commission Expires: _____

**STATE OF**               )
                                  ) **ss.** _____

**COUNTY OF**          )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public: 
My Commission Expires: _____

## SCHEDULE 1(b)

## COMPUTER HARDWARE

| | | | |
|---|---|---|---|
| <u>Major Assemblies</u> | Heat Exchanger | 1 | ea |
| | Plasma Torch Systems | 3 | ea |
| | Spiral Heat Exchangers | 3 | ea |
| | Spherical Bearings | 3 | ea |
| <u>Plasma Converter Vessels</u> | Vessel (5 T) w/Refractory (Special Design) | 1 | ea |
| | Vessels (10T) | 3 | ea |
| | 5T Vessel (Refractory Lined) | 1 | ea |
| <u>Control Cabinets</u> | 2 Port Ethernet CPU | 3 | ea |
| | CS Enclosures | 6 | ea |
| | Cabinet  Enclosure | 6 | ea |
| | Cabinet  Enclosure | 6 | ea |
| | Panel Mounts | 5 | ea |
| | PLC & Control Cabinets | 5 | ea |
| <u>Electrical Parts</u> | Electrode Ring Disk (Cathode) | 1 | ea |
| | Thermocouples | 4 | ea |
| | Thermocouples | 10 | ea |
| | Signal Wire (I&C) | 500 | ft |
| | Wire Spool & Switch | 7000 | ft |
| | TP; Elect, Body & Vgen | 7 | ea |
| <u>Instruments & I/O Devices</u> | Misc Controls Parts | Multiple | lot |
| | Analog Circuit Cards | 8 | ea |
| | I/O Modules | 5 | ea |
| | HMI Proficiency OS | 1 | ea |
| | I/O Modules w CPU Base | 2 | ea |
| | Ethernet CPU | 1 | ea |
| | Analog Circuit Cards | 9 | ea |
| | I/O Card (Type A) | 1 | ea |
| | I/O Card (Type B) | 1 | ea |
| | Instruments & Meters | Multiple | lot |
| | Flow Meters | 4 | ea |
| | Solid State  Relays | 2 | ea |
| | Instruments & Meters | Multiple | lot |
| | Flow meter | 1 | ea |

| Mechanical Parts | Gap Insulators | 3 | ea |
|---|---|---|---|
| | Filters | Multiple | lot |
| | Vessel Insulator Ring | 3 | ea |
| | Ring &  Pivot Pins | 7 | ea |
| | Solid Feed System (Hopper / Auger) | 1 | ea |

## **SCHEDULE 1(c)**

### **COMPUTER SOFTWARE**

- CADD  -  AutoCadd
- Sales Database – ACT
- Accounting – One Write Plus
- Controls / Screens – Simplicity
- Microsoft Office

## SCHEDULE 1(d)

## INTELLECTUAL PROPERTY

O&M / Training Manuals (Generic)

Design data, Proprietary Data, etc

PCS Designs (5, 10 & 25P TPD)

Plant General Arrangements / Drawing Lists

CADD Drawings & Data Archive / Vault

PFD's, P&ID's, Logics, Fabrication, Integration etc

Controls Architecture (Simplicity) Demo & Production PCS Systems

Bill of Materials (Drawing Hierarchies)

Operations Data & Manuals

Design Criteria & Calculations / As-Builts

Training Packages & Manuals (Specialized)

Equipment Catalogs

Procurement Data & Database

Vendor Data / Equipment Lists

Procurement /Equipment Orders (PO's)

Technical Reports (Criteria)

Technical Data Packages (Engineering)

Process Proprietary Reports (PCS)

PCS Equipment Functional Descriptions

Contract Technical Reports (Issues & Reports)

