# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| STARTECH ENVIRONMENTAL CORPORATION, | CASE NO. 10-50955 (AHWS) |
| Debtor-in-Possession | |

STARTECH ENVIRONMENTAL
CORPORATION,
                    Debtor-in-Possession

    Movant

vs.

CHAMPION ENERGY, INC.,

    Respondent

## DEBTOR'S MEMORANDUM IN SUPPORT OF
## MOTION AUTHORIZING AND APPROVING SALE
## AND APPROVING LCY INVESTMENTS AS A PREVAILING BID

Startech Environmental Corporation, Debtor and Debtor-in-Possession ("Startech" or "Debtor"), by and through its undersigned counsel, hereby respectfully submits this post hearing memorandum in support of its request to have this Court determine LCY Investments Corp., (hereafter "LCY") as the prevailing bidder pursuant to bidding procedures established by Order of this Court, and to approve the sale to LCY.

## I.      PRELIMINARY STATEMENT

Startech Environmental Corporation is a publicly traded environmental technology company commercializing its proprietary plasma processing technology known as the Plasma Converter™

that achieves closed-loop elemental recycling. The System irreversibly destroys hazardous and non-hazardous waste and industrial by-products while converting them into useful commercial products. These products include a rich synthesis gas called PCG (Plasma Converter Gas™), surplus energy for power, chemical industry feedstocks, metals and silicates for use and for sale. Startech operated from its facilities in Bristol, CT, and had offices in Wilton, CT. At year end in 2009, the Debtor had 16 employees, however, as of the filing date, the Debtor had 4 employees.

From the onset, the Debtor's chapter 11 case has suffered from no cash from operations and only minimal funding from a potential purchaser. The Debtor entered chapter 11 with an agreement for debtor-in-possession financing with Champion Energy ("Champion") for amounts which were not expected to exceed $750,000. At the same time, the Debtor anticipated executing a stalking horse purchase agreement with Champion, subject to higher and better offers, and that Champion would fund the Debtor's minimal operations during a marketing period headed by a Court approved investment banker[1]. Unfortunately, and notwithstanding entry of a DIP Financing Order, Champion only funded approximately $55,000.00, and subsequently an additional $60,000 (approx.). These amounts were insufficient to meet the Debtor's everyday operating expenses, including, but not limited to, payroll, insurance, and most importantly rent due the Debtor's landlords in Wilton, Connecticut, for its corporate offices, and for two facilities in Bristol, Connecticut, where the majority of the Debtor's physical assets are located.

Consequently, numerous stay relief motions were filed by the Debtor's landlords, which (i) resulted in the Debtor having to vacate its Wilton, Connecticut headquarters; and (ii) resulted in the Debtor agreeing to a deadline of October 24, 2010, or the landlord for its facilities at 190

---

[1] Pursuant to an Order of this Court, the Debtor engaged General Capital Partners ("GCP") to solicit bids for the Debtor's assets.

Century Drive, Bristol, Connecticut, where the majority of the Debtor's assets are located, would be free to execute on a judgment of eviction entered in a state court. Through negotiations between the Debtor and the Century Drive landlord, the Debtor obtained a stay of execution to early February, 2011, to consummate a sale in exchange for a $60,000 payment.

Although there were numerous interested parties, the Debtor was unable to execute an Asset Purchase Agreement ("APA") with a stalking horse sufficient to set a base price at an auction. As a consequence, the Debtor sought and obtained entry of an Order approving bidding procedures for an open auction and establishing two million dollars as the minimum bid. This Court's Order (i) Authorizing and Approving Form of Purchase Agreement, (ii) Authorizing and Approving Bidding Procedures, (iii) Scheduling an Auction, (iv) Approving Form and Manner of Notice Thereof; and (v) Granting Related Relief All In Connection With The Sale Of Substantially All Of the Debtors Assets", dated December 9, 2010, established specific bidding procedures for the submittal of "Qualified Bids" and set January 25, 2011 as an auction date and hearing to approve of the Prevailing Bid and approve the sale (hereafter, "Sale Hearing"). A copy of the December 9, 2010 Order is attached hereto as "Exhibit A" and incorporated herein (hereafter the "Bid Procedures Order").

The Bid Procedures Order set January 19, 2011 at 5:00 p.m. for the submittal of "Qualified Bids". On January 19, 2011 a representative of LCY emailed Debtor's counsel advising that a deposit of $250,000 had been wired to counsel's fiduciary account as the required deposit under the Bid Procedures Order. See, "Exhibit B" annexed hereto. Later that afternoon, Debtor's counsel received an executed APA from LCY along with proof of financial wherewithal. See, Exhibit C attached hereto. The APA was approved by the Bid Procedures Order (see, Bid Procedures Order, ¶ B 2). The approved APA expressly provides that the

3

purchase of Assets is not subject to any contingency, see, APA, Paragraph 5 – "there are no contingencies whatsoever to the obligations set forth in this Agreement". Moreover, the Bid Procedures Order expressly provides that in order to be a Qualifying Bid, the offer "shall not contain a due diligence, financing, or other contingencies of any kind". See, Bid Procedure Order, Exhibit 1, section 5(h).

On the bid deadline of January 19, 2011, a representative of LCY emailed Debtor's counsel confirming that its submissions constitute a "Qualifying Bid" in accordance with the Bid Procedures Order. See, Exhibit D, attached hereto. Debtors counsel was unable to speak with counsel for LCY until the afternoon of Monday, January 24, 2011 when he was informed for the first time that LCY was considering withdrawing its bid. Debtors counsel was told a formal position from LCY would be sent. It was never received. See Exhibit E, attached hereto. Rather, on the day of the Sale Hearing, counsel for LCY advised the Debtor and this Court that it was seeking to withdraw its bid. At the Sale Hearing, LCY's counsel advised the Court that following submittal of the Qualifying Bid, it had performed due diligence which resulted in LCY deciding to withdraw the bid.

It is the Debtor's position that withdrawal of the bid is not permitted and is contrary to this Court's Bid Procedures Order and established law. At the Sale Hearing, the Debtor requested that the Court determine LCY to be the Prevailing Bid in accordance with the Bid Procedures Order, and proceed to a closing. If LCY does not close, then, in accordance with both the signed APA and ¶ 10(b) of Exhibit 1 to the Bid Procedures Order, LCY's $250,000 deposit should be forfeited to the Debtor's estate.

## II.  **DISCUSSION**

LCY's position is that it has the right to withdraw its bid at any time, apparently for any reason. Such a position flies in the face of the carefully crafted procedures provided in the Bid Procedures Order, rewrites the executed APA submitted and signed by LCY, and is contrary to established law.

### A.     A BID SUBMITTED AT A JUDICIAL SALE CANNOT BE WITHDRAWN PRIOR TO APPROVAL AT A SALE HEARING

It is well established that a buyer at a judicial sale is bound by its bid until the Court either approves or disapproves it. In re: Crown Corporation, 679 F. 2d 774, 777 n.4 (9th Cir. 1982), citing Camden v. Mayhew, 129 U.S. 73, 83 9 S. Ct. 246, 248, 32 L. ED. 608(1889); Gordon v. Woods, 189 F. 2d 76, 78 (1ST Cir. 1951); See also, In re Threhan, 85 B.R. 920, 923 (Bankr. S.D.N.Y. 1988); citing 4B *Collier on Bankruptcy* ¶ 70.98 [16] at 1173-74 (14th ed.). A bid at a judicial sale, subject to confirmation, *binds the bidder*, and is considered a contract between the parties but subject to the consent of a third person which is the court and is not subject to withdrawal. Freehill v. Greenfeld, 204 F. 2d 907, 908 (2d Cir. 1953) (emphasis supplied).

The Bid Procedures Order expressly requires that bids be non-contingent. The APA signed by LCY expressly states it is not subject to *any* contingencies, and that the conditions to closing (aside from customary representations and warranties) was only subject to approval of the bankruptcy court. See, APA, ¶ 14(a). In other words, a Qualified Bid is a binding contract between the Debtor and the prospective purchaser until such time as the court approves the bid. To permit a bidder at any time to withdraw its bid would create havoc in the sale process and undo the certainty which is necessary to the integrity of the process and for which all interested parties rely in order to avoid unnecessary costs and delay.

In the matter of <u>Galleria Investments, LLC</u>, 2008 Bankr. LEXIS 1860 (Bankr. N.D. GA),
the Bankruptcy Court enforced a liquidated damages provision which required the forfeiture of
the bidder's deposit when the successful bidder failed to close on the sale. The Court discussed
at length the necessity of adhering to the procedures set forth in its Bid Procedure Order and its
significance to the integrity of the process and fairness to all creditors and parties in interest with
a stake in the outcome. In describing generally the importance of fixed bidding procedures, and
the resulting prejudice to the estate from a defaulting bidder, the Bankruptcy Court stated:

> All of these considerations leave the parties in a bankruptcy case to seek to
> minimize the risks of disaster to approve the bidding procedures and terms
> and conditions of sale that are designed to ensure that a potential purchaser
> of assets from the bankruptcy estate is a serious bidder with the financial
> ability to close the transaction and will timely do so and that the estate
> (and derivatively, its creditors) will have an adequate alternative remedy if
> the purchaser does not.

<u>Galleria Investments, LLC</u>, at *22. The Court went further and stated:

> Whether the result of give and take negotiations or the Court's resolutions
> of disputes over sales procedures, bidding incentives, terms and conditions
> of sale, or timing, the court's entry of an order authorizing and approving
> the proposed sale and the sales procedures establishes definitive rules for
> the transaction, its terms and conditions, the procedures leading up to the
> sale, and its consummation. Everyone in the case knows that the proposed
> procedures, the terms and conditions of the sale, and the sale itself in
> accordance with those procedures have received judicial approval and that
> the transaction can take place as authorized.

<u>Galleria Investments, LLC</u> at *27. Moreover, the Court made clear that a prospective
bidder submits itself to the jurisdiction of the Court and will be treated as accepting the
terms of the Bid Procedure Order to the same extent as parties in interest who were
noticed of the request for entry of the Bid Procedure Order. As such, "an order approving
bid procedures thus becomes binding on the bidder". See <u>Galleria Investments</u> supra at
*29. "To allow purchasers to bid hundreds of thousands of dollars before a Court, to

6

have lien holders agree to the bid, and then to have the purchasers renege upon further inquiry into the nature of the property, would interject an intolerable element of uncertainty and inequity into judicial sales. In re Winston Inn and Restaurant Corp., 120 B.R. 631, 638 (Bankr. E.D.N.Y. 1990), citing, In re Governor's Island, 45 B.R. 247, 254 (Bankr. E.D.N.C. 1984). LCY's attempt to withdraw its bid is contrary to established law regarding judicial sales and the Bid Procedure Order to which it is bound.

B.    THE REASONS PRESENTED BY LCY FOR WITHDRAWING ITS BID ARE INCONSISTENT, AND CONTRARY TO THE PLAIN LANGUAGE IN ITS COURT APPROVED SIGNED APA.

LCY asks this Court to ignore the ground rules established in the Bid Procedure Order and its own signed contract, and for groundless reasons. Most perplexing, is LCY's position that after the bid deadline it undertook due diligence which resulted in its decision to seek withdrawal of its bid. See, Transcript of Sale Hearing at p. 11, 12, 14, 15, (hereafter "Tr. at _____"). If LCY needed additional time to do its due diligence, then it should never have submitted the non contingent bid in the first place. In fact, LCY submitted a signed contract which did not provide for due diligence. As noted by the Court at the Sale Hearing, LCY was not required to submit a bid if it could not satisfy its due diligence requirements prior to the bid deadline. "Nobody is forcing you to bid". Tr. at 23. A Qualified Bidder has no right to attach subsequent conditions after an unconditional bid. Crown, supra at 777, n.4.