Independent 3rd Party Analysis Reports

Sales Data Packages

Sales Database / Client Lists /Contact Lists/ Representatives

## <u>SCHEDULE 1(e)</u>

## MANUFACTURING EQUIPMENT

| Raw Materials in Inventory | Steel Tubing | Multiple | lot |
|---|---|---|---|
| | Metal Fittings & Flanges | Multiple | lot |
| | Bolts & Screws | Multiple | lot |
| | Pipe Fittings & Flanges | Multiple | lot |
| | Fittings, Valves, Misc Parts | Multiple | lot |
| | Steel Flanges | 4 | ea |
| | Steel Plate 3/16 | 7 | ea |
| | Pipe Fittings / Couples | 20 | ea |
| | Fabrication Pipe | Multiple | lot |
| | 304 SS Tube & Plate | Various | lot |
| | Piping, Cable Harness etc | Multiple | lot |
| | Misc Welding Supplies | Multiple | lot |
| | Compression fittings | Multiple | lot |
| | Misc Sht Metal, NB, Pumps etc | Multiple | lot |
| | | | |
| Fabrication Shop Tooling | Tools (Puller/Grabber) | 2 | ea |
| | Fork Lift | 2 | ea |
| | Jet Band Saw | 1 | ea |
| | Skids (Gas Polisher) | 4 | ea |
| | Vessel Lid Lifting Rigs | 2 | ea |
| | Bridgeport w/ stand & accessories | 1 | ea |
| | Nuts & Bolt Rack | 1 | ea |
| | Upright Grinder | 2 | ea |
| | Pipe Rack | 1 | ea |
| | Steel Rack | 1 | ea |
| | Storage Racks | 1 | ea |
| | Portable air compressor | 1 | ea |
| | Mig Welder | 1 | ea |
| | Tig Welder | 1 | ea |
| | Plasma Cutter | 1 | ea |
| | Welding Bench | 1 | ea |
| | Work Bench | 1 | ea |
| | Elect Work Bench | 1 | ea |
| | Sanclear Table | 1 | ea |
| | Cut Off Saw | 1 | ea |
| | Nut & Bolt Cart | 1 | ea |
| | Drum Dolly | 1 | ea |
| | Small Band Saw | 1 | ea |

| | | |
|---|---|---|
| Floor Sweeper | 1 | ea |
| Truck Cage | 1 | ea |
| Melt Cart | 1 | ea |
| Scale Cart | 1 | ea |
| Floor Washer | 1 | ea |
| Horiba NOx analyzer | 1 | ea |
| 12 Pleated filters | 12 | ea |
| Combustion Gas Analyzer | 1 | ea |
| Tool cabinet & tools | Multiple | lot |
| Weigh Scales | 2 | ea |

**SCHEDULE 1(f)**

**OFFICE EQUIPMENT**

| | | | |
|---|---|---|---|
| <u>Computers / Software</u> | PC's, Notebooks, Etc | 16 | ea |
| | Printers | 12 | ea |
| | Servers | 2 | ea |
| | Routers / Modems | 2 | ea |
| | AutoCAD Licenses , 3D Model Software | 6 | ea |
| | Misc MS Office, Acct, Sales, Etc Software | 16 | ea |
| | | | |
| <u>Furniture & Office Equipment</u> | Executive Suites | 5 | ea |
| | Desks | 14 | ea |
| | Conference Rooms | 3 | ea |
| | Engineering Workstations | 6 | ea |
| | Chairs, Couches, Credenza | Multiple | lot |
| | Audio Visual Equipment | Multiple | lot |
| | Other Misc Sundry Equipment (i.e. Repro) | Varied | lot |
| | | | |
| <u>Telecommunications Equipment</u> | VOIP System Equipment | 18 | set |

34

**SCHEDULE 1(g)**

**OTHER COMPANY ASSETS**

| | | | |
|---|---|---|---|
| PCS Demonstration System | 5 TPD Plasma Converter System | 1 | ea |
| | Gas Polisher w / Energy Extraction System | 1 | ea |
| | Solid Feed System (Hopper / Auger) | 1 | ea |
| | Liquid Feed System | 1 | ea |
| | High Pressure Cooling Water Recirc Sys | 1 | ea |
| | Low Pressure Cooling Water Recirc Sys | 1 | ea |
| | 150 KW Plasma Torch System | 1 | ea |
| | Hydraulic System | 1 | ea |
| | Melt Charge Carts | 1 | ea |
| | Control System | 1 | ea |
| | Gas Analyzer Monitoring System (N2, H2, CO, CH4, CO2) | 5 | Lot |
| | Gas Chromatographs | 2 | ea |
| | Plasma Gas Rack & Modulators | 1 | ea |
| | Spare Parts Kit | Multiple | Lot |
| | O&M / Training Manuals | Multiple | Lot |
| | | | |
| Other Items (StarCell) | Mech / Elect Design Pkg | Multiple | lot |
| | StarCell Compressors | 2 | ea |
| | StarCell Power Supply | 1 | ea |
| | StarCell Membranes | 3 | ea |
| | StarCell Skid & Platforms | 3 | ea |
| | StarCell Control & Cabinets | 2 | ea |
| | | | |
| Plant / Facility Upgrades | Chiller | 1 | ea |
| | Compressor | 1 | ea |
| | ID Fan | 1 | ea |
| | Waste Tanks | 1 | ea |
| | Elevated Gallery | 1 | ea |
| | Boiler (Inside) | 1 | ea |
| | Boiler (Outside) | 1 | ea |
| | Lab Equipment | Multiple | lot |
| | Gas Racks | 2 | ea |
| | Plasma Medium Test Bench / Rack | 6 | ea |
| | | | |
| **Spare Equipment in Inventory** | NG Electric Generator, Generic (60kw) | 1 | ea |
| | Dressor-Rand Skid Mounted Compressor Station | 1 | ea |
| | ID Fan (Crated) | 1 | ea |