LCY also asserted at the Sale Hearing that it did not receive the Confidentiality Agreement until after the bid deadline. Tr. at 12. That is because it did not request the Confidentiality Agreement which was required by the Bid Procedure Order in order to protect the proprietary information included as part of the Asset Sale. Once the Confidentiality

Agreement was executed, LCY was given access to an internet "Data Room" containing all information that all bidders who signed Confidentiality Agreements had access to. Indeed, the "Data Room" has been in existence for months while the Debtor and GCP solicited offers for the Debtor's assets. Tr. at 19. It is nonsensical for a sophisticated party purchasing assets with a minimum value of $2,000,000 which signed a non-contingent agreement and had prior access to a Data Room, to be permitted to withdraw its bid because it subsequently decides the "project is not viable" Tr. at 15.

In addition, LCY argued at the Sale Hearing that it had the right to "modify" it's bid at any time as contemplated by the Bid Procedure Order. Tr. at 12. The "modification" permitted in the Bid Procedure Order permits a Qualified Bidder to modify its bid as part of the *auction*. (See, Exhibit 1 to Bid Procedure Order, ¶ 8(v). "Any Qualified Bidder may make modifications to the Purchase Agreement during the Auction, provided that the Debtor reserves the right, in its business judgment, to determine whether such modifications impact whether such bid represents the highest and best offer for the Assets". Clearly the "modification" referred to in the Order is to increase a bid during the Auction, not withdraw a bid. The only other language LCY could rely on in the Bid Procedure Order permits an offeror to blackline a version of the purchase agreement to reflect proposed changes as part of its Qualifying Bid. However, this language does not apply as LCY did not blackline the Purchase Agreement. Indeed, they made no changes to the court-approved form of agreement. See Bid Procedure Order, Exhibit 1, ¶ 5(a).

LCY also asserts that it was never formally informed it was a Qualified Bidder. Tr. at 15. In fact, LCY was informed it was a Qualified Bidder when counsel was able to communicate with counsel for LCY. See Exhibit "E", attached hereto. Moreover, as stated by the 9th Circuit In re Crown Corporation, in refuting such an argument, such an "interpretation amounts to an

8

argument that the bidder can simply renege by refusing to turn over financial data and forcing the seller to release the bid. We refuse to except such a proposition" Crown, supra at 777 n.4.

In addition, paragraph 11 of Exhibit 1 to the Bid Procedure Order expressly provides for the return of deposits. Paragraph 11 states "Except for the Prevailing Bid and Back-up Bidder, all deposits shall be returned to Qualifying Bidders within three business days after the completion of the Auction. If the Prevailing Bid consummates the sale, then the deposit of the Backup Bidder shall be returned within two business days of closing". Such language clearly makes it implicit that a Qualifying Bid cannot be withdrawn in advance of the prescribed timetable. LCY's position that it can withdraw and demand return of its deposit in advance of the Sale Hearing is undermined by the express language of the Bid Procedure Order which sets forth the timing for return of deposits.

Notwithstanding ¶ 11 of the Bid Procedure Order, LCY argues that it was told that its deposit was refundable. Tr. at 11. This argument, as its other arguments, ignores the Order of this Court, for which LCY is bound, as well as the signed APA. Moreover, the e-mail referred to by LCY written by a representative of GCP provides that it would be refundable, but also includes language that the sale process was subject to the Bid Procedure Order. See Exhibit "F" attached hereto. The reference to refundability of the deposit is actually consistent with ¶ 11 of the Bid Procedure Order. The language in the e-mail from GCP might be considered ambiguous, except LCY's interpretation is inconsistent with the Bid Procedure Order and its signed APA. Reliance on it is simply not justified. Moreover, an agent of GCP does not have the authority to modify this Court's Order. Finally, the signed APA has a standard integration clause in ¶ 24(d) thereof reflecting that the terms of the agreement represent the entire agreement of the parties.

C.    WITHDRAWAL OF THE LCY BID WILL PREJUDICE THE ESTATE

Should the Court permit LCY to withdraw its bid, Startech's bankruptcy estate will be significantly prejudiced. As set forth in the Preliminary Statement above, the Startech estate has been starved for cash since its initial Chapter 11 filing. Through extensive negotiation with its landlords, it was able to extend a previously set "drop dead date" to February 7, 2011, in order to close on the sale of its assets. Failure to close as of February 7th will result in the lifting of the stay of execution of the landlord's judgment and possibly the forfeiture of the value of the Debtor's assets. The landlord has asserted throughout this case that it owns the assets if the Debtor does not remove them pursuant to applicable state law. As set forth above, these assets are extensive and valuable, and the Debtor has no funds to relocate them. The landlord has advised Startech that it will proceed to sell the Debtor's assets for its own benefit in order to satisfy its use and occupancy claims if the February 7, 2011 deadline is not met.

Moreover, significant time and expense has been incurred by the bankruptcy estate to solicit bids, establish bidding procedures, file pleadings, and notice creditors and shareholders regarding the entire sale process all towards the end of closing on a sale within the required time frame. To protect against losses incurred by a defaulting bidder, an earnest money deposit was required in the amount of $250,000. Bid Procedure Order, Exhibit 1 ¶ 10(b) and APA section 19. Failure to grant the relief requested will result in significant financial loss to the estate. If LCY does not close the sale, the deposit must be forfeited to cover the Debtor's losses. While forfeitures are generally disfavored, such clauses must be clearly and unambiguously be stated to be enforced. Crown, supra at 776 and 777. In the instant case, the forfeiture is clearly set forth in both the APA (See, ¶ 19) and the Bid Procedure Order (Exhibit 1 ¶ 10(b)).

III.   **CONCLUSION**

LCY has no legal basis to seek the withdrawal of its bid.  LCY submitted a Qualifying

Bid and the highest bid for the assets all in accordance with bid procedures established by this

Court.  LCY signed a non-contingent agreement and submitted a deposit as earnest money to

enforce the provisions of the APA.  LCY cannot now, after the fact, determine that it does not

want to purchase the assets based upon late due diligence.  Therefore, Startech requests this

Court (i) enter an Order specifically finding that LCY submitted the "Prevailing Bid" in

accordance with this Court's Bid Procedures Order, (ii) approve the sale of assets in accordance

with section 363(b) and (f) pursuant to the terms of an Order which will be submitted by the

Debtor,  and (iii) in the event LCY fails to close on the sale of assets in accordance with the

terms and provisions of its executed APA, within 5 calendar days of entry of such a Court Order,

then its $250,000 deposit currently in the trustee account of Debtor's counsel shall be considered

forfeited and property of the Startech bankruptcy estate, and (iv) for such other and further relief

as this Court deems just and proper.

Respectfully submitted this 7th day of February, 2011.

The Debtor,
STARTECH ENVIRONMENTAL CORPORATION


By:      /s/Craig I. Lifland
         Craig I. Lifland, Esq. (ct00976)
         Zeisler & Zeisler, P.C.
         558 Clinton Avenue
         Bridgeport, CT  06605
         Tel: 203-368-4234 / Fax: 203-367-9678
         Email: clifland@zeislaw.com
         ATTORNEY FOR DEBTOR
         AND DEBTOR-IN-POSSESSION

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| STARTECH ENVIRONMENTAL CORPORATION, | : | CASE NO. 10-50955 (AHWS) |
| | : | |
| | : | |
| Debtor-in-Possession. | : | Re: Doc. No. 186 |
| | : | |

**ORDER (i) AUTHORIZING AND APPROVING FORM OF PURCHASE AGREEMENT, (ii) AUTHORIZING AND APPROVING BIDDING PROCEDURES, (iii) SCHEDULING AN AUCTION, (iv) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (v) GRANTING RELATED RELIEF, ALL IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**

Upon the Motion of the Debtor and Debtor-in-possession for an Order (i) Authorizing and Approving Form of Purchase Agreement, (ii) Authorizing and Approving Bidding Procedures, (iii) Scheduling an Auction, (iv) Approving the Form and Manner of Notice Thereof, and (v) Granting Related Relief, all in Connection with the Sale of Substantially All of the Debtor's Assets (the "Bidding Procedures Motion"), and any objections to the Bidding Procedures Motion having been overruled or resolved, and good and sufficient cause appearing therefore, and the court having found that sufficient notice having been given, it is hereby

ORDERED:

**A.**   **Approval of Bid Procedures**

790701.5

1.      The Bidding Procedures Motion is granted in all respects and the bidding

procedures set forth on Exhibit 1 annexed hereto are hereby approved in all respects.

**B.      Approval of the Form of Purchase Agreement**

2.      The form *only* of the Purchase Agreement (the "Purchase Agreement") is

approved. The approval of any sale of the Assets of the Debtor shall be approved, if at all, at the

Sale Hearing as scheduled below.

**E.      Scheduling of Auction**

3.      The Auction shall take place at 2:00 p.m. at the United States Bankruptcy Court,

915 Lafayette Boulevard, Bridgeport, CT, 1st Floor, on January 25, 2016.  The Debtor shall give

notice of the Auction and Sale Hearing in the manner proposed in the Bidding Procedures

Motion and the Form of Notice of Auction annexed to the Motion as Exhibit 3 is hereby

approved.

**F.      Scheduling of Sale Hearing**

4.      A hearing to consider the Debtor's request to approve the Sale of Assets to the

successful bidder, and any objections thereto, shall be held immediately following the Auction

on January 25, 2011, at 2:00 p.m. at United States Bankruptcy Court, 915 Lafayette Boulevard,

Bridgeport, CT 06604, 1st Floor.

Dated at Bridgeport, Connecticut this 9th day of December, 2010.

By the court

Alan H. W. Shiff, U.S.B.J.

790701.5

**EXHIBIT 1**

**BIDDING PROCEDURES**

790701.5

## EXHIBIT 1

### BIDDING PROCEDURES

On April 28, 2010, Startech Environmental Corporation (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). These bidding procedures set forth the process by which the Debtor is authorized to conduct a sale by auction (the "Auction") of the Assets (as defined herein).

1.    Assets.

The Assets consist of substantially all of the Assets of the Debtor, as more particularly described in the purchase agreement (the "Purchase Agreement").

2.    Minimum Bid.

The Minimum Bid requirement shall be $2,000,000 in cash payable at closing. However, the Debtor reserves the right to modify said minimum bid if it deems that it is in the best interest of the estate and ultimately to reject all bids, if, and the Debtor's sole discretion, no bid was sufficient to present to the Court including those initially qualified by the Debtor.

3.    Expense Reimbursement.

        (a)    None.

4.    Due Diligence.

Upon the execution of a confidentiality agreement in form and substance satisfactory to the Debtor, any party desiring to submit a Qualifying Bid, as defined herein, may be granted access to relevant business and financial information of the Debtor to enable such party to evaluate the Assets for the sole purpose of submitting a Qualifying Bid, provided that the Debtor shall have no obligation to provide information to any party that, in the business judgment of the Debtor, after consultation with GCP (as defined in the Motion), lacks the ability to consummate a purchase of the Assets as contemplated by these Bidding Procedures.

5.    Qualifying Bids.

A "Qualifying Bid" is a written offer that:

790701.5

(a)     provides that the offeror offers to purchase all or substantially all of the Assets upon terms and conditions substantially as set forth in the Purchase Agreement, and provides a blackline version of the Purchase Agreement to reflect any changes;

(b)     results in a value to the Debtor in its business judgment that is more than the "Minimum Bid," which is Two Million Dollars ($2,000,000) (a "Qualifying Bid Amount");

(c)     does not provide for any payment to the offeror of a break-up fee, expense reimbursement or similar type of fee or payment;

(d)     is accompanied by a duly executed form of Purchase Agreement;

(e)     is accompanied by a deposit in the amount of $250,000, payable in immediately available funds (the "Deposit"), to be held by the Debtor's counsel to secure the Qualifying Bid, which Deposit, subject to the provisions of the Bidding Procedures, shall be refunded to the offeror if the offeror's Qualifying Bid is not accepted by the Debtor as the highest and best offer for the Assets;

(f)     identifies with particularity any executory contract and unexpired lease to be assumed and assigned to the offeror at closing including provisions for assumption of any cure amounts;

(g)     contains financial and other information sufficient to enable the Debtor, in its business judgment, to evaluate and confirm the offeror's financial wherewithal to consummate the purchase of the Assets, including evidence reasonably satisfactory to the Debtor that the offeror has financial resources available and sufficient to finance the purchase of the Assets, and financial and other information sufficient to provide adequate assurance of future performance under § 365 of the Bankruptcy Codes if required;

(h)     does not contain any due diligence, financing or other contingencies of any kind;

(i)     fully discloses the identity of the offeror or any entity participating in the competing offer;

(j)     provides that the offeror consents to the jurisdiction of the Bankruptcy Court; and

(k)     provides for a closing of the purchase and sale of the Assets no later than January 31, 2011; and

(l)     is in conformity with the Purchase Agreement.