| | | | |
|---|---|---|---|
| | Hopper / Shedder Assembly | 1 | ea |
| | Electric Steam Generator | 1 | ea |
| | Eccentric Enardo Flame Arrestor 4" 1/0 | 1 | ea |
| | Discharge Task (Crated) | 1 | ea |
| | Vertical Pump G&L | 1 | ea |
| | Vessel Pressure Transmitter - Foxboro | 1 | ea |
| | Flow Transmitter GFSYSNET | 1 | ea |
| | Flow Control Valve, Sanden | 1 | ea |
| | Variable Frequency Drive | 1 | ea |
| | Plasma Medium Modulating Train (skid) | 1 | ea |
| | Robicon Power Booster Panel | 1 | ea |
| | PCG Blower | 1 | ea |
| | Plasma Torch Starter Cabinet | 1 | ea |
| | High Pressure Cooling Water Skid | 1 | ea |
| | Bag House, Steel | 1 | ea |
| | Hastelloy Gate Valve 6" | 1 | ea |
| | PCG Heat Exchanger Pipe Section | 1 | ea |
| | Knock-Out Pot | 1 | ea |
| | Scrubber Tank, SS | 1 | ea |
| | Scrubber Column, SS (2) | 2 | ea |
| | PCG Heat Exchanger, Shell & Tube | 2 | ea |
| | Control Valve, Bettis, 3" | 1 | ea |
| | Gas Spiral Heat Exchanger, SS | 1 | ea |
| | Scrubber Pump, Iwakee | 1 | ea |
| | GE Pump | 1 | ea |
| | Water Power Junction Box, PT150 system | 1 | ea |
| | Water Cooled Power Cables, Gas Line, 1 Set | 1 | ea |
| | GE Versamax Input/0utput Cards, CPU, power supply | 32 | ea |
| **Plasma Torch Spares (150kw)** | Adapter Sleeve (Pipe/Anode Adapter) | 1 | ea |
| | Torch Body | 2 | ea |
| | Gap Insulator | 2 | ea |
| | Rear Electrode Holder (Downstream Insulator) | 1 | ea |
| | Vortex Generator | 2 | ea |
| | Rear Insulator (est. price) | 1 | ea |
| | Locking Bushing (Collar Split) | 1 | ea |
| | Rear Electrode | 4 | ea |
| | Front Electrode | 3 | ea |
| | Water Guide - Front Electrode | 2 | ea |

## <u>SCHEDULE 1(h)</u>

## ASSUMED CONTRACTS

- 1x 5TPD & 2 x 10 TPD Plasma Converter System with Plasmatech Carribean Corporation

## SCHEDULE 2(h)

## EXCLUDED ASSETS

In addition to the items set forth in Section 3 of the Asset Purchase Agreement the Excluded Assets includes the following assets, which are currently in inventory but assigned to Mihama, Inc. contract for varied Plasma System repair parts and Major Assembly Upgrades. This contract / manufacture has been completed and Mihama, Inc. has not taken delivery.

- ✓ Gas Polisher (Baghouse Header) (Mdesign)
- ✓ Spare 500 KW Torch - (Mdesign)
- ✓ Hurst Boiler (Heat Exchanger)
- ✓ 5T PCS Vessel (Mdesign) with the following
  - Spherical Bearing Assembly
  - All Hydraulic Lines to Torch Manipulator
  - Cooling Water Lines to the Plasma Vessel
  - All Thermocouples and Wiring
  - Electrical Wiring to Vessel and Torch Positioner
  - Hose to Solid Feeder Stand
  - Conduit for Solid Feeder (From PLC to Solenoid Stand)
  - Torch Bellows
  - O2 Flow Meter and Gauge
  - Bag House Filters (12)
  - Cathode  Bottom SubAssembly
  - HX 04 Gaskets and Plates
  - SV 41 (Air Supply to Backup HP Pump)