790701.5

(m)    has executed a confidentiality agreement with the Debtor.

6.    Bid Deadline.

All Qualified Bids are due no later than **January 19, 2011 at 5:00 P.M.** and shall be delivered in writing to the following parties by email or facsimile:

(a)    To the Debtor's counsel and Investment Bankers:

Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT 06605-0186
Attention: Craig I. Lifland, Esq.
Facsimile No.: (203) 367-9678
Email: clifland@zeislaw.com

General Capital Partners, LLC
Republic Plaza
370 Seventeenth St., Suite 5660
Denver, CO 80202
Attention: Greg Barrow
            Sean Donlin
(720) 200-4500

7.    Determination of Qualifying Bids.

Within one (1) business day after the Bid Deadline, the Debtor shall review each bid for the Assets and determine, in its business judgment, whether such bid constitutes a Qualifying Bid, as defined herein. The Debtor shall notify each party that submits an offer whether its offer is a Qualifying Bid.

8.    Participation in the Auction; Scheduling of the Auction.

(a)    The Auction shall be held on January 25, 2011 at 2:00 P.M., at United States Bankruptcy Court, 915 Lafayette Boulevard, Bridgeport, CT 06604, 1st Floor. Only Qualified Bidders (a "Qualified Bidder") may participate in the Auction. If the Debtor does not receive a Qualifying Bid by the deadline established herein, the Debtor may cancel the Auction.

(b)    The following procedures shall govern the Auction:

(i)      Qualifying Bidders may appear in person or through an authorized representative;

(ii)      No party other than a Qualifying Bidder shall be entitled to submit bids for the Assets at the Auction;

(iii)      Bidding at the Auction shall commence at the amount of the highest Qualifying Bid received by the Debtor. Each successive bid must be at least $50,000 higher than the outstanding highest bid.

(iv)      The Debtor reserves the right, in its business judgment, to determine whether a bid constitutes a higher and better offer than other bids received for the Assets. The Debtor shall be entitled to consider the amount of the purchase price, including any release or offset of claims, the financial wherewithal of the bidder and the overall benefit to the Debtor's estate.

(v)      Any Qualifying Bidder may make modifications to the Purchase Agreement during the Auction, provided that the Debtor reserves the right, in its business judgment, to determine whether such modifications impact whether such bid represents the highest and best offer for the Assets.

(vi)      The Debtor shall conduct the Auction until the Debtor determines, in its business judgment, that it has received the highest and best offer for the Assets.

(vii)      The Debtor may, in its business judgment, at any time prior to the Sale Hearing, continue the Auction from time to time, adjourn the Auction and re-open the Auction, upon notice to the Qualifying Bidders, without further notice to the Bankruptcy Court or any other parties, and the Debtor may establish, by announcement at the Auction, such modified or additional bidding procedures as the Debtor deems appropriate based on the circumstances, provided that such modifications or changes shall not materially alter the bidding procedures set forth herein.

8.      <u>Identification of Prevailing Bidder; Court Approval.</u>

Within one (1) business day after the conclusion of the Auction, the Debtor shall announce the identity of the party submitting the highest and best offer for the Assets (the "Prevailing Bid"). Such Prevailing Bid shall be subject to approval by the Bankruptcy Court at the Sale Hearing.

9.      Sale Hearing.

        The hearing to approve the sale of the Assets shall be held before the Honorable Alan H. W. Shiff at the United States Bankruptcy Court for the District of Connecticut, 915 Lafayette Boulevard, Bridgeport, Connecticut at 2:00 P.M. on January 25, 2011, or at such time thereafter as counsel may be heard, or at such other time as the Bankruptcy Court may establish.

10.     Failure to Consummate Purchase.

        (a)     If for any reason the party who submitted the Prevailing Bid fails to consummate the purchase of the Assets, the Debtor shall designate the next best offer ("The Backup Bidder") as the Prevailing Bid, and the Debtor shall consummate the closing of the purchase of the Assets.

        (b)     If for any reason a Qualifying Bidder whose offer is selected as the Prevailing Bid (or Backup Bidder) shall fail to consummate the purchase of the Assets, the Deposit submitted by such Qualifying Bidder shall be forfeited to the Debtor.

11.     Return of Deposit.

        Except for the Prevailing Bid and Backup Bidder, all Deposits shall be returned to Qualifying Bidders within three (3) business days after the completion of the Auction. If the Prevailing Bid consummates the sale, then the deposit of the Backup Bidder shall be returned within two (2) business days of closing.

12.     Jurisdiction of the Bankruptcy Court.

        (a)     The Bankruptcy Court shall have jurisdiction to hear any matters that may arise from or relate to the Bidding Procedures or the sale of the Assets.

790701.5

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent via first-class, postage prepaid mail, e-mail, and facsimile, on this 7th day of December, 2010 to:

**Via Regular Mail:**

Konica Minolta Business Solutions
Attn.: Pres, Mng Mmb, GP
One Deerwood, Ste. 100
10201 Centurion Pkwy N.
Jacksonville, FL 32256

Corporate Stock Transfer
Attn.: Shari Humphreys
3200 Cherry Creek Dr. South
Suite 430
Denver, CO 80209

General Capital Partners, LLC
600 Seventeenth Street, Suite 2350
South Denver, CO 80202

The Estate of J. Everett Pidgeon
c/o David Blaylock, Esq.
Glankler Brown, PLLC
40 S. Main Street, Ste. 1700
Memphis, TN 38103

**Via e-mail transmission:**

Holley L. Claiborn on behalf of U. S. Trustee
holley.l.claiborn@usdoj.gov

Jonathan B. Alter on behalf of Creditor Champion Energy, Inc.
jonathan.alter@bingham.com

Richard G Birinyi on behalf of Creditor Champion Energy, Inc.
rick.birinyi@bullivant.com

790701.5

Edward H Davis on behalf of Creditor Champion Energy, Inc.
edward.davis@bullivant.com

Honor S. Heath on behalf of Creditor The Connecticut Light and Power Company
heathhs@nu.com

Craig I. Lifland on behalf of Debtor Startech Environmental Corporation
clifland@zeislaw.com

Taryn D. Martin on behalf of Creditor Gaski Realty, Inc.
taryn@zieglerlawct.com

Scott D. Rosen on behalf of Creditor WE 190 Century Drive LLC
srosen@cb-shea.com

Kate K. Simon on behalf of Creditor Champion Energy, Inc.
kate.simon@bingham.com

Melvin A. Simon on behalf of Creditor WE 190 Century Drive LLC
msimon@cb-shea.com

Jeffrey M. Sklarz on behalf of Debtor Startech Environmental Corporation
jsklarz@zeislaw.com

U. S. Trustee
USTPRegion02.NH.ECF@USDOJ.GOV

David B. Zabel on behalf of Creditor 88 Danbury Road LLC
dzabel@cohenandwolf.com

Robert A. Ziegler on behalf of Creditor Gaski Realty, Inc.
bob@zieglerlawct.com


**Via Fax:**

| | |
|---|---|
| Marcum LLP | 631-414-4001 |
| JP Morgan Chase | 888-643-9628 |
| Broadridge | 631-2547726 |

790701.5

# EXHIBIT "B"

**Craig Lifland**

| | |
|---|---|
| **From:** | Menezes, Cliferd <cmenezes@lcyelastomers.com> |
| **Sent:** | Wednesday, January 19, 2011 12:33 PM |
| **To:** | Craig Lifland |
| **Subject:** | Startech - $250,000 deposit |

Dear Mr. Lifland:

We wired this morning $250,000 into your account ending in 864.  This deposit is in regards to the auction of Startech Environmental Corporation assets.  Could you please confirm with your bank that you got this money in your account?  This deposit is on behalf of LCY Investment Corp.

Thank you very much.

Cliferd Menezes
Director Of Finance
Tel# 281-424-6305.

# Payment Transaction Details

**Payment  2 of  2  Total Payments**

| | |
|---|---|
| **PI Reference:** | 33086140 |
| **Debit Account:** | 004797977824 |
| **Account Name:** | LCY Elastomers LP Operating |
| **Payment Amount:** | USD 250,000.00 |
| **Value Date:** | 01/19/2011 |
| **Your Reference:** | W1378 |

| | |
|---|---|
| **Payment Status:** | Payment Completed |
| **Payment Type:** | USD Wire |
| **Initiated:** | 01/19/2011 10:53 CST by C |
| **Last Modified:** | 01/19/2011 10:53 CST by C |
| **Last Rejected:** | |
| **Last Approved:** | 01/19/2011 11:12 CST by C |
| **Released:** | 01/19/2011 11:16 CST by C |
| **Trace Reference:** | 33086140 |
| **Service Conf:** | 20110119B6B7HU4R0053 |
| **Template Used:** | |

**Ordering Party Info**

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address:** | |

**RECEIVING BANK**        **Provided By:**

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address:** | |
| **City:** | |
| **State:** | |
| **Country:** | |

**INTERMEDIARY BANK**        **Provided By:** User

| | |
|---|---|
| **ID Type:** | |
| **ID:** | |
| **Name:** | |
| **Address** | |
| **City:** | |
| **State:** | |
| **Country:** | |

**BENEFICIARY BANK INFORMATION**

| | |
|---|---|
| **ID Type:** | ABA |
| **ID:** | 221172186 |
| **Name:** | PEOPLES UNITED BANK |
| **Address:** | 850 MAIN ST |
| **City:** | BRIDGEPORT |
| **State:** | CT |
| **Country:** | US |

**BENEFICIARY INFORMATION**

| | |
|---|---|
| **ID Type:** | ACCT |
| **ID:** | 001-7045864 |
| **Name:** | Zeisler & Zeisler, P.C. |
| **Address:** | |

| | |
|---|---|
| **Bank-To-Bank Info:** | |

| | |
|---|---|
| **Details of Payment:** | Deposit |
| **Charges:** | None Selected |

[ Exit Details ]

**Previous Detail**

© Bank of America, N.A. Member FDIC 2011 Bank of America Corporation. All rights reserved.

# EXHIBIT "C"

## Craig Lifland

| | |
|---|---|
| **From:** | Menezes, Cliferd <cmenezes@lcyelastomers.com> |
| **Sent:** | Wednesday, January 19, 2011 3:02 PM |
| **To:** | Craig Lifland |
| **Subject:** | RE: Startech - $250,000 deposit |
| **Attachments:** | Startech-Asset Purchase Agreement-LCY Chemical.pdf |

Asset Purchase Agreement

On behalf of LCY Investment Corp.
Cliferd Menezes
Director Of Finance
Tel# 281-424-6305.

**From:** Craig Lifland [mailto:CLifland@zeislaw.com]
**Sent:** Wednesday, January 19, 2011 11:42 AM
**To:** Menezes, Cliferd
**Subject:** RE: Startech - $250,000 deposit

Received.