## **SCHEDULE 18**

- Waste Water Discharge Tank
- Gas Polisher Scrubber Tanks
- Demo System Baghouse Particulate

## EXHIBIT A

## BILL OF SALE

This **BILL OF SALE**, dated as of _____, 20__, is executed and delivered pursuant to that certain Asset Purchase Agreement, dated as of _____, 20__, (the "Purchase Agreement") by and between **STARTECH ENVIRONMENTAL CORPORATION**, a corporation organized and existing under the laws of the State of Colorado ("Seller"), and _____ _____, a _____ organized and existing under the laws of the State of _____ ("Purchaser"). Capitalized terms used but not defined in this Bill of Sale shall have the meanings ascribed to them in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which Seller hereby acknowledges, and subject to the Sale Order, the Seller does hereby unconditionally and expressly sell, transfer, assign, convey and deliver to the Purchaser and Purchaser hereby purchases and acquires from Seller, all of Seller's right, title and interest in and to the Assets (including, without limitation, the Assumed Contracts), free and clear, based upon entry of the Sale Order, of all liens and encumbrances.

Seller for itself, its respective successors and assigns, hereby covenants and agrees that, at any time and from time to time, forthwith upon the written request of Purchaser and at no cost to Seller, its respective successors and assigns will execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, each and all such further deeds, assignments, transfers, conveyances and assurances as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure and confirm unto and vest in Purchaser, its successors and assigns, title to the aforementioned Assets.

THE ASSETS AND ASSUMED CONTRACTS ARE BEING TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS". EXCEPT FOR THE REPRESENTATION AS TO OWNERSHIP SET FORTH IN SECTION 8(a)(iv) OF THE PURCHASE AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE ASSETS OR ASSUMED CONTRACTS. NO STATUTORY OR OTHER IMPLIED WARRANTIES AS TO THE CONDITION OF OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS SHALL BE IMPLIED AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY. WITHOUT LIMITING THE FOREGOING, PURCHASER ACKNOWLEDGES THAT THE SELLER HAS MADE NO REPRESENTATION OR WARRANTY CONCERNING (1) ANY USE TO WHICH THE ASSETS MAY BE PUT, (2) ANY FUTURE REVENUE, COSTS, EXPENDITURES, CASH FLOW, RESULTS FROM OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ASSETS OR ASSUMED CONTRACTS, (3) ANY OTHER INFORMATION OR DOCUMENTS MADE  AVAILABLE TO PURCHASER, OR (4) THE CONDITION OF THE ASSETS.

Purchaser acknowledges and agrees that this sale of the Assets is final and that the Assets may not be returned to Seller by Purchaser or any other person or entity for any reason whatsoever including, but not limited to, damage or defect.

This Bill of Sale may be executed in one or more counterparts, each of which shall be an original. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

The laws of the State of Connecticut shall govern any controversy arising out of or relating to this Bill of Sale, without regard to conflicts of laws principles that would require the application of any other law, as to all matters, including but not limited to matters of jurisdiction, validity, construction, effect and performance.

**[ SIGNATURES TO FOLLOW ON NEXT PAGE ]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed as of the _____ day of _____, 20__.

**SELLER:**

**STARTECH ENVIRONMENAL
CORPORATION**

By: _____

      Name: _____

      Its: _____

**PURCHASER:**

_____

By: _____

Name: _____

Its: _____

## EXHIBIT B

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This **INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (the "Assignment Agreement"), dated as of _____, 20__ by and between **STARTECH ENVIRONMENTAL CORPORATION**, a corporation organized and existing under the laws of the State of Colorado (the "Assignor"), and _____, a _____ organized and existing under the laws of the State of _____ (the "Assignee"), with reference to the facts set forth below.

## WITNESSETH:

**WHEREAS**, in accordance with the Asset Purchase Agreement by and between Assignor and Assignee, dated as of _____, 20__ (the "Asset Purchase Agreement"), Assignor wishes to sell, transfer, convey, assign and deliver to Assignee (to the extent assignable), and Assignee wishes to acquire, accept and assume, all of Assignor's right, title and interest in and to that certain Intellectual Property (as defined below) or rights thereto owned by Assignor as set forth on **Schedule A** attached hereto and made a part hereof ("Assigned IP") along with all income, royalties, damages and payments due or payable to Assignor arising with respect to the Assigned IP as of the Closing Date or thereafter, including, without limitation, damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all originals, copies and tangible embodiments of Assignor's Intellectual Property in Assignor's possession, custody or control (collectively, the "Assigned IP Assets") and Assignee has further agreed to assume all obligations arising pursuant thereto from and after the date hereof.