**From:** Menezes, Cliferd [mailto:cmenezes@lcyelastomers.com]
**Sent:** Wednesday, January 19, 2011 12:33 PM
**To:** Craig Lifland
**Subject:** Startech - $250,000 deposit

Dear Mr. Lifland:

We wired this morning $250,000 into your account ending in 864. This deposit is in regards to the auction of Startech Environmental Corporation assets. Could you please confirm with your bank that you got this money in your account? This deposit is on behalf of LCY Investment Corp.

Thank you very much.

Cliferd Menezes
Director Of Finance
Tel# 281-424-6305.

# ASSET PURCHASE AGREEMENT

(To be Executed in Duplicate)

By and Between

STARTECH ENVIRONMENTAL CORPORATION

SELLER

and

LCY INVESTMENTS CORP.

PURCHASER

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made as of the date of the last signature hereto by and between STARTECH ENVIRONMENTAL CORPORATION, a Colorado corporation with an address c/o Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, Connecticut 06605 (hereinafter referred to as the "Seller") and _____, a _____ entity organized under the laws of _____, whose principal place of business address is _____ (hereinafter referred to as the "Purchaser").

### RECITALS

WHEREAS, the Seller owns and desires to sell, and the Purchaser desires to purchase, those certain Assets (as defined below), for the consideration and on the terms and conditions set forth in this Agreement; and

WHEREAS, on April 28, 2010, the Seller filed a voluntary bankruptcy petition (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"); and

WHEREAS, as a result of the Bankruptcy Case, any sale and purchase of the Assets is to be effectuated pursuant to an order of the Bankruptcy Court under Section 363 of the Bankruptcy Code approving such transaction (the "Sale Order"); and

WHEREAS, subject to the entry of the Sale Order, Seller shall sell and Purchaser shall acquire the Assets in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties set out below, the parties hereby covenant and agree as follows:

1.   **PURCHASE AND SALE OF ASSETS.** On the terms and conditions of this Agreement, and subject to entry of the Sale Order, Seller agrees to sell, convey, assign, transfer and deliver possession to the Purchaser, at the Bristol Facilities (as hereinafter defined), and the Purchaser agrees to purchase and acquire from Seller, on the Closing Date, all of Seller's right, title and interest in and to the Assets (other than the Excluded Assets (defined below), which Assets shall be, effective as of the Closing, pursuant to Section 363 of the Bankruptcy Code, free and clear of all liens, claims, security interests and encumbrances, all for the Purchase Price set forth herein. As used in this Agreement, "Assets" means all of the following properties and assets of the Seller, of every kind and description (whether real, personal, mixed, tangible or intangible), wherever located (but not including the Excluded Assets):

(a)   all inventory, goods, merchandise, stock in trade, raw materials, work in progress and finished goods owned by Seller as of the Closing ("Inventory");

(b)     all computer hardware owned by the Seller as set forth on **Schedule 1(b)** attached hereto and made a part hereof ("Computer Hardware");

(c)     all computer software, including, without limitation, application software, object codes and source codes owned by Seller as set forth on **Schedule 1(c)** attached hereto and made a part hereof ("Computer Software");

(d)     all rights, title and interest of Seller in and to intellectual property of every nature, whether registered or unregistered consisting of whatever copyrights, patents, patent rights, trade-marks, service marks, trade names and certification marks are set forth in **Schedule 1(d)** attached hereto and made a part hereof, together with all applications, trade secrets, proprietary manufacturing information and know-how, unpatented blue prints, drawings and designs, processes, prototypes and technology for any of the foregoing ("Intellectual Property");

(e)     all machinery, plant, equipment, parts, fixtures, tools and accessories of Seller as set forth on **Schedule 1(e)** attached hereto and made a part hereof ("Manufacturing Equipment");

(f)     all office equipment and furniture owned by Seller as set forth on **Schedule 1(f)** attached hereto and made a part hereof ("Office Equipment");

(g)     such other equipment, furniture, furnishings, accessories, motors, tools, utensils, supplies as set forth on **Schedule 1(g)** attached hereto and made a part hereof ("Other Company Assets" which, together with the Inventory, Computer Hardware, Manufacturing Equipment and Office Equipment are hereinafter, collectively the "Tangible Assets");

(h)     all of Seller's right, title and interest in and obligations under those certain contracts and agreements set forth on **Schedule 1(h)** attached hereto and made a part hereof ("Assumed Contracts"); and

(i)     all files, books and records of Seller directly related to the Assets together with all warranties, guaranties and the like of manufacturers, contractors and suppliers pertaining to any of the Assets (to the extent assignable).

2.      **EXCLUDED ASSETS.** Any provision of this Agreement to the contrary notwithstanding, the following (collectively, the "Excluded Assets") shall not be included in the Assets and shall not be conveyed or assigned by Seller to Purchaser pursuant to this Agreement:

(a)     all cash and cash equivalents of Seller as of the Closing Date including, without limitation, all cash on hand or in banks or other depositories, (including the cash in the Seller's subsidiaries) and all marketable securities, certificates of deposit, lockboxes and other time deposits;

(b)     all contracts, leases, use and occupancy agreements and other agreements

3

of Seller other than the Assumed Contracts (collectively, the "Contracts") and all rights with respect thereto;

(c)   all accounts receivable, all credits and benefits including, without limitation, any tax credits, insurance benefits, indemnification rights, escrows and prepaid expenses related to any of the Assets arising prior to the Closing Date or otherwise related to any of the Excluded Assets;

(d)   all insurance policies of Seller, and the proceeds thereof;

(e)   the name of the Seller or any variation thereof;

(f)   all books and records of Seller not directly related to the Assets;

(g)   the corporate seals, certificate of incorporation, minute books, stock books, tax returns, books of account or other records having to do with the corporate organization of the Seller;

(h)   the assets listed on **Schedule 2(h)** attached hereto and made a part hereof;

(i)   all rights, actions, causes of action, claims and proceedings arising from or related to the Excluded Assets and all claims and actions arising under Sections 544 through 553, inclusive, of the Bankruptcy Code, against any pre-petition creditor of the Seller with the exception of any claim against Purchaser; and

(j)   all other rights, interests, properties or assets of Seller not specifically set forth in Section 1 above.

3.   **CONSIDERATION.**

(a)   The purchase price for the Assets, subject to adjustment pursuant to Section 12 below, equals the sum of the minimum base price of **Two Million Dollars ($2,000,000)**, PLUS the additional price of _____ ($ __0__ ) Dollars, for a TOTAL purchase price of Two Million Dollars ($2,000,000 ) Dollars (collectively, the "Purchase Price"), which the Purchaser agrees to pay as follows:

(i)   A deposit herewith in the form of a bank or certified check payable to the order of the Seller's attorney as trustee ("Deposit"):                    $  250,000.00

(ii)   At the Closing, at Seller's option, by bank or certified check drawn on a Connecticut bank, or by wire transfer:                    $ _____.00

PURCHASE PRICE:                    $ _____.00

4

(b)    The Deposit paid hereunder shall be held by Seller's counsel in trust, in a non-interest bearing account pending the Closing or earlier termination of this Agreement. The Deposit shall be: (i) paid to Seller at the Closing, to be credited against the Purchase Price, or (ii) returned to Purchaser upon the termination of this Agreement, for reasons other than Purchaser's default hereunder, or (iii) if said termination is due to Purchaser's default, to the Seller as liquidated damages pursuant to Section 19 hereof.

4.    **CLOSING.** The Closing shall take place at the offices of Zeisler & Zeisler, P.C., 558 Clinton Avenue, Bridgeport, Connecticut or at such other place as the parties may agree upon, at 10:00 a.m. on or before January 31, 2011 (the "Closing" or "Closing Date"). Subject to compliance with the terms and conditions of this Agreement and the approval of the Bankruptcy Court, the transfer of the Assets to the Purchaser shall be deemed to take effect as of the Closing. The Closing shall be deemed effective as of _____ am/pm on the Closing Date ("Effective Time").

5.    **NON-CONTINGENT AGREEMENT.** There are no contingencies whatsoever to the obligations set forth in this Agreement.

6.    **AS IS / WHERE IS.** THE ASSETS ARE BEING SOLD BY SELLER AND ACCEPTED BY PURCHASER IN THEIR "AS IS, WHERE IS AND WITH ALL FAULTS" CONDITION, WITH NO RIGHT OF SETOFF OR REDUCTION IN THE PURCHASE PRICE. EXCEPT FOR THE REPRESENTATION AS TO OWNERSHIP SET FORTH IN SECTION 8(a)(iv) HEREOF, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE ASSETS. NO STATUTORY OR OTHER IMPLIED WARRANTIES AS TO THE CONDITION OF OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS SHALL BE IMPLIED AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY. WITHOUT LIMITING THE FOREGOING, PURCHASER ACKNOWLEDGES THAT THE SELLER HAS MADE NO REPRESENTATION OR WARRANTY CONCERNING (1) ANY USE TO WHICH THE ASSETS MAY BE PUT, (2) ANY FUTURE REVENUE, COSTS, EXPENDITURES, CASH FLOW, RESULTS FROM OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ASSETS, (3) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER, OR (4) THE CONDITION OF THE ASSETS. THE PURCHASER AGREES THAT IT HAS INSPECTED THE ASSETS, IS SATISFIED THEREWITH AND AGREES TO ACCEPT AT CLOSING THE ASSETS IN THEIR PRESENT CONDITION ON THIS "AS IS, WHERE IS, WITH ALL FAULTS" BASIS, REASONABLE WEAR AND TEAR EXCEPTED. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.

7.    **ASSUMED LIABILITIES.** In connection with its acquisition of the Assets, Purchaser shall assume all liabilities and obligations of Seller arising under the Assumed Contracts ("Assumed Liabilities"). In addition, on and effective as of the Closing Date, the Purchaser shall assume : (a) any and all liability for sales, use or other similar tax arising after the transfer of the Assets; and (b) the costs of compliance with all applicable Environmental

5

Laws relating to disposal waste and of hazardous materials caused by the dismantling and/or removal of Assets after the Closing, as further discussed in Section 18 hereof and all liability related to any such dismantling and/or removal.

8.     **REPRESENTATIONS.**

    (a)    <u>Seller Representations.</u>    The Seller represents and warrants to the Purchaser as follows:

        (i)     Seller is duly organized, validly existing and in good standing under the laws of Colorado and has all requisite power and authority to own its properties and assets.

        (ii)     The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by Seller pursuant to this Agreement, and the completion and performance of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Seller, and this Agreement constitutes a legal, valid and binding obligation of the Seller subject to the approval of the Bankruptcy Court.

        (iii)     Neither the execution nor the delivery of this Agreement nor the completion and performance of the transaction contemplated herein will violate the Seller's certificate of incorporation or bylaws or result in the creation or imposition of any lien or encumbrance in favor of any third party with respect to any of the Assets.

        (iv)     Seller holds full right, title and interest in the Assets which Assets shall be transferred to Purchaser on the Closing Date, pursuant to the Sale Order and Section 363 of the Bankruptcy Code, free and clear of all mortgages, liens, pledges, security interests and easements.

    (b)    <u>Purchaser's Representations.</u>    The Purchaser represents and warrants to Seller that:

        (i)     Purchaser is duly organized, validly existing and in good standing under the laws of _____ and has all requisite power and authority to own its properties and assets and conduct its business in the manner in which such business is now being conducted and has full power and capacity to enter into this Agreement, carry out the transactions contemplated herein, and duly observe and perform all its obligations contained herein.

        (ii)     The execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered

6

by the Purchaser pursuant to this Agreement, and the completion and performance of the transactions contemplated hereby or thereby have been duly authorized by all necessary corporate action on the part of the Purchaser, and this Agreement has been duly executed and delivered by the Purchaser and constitutes the legal, valid and binding obligation of the Purchaser enforceable in accordance with its terms.

(iii)     Neither the execution and delivery of this Agreement nor the completion and performance of the transaction contemplated herein will violate the Purchaser's certificate or articles of formation or other governing documents or the terms or conditions of any agreement, encumbrance, indenture, contract or instrument to which the Purchaser is a party or by which it is bound.