**WHEREAS**, Assignee wishes to acquire and assume, and Assignor wishes to transfer to Assignee all of Assignor's right, title and interest in and to the Assigned IP Assets.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in the Asset Purchase Agreement and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1. <u>Defined Terms</u>.

   (a) Capitalized terms used herein and not otherwise defined herein shall have the meanings given in the Asset Purchase Agreement.

   (b) "<u>Intellectual Property</u>" means all rights, title and interest of Seller in and to intellectual property of every nature, whether registered or unregistered consisting of any and all copyrights, patents, patent rights, trade-marks, service marks, trade names and certification marks set forth in on **Schedule A** attached hereto, together with all applications, trade secrets, proprietary manufacturing information and know-how, unpatented blue prints, drawings and designs,

processes, prototypes and technology for any of the foregoing.

2. <u>Assignment and Assumption</u>.  Assignor hereby sells, assigns, transfers and sets over to Assignee all of its right, title and interest in and to the Assigned IP Assets, together with the goodwill associated with such Assigned IP Assets and Assignee hereby accepts and assumes all of the Assignor's right, title and interest in and to the Assigned IP Assets and all obligations with respect thereto arising from and after the date hereof.

3. <u>Further Assurances</u>.  Assignor hereby agrees, upon written request and at Assignee's sole cost and expense, to execute and deliver such other documents, instruments or agreements as are reasonably necessary for the implementation or perfection of this Assignment Agreement.

4. <u>Miscellaneous</u>.

   (a)   This Assignment Agreement shall be binding on and inure to the benefit of the respective successors and assigns of Assignor and Assignee.

   (b)   This Assignment Agreement shall be governed by and construed with the laws of the State of Connecticut without regard to the conflicts-of-law rules thereof.

   (c)   The section headings contained in this Assignment Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not affect in any way the meaning or interpretation of this Assignment Agreement.

   (d)   This Assignment Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one in the same.

**[ SIGNATURES TO FOLLOW ON NEXT PAGE ]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment Agreement to be executed by an officer duly authorized, on and as of the day and year first above written.

**ASSIGNOR:**

**STARTECH ENVIRONMENTAL CORPORATION**

By: _____
Name:
Its:

**ASSIGNEE:**

_____

By: _____
Name:
Its:

**STATE OF**                                    )
                                                ) **ss.** _____
**COUNTY OF**                                   )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of **STARTECH ENVIRONMENTAL CORPORATION**, a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

**STATE OF**                                    )
                                                ) **ss.** _____
**COUNTY OF**                                   )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

## EXHIBIT C

### ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** ("Assignment") is dated and made effective as of the _____ day of _____, 20__, by and between **STARTECH ENVIRONMENTAL CORPORTION**, a corporation organized and existing under the laws of the State of Colorado ("Assignor") and _____, a _____ organized and existing under the laws of the State of _____ ("Assignee").

W I T N E S S E T H:

**WHEREAS**, subject to the terms and conditions of that certain Asset Purchase Agreement by and between Assignor and Assignee dated _____ (the "Purchase Agreement"), Assignor has agreed to assign to Assignee, and Assignee has agreed to accept and assume from Assignor, all of Assignor's right, title and interest in, to and under the Assumed Contracts and the Assumed Liabilities upon the terms and conditions set forth herein and in the Purchase Agreement; and

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree, subject to the terms and conditions set forth in the Purchase Agreement, as follows:

1.      All capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement.

2.      Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in, to and under the Assumed Contracts, to have and to hold the same unto Assignee and its successors and assigns, and Assignee for itself and its successors and assigns hereby assumes the Assumed Contracts as well as all corresponding rights, duties, obligations and liabilities that may exist therein or hereafter arise with respect thereto including, without limitation, under all applicable laws whether now or hereafter in effect.

3.      Assignee also hereby assumes and shall hereafter pay, perform and discharge as and when due, all of the Assumed Liabilities together with all corresponding rights, duties, obligations and liabilities as may exist with respect thereto including, without limitation, under all applicable laws whether now or hereafter in effect.