(iv)     Purchaser has the financial resources to consummate this transaction in accordance with the terms of this Agreement and to make the payments required of the Purchaser when such payments are due.

(c)     Survival of Representations. Unless otherwise specifically set forth herein as surviving the Closing or termination of this Agreement, each and every representation and warranty set forth in this Agreement shall terminate as of the Closing (or earlier upon termination of this Agreement) and thereafter be of no further force and effect.

(d)     No Other Representations. Purchaser agrees that, except as set forth in Section 8(a) above, this transaction is made without representations, warranties, promises or guaranties of any kind by Seller or any agent, attorney or consultant of Seller. The Purchaser has been advised to verify, independently, any information it deems important. The Purchaser has used the information provided in connection with these matters only as an aid to assist it in its own investigation of the Assets prior to entering into this Agreement. The provisions of this Subsection (d) shall survive the Closing.

9.     **RISK OF LOSS.** The risk of loss or damage by fire or other casualty to the Assets is assumed by the Seller until the Closing and shall pass to Purchaser at the Closing. Throughout the period from the date of this Agreement until the Closing, Seller shall continue to carry existing fire and extended coverage insurance on the Assets. In the event that loss or damage does occur prior to Closing, the Seller shall be allowed, at its option, a reasonable time thereafter, not to exceed thirty (30) days from such loss or damage, within which to repair or replace such loss or damage. In the event that the Seller does not repair or replace such loss or damage within said time (or gives written notice to Purchaser that it does not intend to do so), the Purchaser shall have the option of:

(a)     terminating this Agreement, in which shall be paid to the Purchaser and all

7

further claims and obligations between the parties hereto by reason of this Agreement shall be released and discharged (except to the extent this Agreement provides that any such obligation specifically survives); or

(b)    closing on the purchase of the Assets in accordance with this Agreement and with no reduction in Purchase Price but receiving the benefit of all insurance monies recovered or recoverable by Seller on account of such loss or damage (to the extent such sums are attributable to the loss or damage to Assets included in this sale), less the amount of any monies actually expended by the Seller on said repair or replacement or in processing said claim.

10.    **WHEN SELLER BOUND.**  Execution and delivery of this Agreement by Purchaser and the delivery thereof to the Seller, together with the Deposit shall have no binding force and effect on Seller unless and until the Seller has executed this Agreement and a counterpart thereof has been delivered to Purchaser.

11.    **BROKER(S).**  The Purchaser hereby agrees that no broker or agent has brought the Assets to the Purchaser's attention nor negotiated the sale of the Assets nor is entitled to a commission other than Seller's investment banker, General Capital Partners. This Agreement is consummated by the Seller in reliance on the foregoing representation of the Purchaser. As such, the Purchaser hereby agrees to indemnify and hold harmless the Seller against any liability by reason of any claim of any other broker or agent for a commission on account of this sale, said indemnity to include all costs of defending any such claim, including reasonable attorney's fees. In the event of any such claim, Seller shall properly notify Purchaser. The provisions of this Section shall survive the Closing.

12.    **ADJUSTMENT.**  Personal property taxes, sales and use taxes and any use and occupancy or related payments due with respect to the Bristol Facilities (defined below) and all other matters commonly adjusted at the time of closing shall be apportioned between the Seller and Purchaser over the physical period for which levied at the time of Closing. Any errors or omissions in computing the apportionment or other adjustments at the Closing shall be corrected within a reasonable time following the Closing. The provisions of this Section shall survive the Closing.

13.    **ALLOCATION.**  Within thirty (30) days after the Closing, Purchaser shall prepare an allocation schedule which shall allocate the Purchase Price in accordance with the applicable provisions of the Internal Revenue Code, as amended and the regulations thereunder ("Closing Allocation"). The Closing Allocation shall be binding upon the Purchaser and the Seller for all tax purposes. After the Closing, the parties shall make consistent use of such Closing Allocations in all filings, declarations and reports with the Internal Revenue Service in respect thereof and in all proceedings related thereto. Neither party shall take any position contrary to the Closing Allocation in any tax return, filing, proceeding or contest.

14.    **CONDITIONS TO CLOSING.**

(a)    The obligation of the Purchaser to complete the purchase of the Assets

contemplated by this Agreement is subject to: (i) the representations and warranties of Seller contained in this Agreement being true and correct in all material aspects as of the Closing with the same effect as though such representations and warranties had been made on the Closing Date; (ii) Seller having performed or observed, in all material respects, the covenants and obligations to be performed or observed by Seller on or before the Closing pursuant to this Agreement; (iii) (iv) Seller having executed all applicable Transfer Documents (defined below); and (v) the Bankruptcy Court having entered the Sale Order, in form and substance reasonably acceptable to the Purchaser and the Seller and not been stayed pending any appeal.

(b)    The obligation of the Seller to complete the sale of the Assets contemplated by this Agreement is subject to the fulfillment of the following conditions: (i) the representations and warranties of the Purchaser contained in this Agreement being true and correct in all material respects as of the Closing with the same effect as though such representations and warranties had been made on the Closing Date; (ii) Purchaser having performed or observed, in all material respects, all of the covenants and obligations to be performed or observed by Purchaser on or before the Closing pursuant to this Agreement; (iii) Purchaser having executed all applicable Transfer Documents; (iv) the Bankruptcy Court having entered the Sale Order in form and substance reasonably acceptable to the Purchaser and the Seller and not been stayed pending any appeal; and (v) Purchaser having delivered the Purchase Price.

15.    **CLOSING TRANSACTIONS.**

(a)    At the Closing, the Seller shall deliver the following to the Purchaser:

(i)    an executed bill of sale conveying the Assets to Purchaser, "as is", "where is", in form substantially as set forth on **Exhibit A** attached hereto ("Bill of Sale");

(ii)    an executed Intellectual Property Assignment and Assumption Agreement assigning the Intellectual Property of Seller to Purchaser, "as is", "where is," in form substantially as set forth on **Exhibit B** attached hereto ("IP Assignment");

(iii)    an executed Assignment and Assumption Agreement with respect to the Assets in form substantially as set forth on **Exhibit C** attached hereto ("Assignment and Assumption", which together with the Bill of Sale and IP Assignments are hereinafter, collectively, the "Transfer Documents");

(iv)    a mutually agreed upon closing statement reflecting the payment, adjustment and disbursement of the Purchase Price ("Closing

9

Statement"); and

    (v)    a certified copy of the Sale Order.

  (b)    At the Closing, the Purchaser shall deliver the following to the Seller:

    (i)    the Purchase Price (less the Deposit previously paid and subject to the adjustments set forth herein);

    (ii)    executed Transfer Documents, as applicable;

    (iii)    the Closing Statement; and

    (iv)    such other documents reasonably necessary to effectuate the transaction in accordance with this Agreement.

16.    **CONCURRENT DELIVERY.**  It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

17.    **BRISTOL FACILITIES.**  The Tangible Assets are currently located at two leased facilities in Bristol, Connecticut, one located at 190 Century Drive ("Century Drive Facility"), and the other at 575 Broad Street ("Broad Street Facility" which, together with the Century Drive Facility are hereinafter, collectively, the "Bristol Facilities"). The Bristol Facilities are not owned by Seller but are rather used by Seller pursuant to certain use and occupancy or other agreements with the facility owners as discussed below.

    (a)    Century Drive Facility.  Seller currently occupies the Century Drive Facility pursuant to certain orders entered in the Bankruptcy Case under which Seller has paid WE 190 Century Drive, LLC ("Century Owner") for access to the Century Drive Facility up to and including January 31, 2011. If the Closing occurs prior to that date, the Purchase Price shall be adjusted in Seller's favor based on a per diem from the Closing Date to January 31, 2011.  It shall be Purchaser's obligation, at its sole cost and expense , to deal directly with the Century Owner for any access to the Century Drive Facility beyond the Closing Date.

    (b)    Broad Street Facility.  Seller currently occupies the Broad Street Facility pursuant to a settlement reached with Gaski Realty, Inc. ("Broad Street Owner") in the Bankruptcy Case under which Seller has agreed to pay $49,471.25 on or before January 15, 2011, with a per diem thereafter of $192.50, for access to the Broad Street Facility. Seller acknowledges and agrees that it shall be responsible for all payments thereunder up to the Closing Date and Purchaser acknowledges and agrees that it shall be responsible for all payments thereafter. It shall be Purchaser's obligation, at its sole cost and expense, to deal directly with the Broad Street Owner

10

for any access to the Broad Street Facility beyond the Closing Date.

18. **REMOVAL OF ASSETS.**

(a) The Purchaser will be responsible for the dismantling and removal of the Assets from the Bristol Facilities or wherever located, at Purchaser's expense ("Removal"). Purchaser covenants and agrees that it will cause all such dismantling and removal to be performed in a good and workmanlike manner and in accordance with all applicable Laws including, without limitation, all Environmental Laws (as defined below). Purchaser acknowledges that Seller has disclosed to Purchaser that there are certain Assets, including as described on **Schedule 18** attached hereto and made a part hereof, that may contain Hazardous Substances (as defined below). Purchaser hereby covenants and agrees that, in conjunction with the dismantling and/or removal of any Assets from the Bristol Facilities or any other location, Purchaser shall cause, at Purchaser's sole cost and expense, all Hazardous Substances contained in or arising pertaining to the Assets to be removed and disposed of in accordance with all applicable Environmental Laws ("Environmental Compliance"). Purchaser acknowledges and agrees that Seller shall not be liable for any Environmental Compliance nor for any personal injury or tort caused by or resulting from the Removal or the Environmental Compliance (including, without limitation, any personal injury to any employee, agent, or representative of Purchaser), or for any damage to the Bristol Facilities or any other location caused thereby. Purchaser agrees, for itself and its successors and assigns, to indemnify and hold Seller, its officers, directors, shareholders, agents, representatives, successors and assigns harmless with respect to any and all claims, actions, causes of action, loss, damage, costs and expense (including, without limitation, reasonable attorneys fees) arising pursuant to the Removal and the Environmental Compliance. The provisions of this Section shall survive the Closing.

(b) As used in this Agreement "Law" means any statute, law, ordinance, regulation, rule, policy, code, order, other requirement or rule of law of any federal, state, local or foreign government and all agencies thereof. As used in this Agreement, "Environmental Law" means any and all federal, state, provincial, local and foreign statutes, Laws, regulations, ordinances, orders, common law, and similar provisions currently in existence and applicable and having the force or effect of law, concerning public health or safety, worker health or safety, pollution or protection of the environment, including, but not limited to, the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Resource Conservation Recovery Act, 42 U.S.C. §6901 et seq. ("RCRA"), the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq. ("CERCLA") and any and all other laws

which govern: (i) the existence, cleanup, removal and/or remedy of contamination or threat of contamination on or about owned or leased real property; (ii) the emission or discharge of Hazardous Substance into the environment; (iii) the control of Hazardous Substance; or, (iv) the use, generation, transport, treatment, storage, disposal, removal, recycling, handling or recovery of Hazardous Substance, including building materials. Also as used in this Agreement, "Hazardous Substance" means any material or substance: (i) which is defined as a "hazardous substance," "pollutant" or "contaminant" pursuant to CERCLA and regulations promulgated thereunder; (ii) containing gasoline, oil, diesel fuel or other petroleum products, or fractions thereof; (iii) which is defined as a "hazardous waste" pursuant to RCRA and regulations promulgated thereunder; (iv) containing polychlorinated biphenyls (PCBs); (v) containing asbestos; (vi) which is radioactive; (vii) which is biologically hazardous; (viii) the presence of which requires investigation or remediation under any Law; (ix) which is defined as a "hazardous waste", "hazardous substance", "pollutant" or "contaminant" or other such terms used to define a substance having an adverse effect on the environment under any Law; or (x) any toxic, explosive, dangerous, corrosive or otherwise hazardous substance, material or waste which is regulated by any governmental authority.