4.      Assignee acknowledges and agrees that Assignor makes no representations or warranties with respect to the Assumed Contracts or Assumed Liabilities and that Assignee is not relying on any such representations or warranties but is relying solely on its own review and

analysis thereof.

     5.      Assignee, for itself and its successors, assigns and legal representatives agrees, at all times, to indemnify and hold Assignor, its successors, assigns and legal representatives, harmless from any and all cost, loss, liability, damage and expenses (including, without limitation, reasonable attorneys' fees) of any nature arising out of or related to the Assumed Contracts and/or Assumed Liabilities.

     6.      This Assignment: (a) shall be binding upon and inure solely to the benefit of Assignor and Assignee and their respective permitted successors and assigns in accordance with the terms of the Purchase Agreement; (b) may be executed in one (1) or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument; (c) may be executed and delivered by telecopier or portable document format (PDF) transmission with the same force and effect as if the same were a fully executed and delivered original manual counterpart; and (d) shall be governed by, and construed in accordance with, the substantive laws of the State of Connecticut applicable to agreements made and to be performed entirely within such state, without reference to the conflict of laws rules of such state.

**[ SIGNATURES TO FOLLOW ON THE NEXT PAGE ]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment executed as of the date first above written.

<div style="margin-left:50%">

**ASSIGNOR:**

**STARTECH ENVIRONMENTAL CORPORATION**

By: _____
    Name:
    Its:

**ASSIGNEE:**

_____

By: _____
    Name:
    Its:

</div>

**STATE OF**                  )
                        ) **ss.** _____

**COUNTY OF**             )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of **STARTECH ENVIRONMENTAL CORPORATION**, a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

**STATE OF**                   )
                         ) **ss.** _____

**COUNTY OF**              )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF**, I hereunto set my hand.


_____

Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

**EXHIBIT 2**

**BIDDING PROCEDURES**

**EXHIBIT 2**

**BIDDING PROCEDURES**

On April 28, 2010, Startech Environmental Corporation (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). These bidding procedures set forth the process by which the Debtor is authorized to conduct a sale by auction (the "Auction") of the Assets (as defined herein).

1.    <u>Assets</u>.

The Assets consist of substantially all of the Assets of the Debtor, as more particularly described in the purchase agreement (the "Purchase Agreement").

2.    <u>Minimum Bid</u>.

The Minimum Bid requirement shall be $2,000,000 in cash payable at closing. However, the Debtor reserves the right to modify said minimum bid if it deems that it is in the best interest of the estate and ultimately to reject all bids, if, and the Debtor's sole discretion, no bid was sufficient to present to the Court including those initially qualified by the Debtor.

3.    <u>Expense Reimbursement</u>.

    (a)    None.

4.    <u>Due Diligence</u>.

Upon the execution of a confidentiality agreement in form and substance satisfactory to the Debtor, any party desiring to submit a Qualifying Bid, as defined herein, may be granted access to relevant business and financial information of the Debtor to enable such party to evaluate the Assets for the sole purpose of submitting a Qualifying Bid, provided that the Debtor shall have no obligation to provide information to any party that, in the business judgment of the Debtor, after consultation with GCP (as defined in the Motion), lacks the ability to consummate a purchase of the Assets as contemplated by these Bidding Procedures.

5.    <u>Qualifying Bids</u>.

A "Qualifying Bid" is a written offer that:

    (a)    provides that the offeror offers to purchase all or substantially all of the Assets upon terms and conditions substantially as set forth in the Purchase Agreement, and provides a blackline version of the Purchase Agreement to reflect any changes;

(b)      results in a value to the Debtor in its business judgment that is more than the "Minimum Bid," which is Two Million Dollars ($2,000,000) (a "Qualifying Bid Amount");

(c)      does not provide for any payment to the offeror of a break-up fee, expense reimbursement or similar type of fee or payment;

(d)      is accompanied by a duly executed form of Purchase Agreement;

(e)      is accompanied by a deposit in the amount of $250,000, payable in immediately available funds (the "Deposit"), to be held by the Debtor's counsel to secure the Qualifying Bid, which Deposit, subject to the provisions of the Bidding Procedures, shall be refunded to the offeror if the offeror's Qualifying Bid is not accepted by the Debtor as the highest and best offer for the Assets;

(f)      identifies with particularity any executory contract and unexpired lease to be assumed and assigned to the offeror at closing including provisions for assumption of any cure amounts;