19.  **DEFAULT.**  In the event Purchaser: (a) defaults in its obligations hereunder, (b) fails to complete the Closing by the Closing Date (time being of the essence), or (c) otherwise indicates it is unable or unwilling to perform its obligations hereunder and Seller stands ready to perform Seller's obligations, Seller's remedy shall be the right to terminate this Agreement by written notice to Purchaser and retain the Deposit as reasonable liquidated damages for Purchaser's inability or unwillingness to perform. It is the intention of the parties hereto to make advanced provision on the date of the Agreement for such event in order to avoid controversy, delay and expense, and to specify now a reasonable amount agreeable for compensation to the Seller for loses which may not be readily ascertainable or quantifiable, such as any which might be necessary to place Seller in the position Seller would have been in had Purchaser timely performed its obligations hereunder.

20.  **PURCHASER'S SOLE REMEDY.**  Notwithstanding anything herein to the contrary, Purchaser's sole and exclusive remedy for any default by Seller in its obligations under this Agreement or for Seller's failure to complete the Closing by the Closing Date or for otherwise indicating its unwillingness or inability to perform its obligations hereunder or for any other reason, is to terminate this Agreement. Upon such termination and provided the Deposit shall be returned to Purchaser, and all rights and obligations of the parties hereunder shall terminate.

21.  **INDIVISIBLE TRANSACTION.**  The sale of the Assets to Purchaser constitutes a single, indivisible transaction, and are intended to be sold to the Purchaser as a single, indivisible group of Assets.

22.  **SURVIVAL.**  Other than as expressly set forth in this Agreement, the delivery

12

and acceptance of the Transfer Documents herein described shall be deemed to constitute Seller's full compliance with all the terms, conditions, covenants and agreements contained herein or made in connection with this transaction. No Seller obligations shall survive the Closing except as expressly set forth herein.

23.   **NOTICES.** All notices under this Agreement shall be in writing and shall be deemed delivered, when delivered personally, or the next business day if sent by reputable overnight courier, or three days from when deposited in the U.S. Mail if sent by registered or certified mail, return receipt requested, to the following addresses:

> Seller:     Startech Environmental Corporation
> c/o Zeisler & Zeisler, P.C.
> 558 Clinton Avenue
> Bridgeport, CT 06605
> Attention: Craig I. Lifland

> Purchaser:  LCY INVESTMENTS CORP.
> P. O. BOX 3151, ROAD TOWN,
> TORTOLA, BRITISH VIRIGIN ISLANDS
> C/O 3F/4F, 83, SEC. 4, BADE ROAD,
> TAIPEI, 105, TAIWAN

24.   **MISCELLANEOUS.**

(a)   Legal and Other Fees and Expenses. Unless otherwise specifically provided herein, the parties will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement and the completion of the transactions contemplated herein.

(b)   Further Assurances. Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement and the transactions arising pursuant hereto.

(c)   Time of the Essence. Time shall be of the essence of this Agreement.

(d)   Entire Agreement. This Agreement constitutes the entire agreement between the Seller and the Purchaser pertaining to the purchase and sale of the Assets and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Seller and the Purchaser and there are no warranties, representations, covenants, obligations or agreements between the Seller (or any affiliate thereof) and the Purchaser except as set forth in this Agreement.

(e)   Assignment. Except upon the prior written consent of the Seller, Purchaser may not assign any of its rights or obligations under or in

13

respect of this Agreement, and any purported assignment without such prior consent shall be void and of no force or effect.

(f)     Invalidity. Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

(g)     Waiver and Amendment. Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver. No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement nor a continuing waiver unless otherwise expressly provided.

(h)     Captions. The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(i)     Counterparts. This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

(j)     Enurement. This Agreement will enure to the benefit of and will be binding upon the parties and their respective successors and assigns. Notwithstanding the foregoing, nothing contained herein shall be deemed to waive Purchaser's obligations under Section 24(e) hereof.

(k)     No Third Party Beneficiaries. This Agreement is not intended to confer upon any Person other than the parties hereto and their successors, any rights or remedies under or by reason of this Agreement.

(l)     Governing Law; Jurisdiction and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut. Notwithstanding the foregoing, prior to the closing of the Bankruptcy Case the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court in Connecticut, and each party hereto hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably

14

waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court: or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.

**[ SIGNATURES TO FOLLOW ON NEXT PAGE ]**

IN WITNESS WHEREOF, the parties to these presence have hereunder set their hands and seals as to the date next to their signatures.

SELLER:

STARTECH ENVIRONMENTAL
CORPORATION

By: _____

    Name: _____
    Its: _____
    Date: _____

PURCHASER:

By: _____

Name: _____
Its: _____
Date: _____

16

STATE OF            )
                              ) ss. _____
COUNTY OF       )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of **STARTECH ENVIRONMENTAL CORPORATION**, a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF,** I hereunto set my hand.

_____
Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

STATE OF            )
                              ) ss. _____
COUNTY OF       )

On this the _____ day of _____, 20__, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

**IN WITNESS WHEREOF,** I hereunto set my hand.

_____
Commissioner of the Superior Court
Notary Public:
My Commission Expires: _____

17

## SCHEDULE 1(b)

## COMPUTER HARDWARE

| | | | |
|---|---|---|---|
| Major Assemblies | Heat Exchanger | 1 | ea |
| | Plasma Torch Systems | 3 | ea |
| | Spiral Heat Exchangers | 3 | ea |
| | Spherical Bearings | 3 | ea |
| | | | |
| Plasma Converter Vessels | Vessel (5 T) w/Refractory (Special Design) | 1 | ea |
| | Vessels (10T) | 3 | ea |
| | 5T Vessel (Refractory Lined) | 1 | ea |
| | | | |
| Control Cabinets | 2 Port Ethernet CPU | 3 | ea |
| | CS Enclosures | 6 | ea |
| | Cabinet Enclosure | 6 | ea |
| | Cabinet Enclosure | 6 | ea |
| | Panel Mounts | 5 | ea |
| | PLC & Control Cabinets | 5 | ea |
| | | | |
| Electrical Parts | Electrode Ring Disk (Cathode) | 1 | ea |
| | Thermocouples | 4 | ea |
| | Thermocouples | 10 | ea |
| | Signal Wire (I&C) | 500 | ft |
| | Wire Spool & Switch | 7000 | ft |
| | TP; Elect, Body & Vgen | 7 | ea |
| | | | |
| Instruments & I/O Devices | Misc Controls Parts | Multiple | lot |
| | Analog Circuit Cards | 8 | ea |
| | I/O Modules | 5 | ea |
| | HMI Proficiency OS | 1 | ea |
| | I/O Modules w CPU Base | 2 | ea |
| | Ethernet CPU | 1 | ea |
| | Analog Circuit Cards | 9 | ea |
| | I/O Card (Type A) | 1 | ea |
| | I/O Card (Type B) | 1 | ea |
| | Instruments & Meters | Multiple | lot |
| | Flow Meters | 4 | ea |
| | Solid State Relays | 2 | ea |
| | Instruments & Meters | Multiple | lot |
| | Flow meter | 1 | ea |

18

| Mechanical Parts | | | |
|---|---|---|---|
| | Gap Insulators | 3 | ea |
| | Filters | Multiple | lot |
| | Vessel Insulator Ring | 3 | ea |
| | Ring & Pivot Pins | 7 | ea |
| | Solid Feed System (Hopper / Auger) | 2 | ea |

## SCHEDULE 1(c)

### COMPUTER SOFTWARE

- CADD – AutoCadd
- Sales Database – ACT
- Accounting – One Write Plus
- Controls / Screens – Simplicity
- Microsoft Office

## SCHEDULE 1(d)

## INTELLECTUAL PROPERTY

O&M / Training Manuals (Generic)
Design data, Proprietary Data, etc.
PCS Designs (5, 10 & 25P TPD)
Plant General Arrangements / Drawing Lists
CADD Drawings & Data Archive / Vault
PFD's, P&ID's, Logics, Fabrication, Integration etc
Controls Architecture (Simplicity) Demo & Production PCS Systems
Bill of Materials (Drawing Hierarchies)
Operations Data & Manuals
Design Criteria & Calculations / As-Builts
Training Packages & Manuals (Specialized)
Equipment Catalogs
Procurement Data & Database
Vendor Data / Equipment Lists
Procurement / Equipment Orders (PO's)
Technical Reports (Criteria)
Technical Data Packages (Engineering)
Process Proprietary Reports (PCS)
PCS Equipment Functional Descriptions
Contract Technical Reports (Issues & Reports)
Independent 3rd Party Analysis Reports
Sales Data Packages
Sales Database / Client Lists / Contact Lists / Representatives

21

**SCHEDULE 1(e)**

**MANUFACTURING EQUIPMENT**

| | | | |
|---|---|---|---|
| Raw Materials in Inventory | Steel Tubing | Multiple | lot |
| | Metal Fittings & Flanges | Multiple | lot |
| | Bolts & Screws | Multiple | lot |
| | Pipe Fittings & Flanges | Multiple | lot |
| | Fittings, Valves, Misc Parts | Multiple | lot |
| | Steel Flanges | 4 | ea |
| | Steel Plate 3/16" | 7 | ea |
| | Pipe Fittings / Couples | 20 | ea |
| | Fabrication Pipe | Multiple | lot |
| | 304 SS Tube & Plate | Various | lot |
| | Piping, Cable Harness etc | Multiple | lot |
| | Misc Welding Supplies | Multiple | lot |
| | Compression fittings | Multiple | lot |
| | Misc Sht Metal, NB, Pumps etc | Multiple | lot |
| | | | |
| Fabrication Shop Tooling | Tools (Puller/Grabber) | 2 | ea |
| | Fork Lift | 2 | ea |
| | Jet Band Saw | 1 | ea |
| | Skids (Gas Polisher) | 4 | ea |
| | Vessel Lid Lifting Rigs | 2 | ea |
| | Bridgeport w/ stand & accessories | 1 | ea |
| | Nuts & Bolt Rack | 1 | ea |
| | Upright Grinder | 2 | ea |
| | Pipe Rack | 1 | ea |
| | Steel Rack | 1 | ea |
| | Storage Racks | 1 | ea |
| | Portable air compressor | 1 | ea |
| | Mig Welder | 1 | ea |
| | Tig Welder | 1 | ea |
| | Plasma Cutter | 1 | ea |
| | Welding Bench | 1 | ea |
| | Work Bench | 1 | ea |
| | Elect Work Bench | 1 | ea |
| | Sanclear Table | 1 | ea |
| | Cut Off Saw | 1 | ea |
| | Nut & Bolt Cart | 1 | ea |
| | Drum Dolly | 1 | ea |
| | Small Band Saw | 1 | ea |

22

| | | |
|---|---|---|
| Floor Sweeper | 1 | ea |
| Truck Cage | 1 | ea |
| Melt Cart | 1 | ea |
| Scale Cart | 1 | ea |
| Floor Washer | 1 | ea |
| Horiba NOx analyzer | 1 | ea |
| 12 Pleated filters | 12 | ea |
| Combustion Gas Analyzer | 1 | ea |
| Tool cabinet & tools | Multiple | lot |
| Weigh Scales | 2 | ea |

## SCHEDULE 1(f)

## OFFICE EQUIPMENT

| Computers / Software | PCs, Notebooks, Etc | 16 | ea |
| | Printers | 12 | ea. |
| | Servers | 2 | ea |
| | Routers / Modems | 2 | ea |
| | AutoCAD Licenses., 3D Model Software | 6 | ea |
| | Misc MS Office, Acct, Sales, Etc Software | 16 | ea |
| | | | |
| Furniture & Office Equipment | Executive Suites | 5 | ea |
| | Desks | 14 | ea |
| | Conference Rooms | 3 | ea |
| | Engineering Workstations | 6 | ea |
| | Chairs, Couches, Credenza | Multiple | lot |
| | Audio Visual Equipment | Multiple | lot |
| | Other Misc Sundry Equipment (i.e. Repro) | Varied | lot |
| | | | |
| Telecommunications Equipment | VOIP System Equipment | 18 | set |