(g)      contains financial and other information sufficient to enable the Debtor, in its business judgment, to evaluate and confirm the offeror's financial wherewithal to consummate the purchase of the Assets, including evidence reasonably satisfactory to the Debtor that the offeror has financial resources available and sufficient to finance the purchase of the Assets, and financial and other information sufficient to provide adequate assurance of future performance under § 365 of the Bankruptcy Codes if required;

(h)      does not contain any due diligence, financing or other contingencies of any kind;

(i)      fully discloses the identity of the offeror or any entity participating in the competing offer;

(j)      provides that the offeror consents to the jurisdiction of the Bankruptcy Court; and

(k)      provides for a closing of the purchase and sale of the Assets no later than January 31, 2011; and

(l)      is in conformity with the Purchase Agreement.

(m)      has executed a confidentiality agreement with the Debtor.

6.     <u>Bid Deadline</u>.

All Qualified Bids are due no later than **January 19, 2011 at 5:00 P.M.** and shall be delivered in writing to the following parties by email or facsimile:

      (a)     To the Debtor's counsel and Investment Bankers:

          Zeisler & Zeisler, P.C.
          558 Clinton Avenue
          Bridgeport, CT  06605-0186
          Attention:  Craig I. Lifland, Esq.
          Facsimile No.:  (203) 367-9678
          Email: clifland@zeislaw.com

          General Capital Partners, LLC
          Republic Plaza
          370 Seventeenth St., Suite 5660
          Denver, CO 80202
          Attention: Greg Barrow
                 Sean Donlin
          (720) 200-4500

6.      <u>Determination of Qualifying Bids</u>.

Within one (1) business day after the Bid Deadline, the Debtor shall review each bid for the Assets and determine, in its business judgment, whether such bid constitutes a Qualifying Bid, as defined herein.  The Debtor shall notify each party that submits an offer whether its offer is a Qualifying Bid.

7.      <u>Participation in the Auction; Scheduling of the Auction</u>.

      (a)     The Auction shall be held on January 21, 2011 at 10:00 A.M. at the Debtor's counsel's office at Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport**,** Connecticut.  Only Qualified Bidders (a "Qualified Bidder") may participate in the Auction.  If the Debtor does not receive a Qualifying Bid by the deadline established herein, the Debtor may cancel the Auction.

      (b)     The following procedures shall govern the Auction:

          (i)     Only Qualifying Bidder may appear in person or through an authorized representative;

(ii)    No party other than a Qualifying Bidder shall be entitled to submit bids for the Assets at the Auction;

(iii)    Bidding at the Auction shall commence at the amount of the highest Qualifying Bid received by the Debtor.  Each successive bid must be at least $25,000 higher than the outstanding highest bid.

(iv)    The Debtor reserves the right, in its business judgment, to determine whether a bid constitutes a higher and better offer than other bids received for the Assets.  The Debtor shall be entitled to consider the amount of the purchase price, including any release or offset of claims, the financial wherewithal of the bidder and the overall benefit to the Debtor's estate.

(v)    Any Qualifying Bidder may make modifications to the Purchase Agreement during the Auction, provided that the Debtor reserves the right, in its business judgment, to determine whether such modifications impact whether such bid represents the highest and best offer for the Assets.

(vi)    The Debtor shall conduct the Auction until the Debtor determines, in its business judgment, that it has received the highest and best offer for the Assets.

(vii)    The Debtor may, in its business judgment, at any time prior to the Sale Hearing, continue the Auction from time to time, adjourn the Auction and re-open the Auction, upon notice to the Qualifying Bidders, without further notice to the Bankruptcy Court or any other parties, and the Debtor may establish, by announcement at the Auction, such modified or additional bidding procedures as the Debtor deems appropriate based on the circumstances, provided that such modifications or changes shall not materially alter the bidding procedures set forth herein.

8.    Identification of Prevailing Bidder; Court Approval.

Within one (1) business day after the conclusion of the Auction, the Debtor shall announce the identity of the party submitting the highest and best offer for the Assets (the "Prevailing Bid").  Such Prevailing Bid shall be subject to approval by the Bankruptcy Court at the Sale Hearing.

9.    Sale Hearing.

The hearing to approve the sale of the Assets shall be held before the Honorable Alan H. W. Shiff at the United States Bankruptcy Court for the District of Connecticut, 915 Lafayette

Boulevard, Bridgeport, Connecticut at 2:00 P.M. on January ____, 2011, or at such time thereafter as counsel may be heard, or at such other time as the Bankruptcy Court may establish.