## SCHEDULE 1(g)

### OTHER COMPANY ASSETS

| PCS Demonstration System | 5 TPD Plasma Converter System | 1 | ea |
|---|---|---|---|
| | Gas Polisher w / Energy Extraction System | 1 | ea |
| | Solid Feed System (Hopper / Auger) | 1 | ea |
| | Liquid Feed System | 1 | ea |
| | High Pressure Cooling Water Recirc Sys | 1 | ea |
| | Low Pressure Cooling Water Recirc Sys | 1 | ea |
| | 150 KW Plasma Torch System | 1 | ea |
| | Hydraulic System | 1 | ea |
| | Melt Charge Carts | 1 | ea |
| | Control System | 1 | ea |
| | Gas Analyzer Monitoring System (N2, H2, CO, CH4, CO2) | 5 | Lot |
| | Gas Chromatographs | 2 | ea |
| | Plasma Gas Rack & Modulators | 1 | ea |
| | Spare Parts Kit | Multiple | Lot |
| | O&M / Training Manuals | Multiple | Lot |
| | | | |
| Other Items (StarCell) | Mech / Elect Design Pkg | Multiple | lot |
| | StarCell Compressors | 2 | ea |
| | StarCell Power Supply | 1 | ea |
| | StarCell Membranes | 3 | ea |
| | StarCell Skid & Platforms | 3 | ea |
| | StarCell Control & Cabinets | 2 | ea |
| | | | |
| Plant / Facility Upgrades | Chiller | 1 | ea |
| | Compressor | 1 | ea |
| | ID Fan | 1 | ea |
| | Waste Tanks | 1 | ea |
| | Elevated Gallery | 1 | ea |
| | Boiler (Inside) | 1 | ea |
| | Boiler (Outside) | 1 | ea |
| | Lab Equipment | Multiple | lot |
| | Gas Racks | 2 | ea |
| | Plasma Medium Test Bench / Rack | 6 | ea |
| | | | |
| Spare Equipment in Inventory | NG Electric Generator, Generic (60kw) | 1 | ea |
| | Dressor-Rand Skid Mounted Compressor Station | 1 | ea |
| | ID Fan (Crated) | 1 | ea |

| | | | |
|---|---|---|---|
| | Hopper / Shedder Assembly | 1 | ea |
| | Electric Steam Generator | 1 | ea |
| | Eccentric Enardo Flame Arrestor 4" I/0 | 1 | ea |
| | Discharge Task (Crated) | 1 | ea |
| | Vertical Pump G&L | 1 | ea |
| | Vessel Pressure Transmitter – Foxboro | 1 | ea |
| | Flow Transmitter GFSYSNET | 1 | ea |
| | Flow Control Valve, Sanden | 1 | ea |
| | Variable Frequency Drive | 1 | ea |
| | Plasma Medium Modulating Train (skid) | 1 | ea |
| | Robicon Power Booster Panel | 1 | ea |
| | PCG Blower | 1 | ea |
| | Plasma Torch Starter Cabinet | 1 | ea |
| | High Pressure Cooling Water Skid | 1 | ea |
| | Bag House, Steel | 1 | ea |
| | Hastelloy Gate Valve 6" | 1 | ea |
| | PCG Heat Exchanger Pipe Section | 1 | ea |
| | Knock-Out Pot | 1 | ea |
| | Scrubber Tank, SS | 1 | ea |
| | Scrubber Column, SS (2) | 2 | ea |
| | PCG Heat Exchanger, Shell & Tube | 2 | ea |
| | Control Valve, Bettis, 3" | 1 | ea |
| | Gas Spiral Heat Exchanger, SS | 1 | ea |
| | Scrubber Pump, Iwakae | 1 | ea |
| | GE Pump | 1 | ea |
| | Water Power Junction Box, PT150 system | 1 | ea |
| | Water Cooled Power Cables, Gas Line, 1 Set | 1 | ea |
| | GE Versamax Input/Output Cards, CPU, power supply | 32 | ea |
| **Plasma Torch Spares (150kw)** | Adapter Sleeve (Pipe/Anode Adapter) | 1 | ea |
| | Torch Body | 2 | ea |
| | Gap Insulator | 2 | ea |
| | Rear Electrode Holder (Downstream Insulator) | 1 | ea |
| | Vortex Generator | 2 | ea |
| | Rear Insulator (est. price) | 1 | ea |
| | Locking Bushing (Collar Split) | 1 | ea |
| | Rear Electrode | 4 | ea |
| | Front Electrode | 3 | ea |
| | Water Guide - Front Electrode | 2 | ea |

<u>SCHEDULE 1(b)</u>

ASSUMED CONTRACTS

- 1x 5TPD & 2 x 10 TPD Plasma Converter System with Plasmatech Carribean Corporation

## SCHEDULE 2(h)

## EXCLUDED ASSETS

In addition to the items set forth in Section 3 of the Asset Purchase Agreement the Excluded Assets includes the following assets, which are currently in inventory but assigned to Mihama, Inc. contract for varied Plasma System repair parts and Major Assembly Upgrades. This contract / manufacture has been completed and Mihama, Inc. has not taken delivery.

- ✓ Gas Polisher (Baghouse Header) (Mdesign)
- ✓ Spare 500 KW Torch - (Mdesign)
- ✓ Hurst Boiler (Heat Exchanger)
- ✓ 5T PCS Vessel (Mdesign) with the following:
  - Spherical Bearing Assembly
  - All Hydraulic Lines to Torch Manipulator
  - Cooling Water Lines to the Plasma Vessel
  - All Thermocouples and Wiring
  - Electrical Wiring to Vessel and Torch Positioner
  - Hose to Solid Feeder Stand
  - Conduit for Solid Feeder (From PLC to Solenoid Stand)
  - Torch Bellows
  - O2 Flow Meter and Gauge
  - Bag House Filters (12)
  - Cathode Bottom SubAssembly
  - HX 04 Gaskets and Plates
  - SV 41 (Air Supply to Backup HP Pump)

## SCHEDULE 18

- Waste Water Discharge Tank
- Gas Polisher Scrubber Tanks
- Demo System Baghouse Particulate

## EXHIBIT A

### BILL OF SALE

This **BILL OF SALE**, dated as of _____, 20\_\_, is executed and delivered pursuant to that certain Asset Purchase Agreement, dated as of _____, 20\_\_, (the "Purchase Agreement") by and between **STARTECH ENVIRONMENTAL CORPORATION**, a corporation organized and existing under the laws of the State of Colorado ("Seller"), and _____ _____, a _____ organized and existing under the laws of the State of _____ ("Purchaser"). Capitalized terms used but not defined in this Bill of Sale shall have the meanings ascribed to them in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which Seller hereby acknowledges, and subject to the Sale Order, the Seller does hereby unconditionally and expressly sell, transfer, assign, convey and deliver to the Purchaser and Purchaser hereby purchases and acquires from Seller, all of Seller's right, title and interest in and to the Assets (including, without limitation, the Assumed Contracts), free and clear, based upon entry of the Sale Order, of all liens and encumbrances.

Seller for itself, its respective successors and assigns, hereby covenants and agrees that, at any time and from time to time, forthwith upon the written request of Purchaser and at no cost to Seller, its respective successors and assigns will execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, each and all such further deeds, assignments, transfers, conveyances and assurances as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure and confirm unto and vest in Purchaser, its successors and assigns, title to the aforementioned Assets.

THE ASSETS AND ASSUMED CONTRACTS ARE BEING TRANSFERRED "AS IS", "WHERE IS" AND "WITH ALL FAULTS". EXCEPT FOR THE REPRESENTATION AS TO OWNERSHIP SET FORTH IN SECTION 8(a)(iv) OF THE PURCHASE AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE ASSETS OR ASSUMED CONTRACTS. NO STATUTORY OR OTHER IMPLIED WARRANTIES AS TO THE CONDITION OF OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS SHALL BE IMPLIED AND THE SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY. WITHOUT LIMITING THE FOREGOING, PURCHASER ACKNOWLEDGES THAT THE SELLER HAS MADE NO REPRESENTATION OR WARRANTY CONCERNING (1) ANY USE TO WHICH THE ASSETS MAY BE PUT, (2) ANY FUTURE REVENUE, COSTS, EXPENDITURES, CASH FLOW, RESULTS FROM OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ASSETS OR ASSUMED CONTRACTS, (3) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER, OR (4) THE CONDITION OF THE ASSETS.

Purchaser acknowledges and agrees that this sale of the Assets is final and that the Assets may not be returned to Seller by Purchaser or any other person or entity for any reason whatsoever including, but not limited to, damage or defect.

This Bill of Sale may be executed in one or more counterparts, each of which shall be an original. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

The laws of the State of Connecticut shall govern any controversy arising out of or relating to this Bill of Sale, without regard to conflicts of laws principles that would require the application of any other law, as to all matters, including but not limited to matters of jurisdiction, validity, construction, effect and performance.

**[ SIGNATURES TO FOLLOW ON NEXT PAGE ]**

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be executed as of the _____ day of _____, 20__.

SELLER:

STARTECH ENVIRONMENAL CORPORATION

By: _____
Name:
Its:

PURCHASER:

_____

By: _____
Name:
Its:

32.

## EXHIBIT B

### INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This **INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (the "Assignment Agreement"), dated as of _____, 20___ by and between **STARTECH ENVIRONMENTAL CORPORATION**, a corporation organized and existing under the laws of the State of Colorado (the "Assignor"), and _____, a _____ organized and existing under the laws of the State of _____ (the "Assignee"), with reference to the facts set forth below.

### WITNESSETH:

**WHEREAS**, in accordance with the Asset Purchase Agreement by and between Assignor and Assignee, dated as of _____, 20___ (the "Asset Purchase Agreement"), Assignor wishes to sell, transfer, convey, assign and deliver to Assignee (to the extent assignable), and Assignee wishes to acquire, accept and assume, all of Assignor's right, title and interest in and to that certain Intellectual Property (as defined below) or rights thereto owned by Assignor as set forth on **Schedule A** attached hereto and made a part hereof ("Assigned IP") along with all income, royalties, damages and payments due or payable to Assignor arising with respect to the Assigned IP as of the Closing Date or thereafter, including, without limitation, damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all originals, copies and tangible embodiments of Assignor's Intellectual Property in Assignor's possession, custody or control (collectively, the "Assigned IP Assets") and Assignee has further agreed to assume all obligations arising pursuant thereto from and after the date hereof.

**WHEREAS**, Assignee wishes to acquire and assume, and Assignor wishes to transfer to Assignee all of Assignor's right, title and interest in and to the Assigned IP Assets.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in the Asset Purchase Agreement and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1. Defined Terms.

    (a)    Capitalized terms used herein and not otherwise defined herein shall have the meanings given in the Asset Purchase Agreement.

    (b)    "Intellectual Property" means all rights, title and interest of Seller in and to intellectual property of every nature, whether registered or unregistered consisting of any and all copyrights, patents, patent rights, trade-marks, service marks, trade names and certification marks set forth in on **Schedule A** attached hereto, together with all applications, trade secrets, proprietary manufacturing information and know-how, unpatented blue prints, drawings and designs,

processes, prototypes and technology for any of the foregoing.

2.    <u>Assignment and Assumption</u>. Assignor hereby sells, assigns, transfers and sets over to Assignee all of its right, title and interest in and to the Assigned IP Assets, together with the goodwill associated with such Assigned IP Assets and Assignee hereby accepts and assumes all of the Assignor's right, title and interest in and to the Assigned IP Assets and all obligations with respect thereto arising from and after the date hereof.

3.    <u>Further Assurances</u>. Assignor hereby agrees, upon written request and at Assignee's sole cost and expense, to execute and deliver such other documents, instruments or agreements as are reasonably necessary for the implementation or perfection of this Assignment Agreement.