10.     Failure to Consummate Purchase.

(a)     If for any reason the party who submitted the Prevailing Bid fails to consummate the purchase of the Assets, the Debtor shall designate the next best offer ("The Backup Bidder") as the Prevailing Bid, and the Debtor shall consummate the closing of the purchase of the Assets.

(b)     If for any reason a Qualifying Bidder whose offer is selected as the Prevailing Bid (or Backup Bidder) shall fail to consummate the purchase of the Assets, the Deposit submitted by such Qualifying Bidder shall be forfeited to the Debtor.

11.     Return of Deposit.

Except for the Prevailing Bid and Backup Bidder, all Deposits shall be returned to Qualifying Bidders within three (3) business days after the completion of the Auction.  If the Prevailing Bid consummates the sale, then the deposit of the Backup Bidder shall be returned within two (2) business days of closing.

12.     Jurisdiction of the Bankruptcy Court.

(a)     The Bankruptcy Court shall have jurisdiction to hear any matters that may arise from or relate to the Bidding Procedures or the sale of the Assets.

## **EXHIBIT 3**

## **NOTICE OF AUCTION**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: | :    Chapter 11 |
| | : |
| STARTECH ENVIRONMENTAL | :    CASE NO. 10-50955 (AHWS) |
| CORPORATION, | : |
| | : |
| Debtor-in-Possession. | : |
| | : |

**NOTICE OF AUCTION**

TO: CREDITORS AND PARTIES IN INTEREST REQUESTING NOTICE of Auction Sale of Substantially all of the Assets of Startech Environmental Corporation (the "Auction").

PLEASE TAKE FURTHER NOTICE that on December _____,2010, the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") entered the Order (i) Authorizing and Approving Form of Purchase Agreement, (ii)Authorizing and Approving Bidding Procedures, (iii) Scheduling an Auction, (iv) Approving Form and Manner of Notice Thereof, and (v) Granting Related Relief, All in Connection With the Sale of Substantially All of The Debtor's Assets, (the "Bidding Procedures Order"). The Bidding Procedures Order governs the manner in which substantially all of the assets of the Debtors are to be sold. **Copies of the Bidding Procedures Order, and other pleadings relevant to the Sale can be obtained from the United States Bankruptcy Court, District of Connecticut website at:** www.ctb.uscourts.gov. **You must have a Pacer login password to access the documents. A Pacer login password can be obtained at** www.pacer.psc.uscourts.gov.

PLEASE TAKE FURTHER NOTICE that, pursuant to the terms of the Bidding Procedures Order, the Debtor hereby gives notice that the Auction shall be held on January 21, 2011 at 10:00 am, at the offices of Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, CT 06605. **Only Qualified Bidders as defined in the Bidding Procedures Order will be permitted to attend the Auction.**

PLEASE TAKE FURTHER NOTICE that, a hearing to authorize the sale of substantially all of the Debtor's assets, to approve the winning bid and to consider any objection thereto shall be held on January _____, 2011 at 10:00 a.m. at the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division, 915 Lafayette Blvd., Bridgeport, Connecticut. Any objections to the Auction or the sale must be filed with the Court and delivered to Debtor's Counsel, Craig I. Lifland, Esq., Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, CT 06610, at or before the hearing.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures Order, the bidding procedures, a copy of which are annexed hereto, have been approved by the United States

58

Bankruptcy Court for the District of Connecticut and shall govern the solicitation of bids and conduct of the Auction.

PARTIES INTERESTED IN OBTAINING INFORMATION ABOUT THE AUCTION SHOULD CONTACT GREG BARROW OR SEAN DONLIN, GENERAL CAPITAL PARTNERS, LLC, REPUBLIC PLAZA, 370 SEVENTEENTH STREET, #5660, DENVER, CO 80202, (720) 200-4500.  Other inquiries regarding the sale should be addressed to Craig I. Lifland, Esq., attorney for the Debtors, Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, Connecticut, 06605, (203) 368-4234, or at CLifland@zeislaw.com.

Dated this _____day of _____ , 2010 at Bridgeport, Connecticut.

The Debtor, Startech Environmental Corporation

By:  ___/s/Craig I. Lifland_____
Craig I. Lifland, Esq. (ct00976)
Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT  06605
Tel: 203-368-4234 / Fax: 203-367-9678
Email:  clifland@zeislaw.com
ATTORNEY FOR DEBTOR
AND DEBTOR-IN-POSSESSION