4.    <u>Miscellaneous</u>.

    (a)    This Assignment Agreement shall be binding on and inure to the benefit of the respective successors and assigns of Assignor and Assignee.

    (b)    This Assignment Agreement shall be governed by and construed with the laws of the State of Connecticut without regard to the conflicts-of-law rules thereof.

    (c)    The section headings contained in this Assignment Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not affect in any way the meaning or interpretation of this Assignment Agreement.

    (d)    This Assignment Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one in the same.

[ SIGNATURES TO FOLLOW ON NEXT PAGE ]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by an officer duly authorized, on and as of the day and year first above written.

ASSIGNOR:

STARTECH ENVIRONMENTAL CORPORATION

By: _____
    Name:
    Its:

ASSIGNEE:

_____

By: _____
    Name:
    Its:

STATE OF            )

                             ) ss. _____

COUNTY OF       )

On this the _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of **STARTECH ENVIRONMENTAL CORPORATION**, a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

         **IN WITNESS WHEREOF,** I hereunto set my hand.

                                      _____

                                        Commissioner of the Superior Court
                                        Notary Public:
                                         My Commission Expires: _____

STATE OF            )

                             ) ss. _____

COUNTY OF       )

On this the _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

         **IN WITNESS WHEREOF,** I hereunto set my hand.

                                        _____

                                         Commissioner of the Superior Court
                                         Notary Public:
                                         My Commission Expires: _____

From: Fax number To: 1-203-367-9678 Page: 37/40 Date: 1/19/2011 1:54:24 PM

Case 10-50955 Doc 226 Filed 02/07/11 Entered 02/07/11 16:37:25 Desc Main
Document Page 64 of 74

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT ("Assignment") is dated and made effective as of the _____ day of _____, 20__, by and between STARTECH ENVIRONMENTAL CORPORTION, a corporation organized and existing under the laws of the State of Colorado ("Assignor") and _____, a _____ organized and existing under the laws of the State of _____ ("Assignee").

## WITNESSETH:

WHEREAS, subject to the terms and conditions of that certain Asset Purchase Agreement by and between Assignor and Assignee dated _____ (the "Purchase Agreement"), Assignor has agreed to assign to Assignee, and Assignee has agreed to accept and assume from Assignor, all of Assignor's right, title and interest in, to and under the Assumed Contracts and the Assumed Liabilities upon the terms and conditions set forth herein and in the Purchase Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree, subject to the terms and conditions set forth in the Purchase Agreement, as follows:

1. All capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the Purchase Agreement;

2. Assignor hereby assigns to Assignee all of Assignor's rights, title and interest in, to and under the Assumed Contracts, to have and to hold the same unto Assignee and its successors and assigns, and Assignee for itself and its successors and assigns hereby assumes the Assumed Contracts as well as all corresponding rights, duties, obligations and liabilities that may exist therein or hereafter arise with respect thereto including, without limitation, under all applicable laws whether now or hereafter in effect.

3. Assignee also hereby assumes and shall hereafter pay, perform and discharge as and when due, all of the Assumed Liabilities together with all corresponding rights, duties, obligations and liabilities as may exist with respect thereto including, without limitation, under all applicable laws whether now or hereafter in effect.

4. Assignee acknowledges and agrees that Assignor makes no representations or warranties with respect to the Assumed Contracts or Assumed Liabilities and that Assignee is not relying on any such representations or warranties but is relying solely on its own review and analysis thereof.

5.    Assignee, for itself and its successors, assigns and legal representatives agrees, at all times, to indemnify and hold Assignor, its successors, assigns and legal representatives, harmless from any and all cost, loss, liability, damage and expenses (including, without limitation, reasonable attorneys' fees) of any nature arising out of or related to the Assumed Contracts and/or Assumed Liabilities.

6.    This Assignment: (a) shall be binding upon and inure solely to the benefit of Assignor and Assignee and their respective permitted successors and assigns in accordance with the terms of the Purchase Agreement; (b) may be executed in one (1) or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument; (c) may be executed and delivered by telecopier or portable document format (PDF) transmission with the same force and effect as if the same were a fully executed and delivered original manual counterpart; and (d) shall be governed by, and construed in accordance with, the substantive laws of the State of Connecticut applicable to agreements made and to be performed entirely within such state, without reference to the conflict of laws rules of such state.


[ SIGNATURES TO FOLLOW ON THE NEXT PAGE ]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment executed as of the date first above written.

ASSIGNOR:

STARTECH ENVIRONMENTAL CORPORATION

By: _____
Name:
Its:

ASSIGNEE:

_____

By: _____
Name:
Its:

39

STATE OF               )

                              ) ss. _____

COUNTY OF         )

On this the _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of STARTECH ENVIRONMENTAL CORPORATION, a Colorado corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

        IN WITNESS WHEREOF, I hereunto set my hand.


                                       _____

                                       Commissioner of the Superior Court
                                       Notary Public:
                                       My Commission Expires: _____

STATE OF               )

                              ) ss. _____

COUNTY OF         )

On this the _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____ who acknowledged him/herself to be the _____ of _____, a Connecticut corporation, and that he/she as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as such officer.

        IN WITNESS WHEREOF, I hereunto set my hand.


                                       _____

                                       Commissioner of the Superior Court
                                       Notary Public:
                                       My Commission Expires: _____

# 大眾銀行存款餘額證明書

## CERTIFICATE OF ACCOUNT BALANCE

中文戶名：
Depositor : LCY INVESTMENTS CORP.

證明書號碼：
Certificate No :100-019-00001

存款種類與帳號：Demand Deposit Account
Type and No of account: 300209085916

日期：
Date :2011/01/19

敬啟者：
To whom it may concern :

茲　　證　　明　　貴　　戶　　存　　在　　本　　行　　存　　款
This is to certify that the balance of the above mentioned account

截至
at our bank as of _____ 2011/01/18 _____ 止
(年Year　月Month　日Day)　　　　Was

為　美元
US Dollars  FIVE MILLION ONE HUNDRED SEVENTY-SEVEN THOUSAND
FIFTY-FIVE AND CENTS FORTY-SEVEN ONLY

| | 折　合　美　金 | | 依　照　存　款 | |
|---|---|---|---|---|
| (NTD | ******** | equivalent to US$ ******** | | conversion rate of |
| 當日 | | 美　金　兌　換　新　台　幣　之　匯　率　折　算 | | |
| NTD | ******** | to US$1.00 on the above mentioned balance date ) | | |

Ta Chong Bank Ltd.

大眾商業銀行國際金融業務分行

襄理

有權簽章人員

Authorized Signature

# EXHIBIT "D"

## Craig Lifland

| | |
|---|---|
| **From:** | Raymond Chao 趙桓易 <raymond.chao@lcygroup.com> |
| **Sent:** | Wednesday, January 19, 2011 8:59 PM |
| **To:** | JGB@generalcapitalpartners.com; SMD@generalcapitalpartners.com; Craig Lifland |
| **Subject:** | RE: Star Tech Bidding Package_LCY Chemical |
| **Attachments:** | Bank Letter-LCY Chemical.pdf; Startech asset purchase agreement_LCY Chemicals.pdf; Deposit payment detail.pdf |

Dear All,

It seems that the files I sent this morning is too large and rejected by your sever system. Therefore, I'm sending you again with smaller one for your reference. Under current circumstance of deposit been handed in, I would assume LCY has been in the track of Startech bidding process. If any modification needed for document, please feel free to let me know. Thank you!


Best regards,

Raymond Chao



LCY Chemical Corp., Methanol & Solvent Business Unit

Tel: +886-2-2763-1611 ext. 346; E-mail: raymond.chao@lcygroup.com

DISCLAIMER:

This electronic message (including all attachments) may contain information that is confidential, proprietary, privileged or otherwise protected by law. The message is intended solely for the named addressee. If you are not the intended recipient of this message, you are not authorized to use, disclose, print, retain copy or disseminate this message or any part of it. If you have received this message in error, please destroy the message or delete it from your system immediately and notify the sender by return or e-mail to lcy@lcygroup.com In additional, any prices, order, quotes or statistics and other information of any confidential nature expressed in this message is not a guarantee of future results by this sender unless otherwise confirmed by a duly signed copy of this message by facsimile or mail. THANK YOU.

---

**From:** Raymond Chao 趙桓易
**Sent:** Thursday, January 20, 2011 1:50 AM
**To:** JGB@generalcapitalpartners.com; SMD@generalcapitalpartners.com; clifland@zeislaw.com
**Cc:** Angela Lu 盧雅雯; Cecil Lee 李連成; Bowei Lee 董事長; Raymond Chao 趙桓易
**Subject:** Star Tech Bidding Package_LCY Chemical

Dear All,

Please refer to the attached the LCY's bidding package for "Startech Environmental Corporation", which includes a bank letter of financial statement, deposit payment transaction copy and asset purchase agreement, 3 documents in total. Therefore, I would assume LCY is in the track of bidding process currently. Thank you!

Regards,
Raymond Chao
LCY Chemical Group

# EXHIBIT "E"

## Craig Lifland

**From:** Craig Lifland
**Sent:** Monday, January 24, 2011 3:02 PM
**To:** 'Carol Gee'
**Subject:** RE: LCY Investment Corp. / Startech Environmental Corporation

Ms Gee, I am still waiting on your official position regarding the sale. You indicated a letter would be coming indicating you intend to withdraw your clients bid. As advised, your client submitted the only qualified bid, and, at this time, we intend to ask the court at tomorrow's hearing to approve the LCY bid as the Prevailing Bid.
Thank you for your consideration.
craig

-----Original Message-----
From: Carol Gee [mailto:carolgee@sbcglobal.net]
Sent: Monday, January 24, 2011 12:07 PM
To: Craig Lifland
Cc: Angela Lu 盧雅雯
Subject: LCY Investment Corp. / Startech Environmental Corporation

Dear Craig:

I am representing LCY Investment Corp. Please feel free to give me a call on my office line, 415 661 4310.


Regards,
Carol Gee
--
Carol A. Gee
Attorney at Law
紀璇律師
2379 - 24th Ave.
San Francisco, CA  94116
(415) 787-3154
Fax: (415) 664-9902
www.geebizlaw.com

# EXHIBIT "F"

## Raymond Chao 趙桓易

| | |
|---|---|
| 寄件者: | Sean Donlin [smd@generalcapitalpartners.com] |
| 寄件日期: | 2011年1月19日星期三 上午 10:15 |
| 收件者: | Raymond Chao 趙桓易 |
| 主旨: | Startech Bidding Information |
| 附件: | Startech - Asset Purchase Agreement.pdf; Startech - Signed Order for Bidding Procedures.pdf |

Raymond,

I recieved your voice mail and thank you for your interest in Startech.  Any party wishing to participate in the Startech auction must submit at least a minimum bid of $2,000,000 for the Startech assets before the bid deadline of Wednesday, January 19th, 2011 at 5:00 PM EST along with a $250,000 deposit and an executed copy of the attached, court approved, Asset Purchase Agreement. The auction for the assets of Startech will be held on January 25th, 2011 at 2:00 P.M. EST at the United States Bankruptcy Court for the District of Connecticut, 915 Lafayette Boulevard, Bridgeport, CT.  The auction will be conducted per the terms and conditions outlined in the attached, court approved, Bidding Procedures.

Below are the wiring instructions for the $250,000 refundable deposit that needs to be wired by January 19th, 2011:

WIRE INSTRUCTIONS
People's Bank
850 Main Street
Bridgeport, CT  06604
To IOLTA Account:
Zeisler & Zeisler, P.C.
Account #001-7045864
ABA # 221172186

Should you have any further questions, please feel free to contact me directly.

Thanks,
Sean

Sean M Donlin
General Capital Partners
370 17th Street – Suite 5660
Denver, CO 80202
T. 720-200-4966
F. 720-200-4501
www.GeneralCapitalPartners.com