UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | |
|---|---|
| In re:<br><br>STARTECH ENVIRONMENTAL<br>CORPORATION<br>          Debtor-in-Possession | )<br>)<br>)   Chapter 11<br>)<br>)   Case No. 10-50955 (AHWS)<br>)<br>)<br>)   FEBRUARY 7, 2011 |

## POST-ARGUMENT BRIEF OF LCY INVESTMENTS CORPORATION

### Introduction

LCY Investments Corporation ("LCY") submits this Post Argument Brief, along with the attached Declaration of its agent, Huan-Yi-Chao ("Affidavit") and the Attachments (1-18) appended thereto. This brief is submitted at the Court's request, following argument on January 25, 2011 concerning the right of LCY to the return of a bid deposit currently held by counsel for debtor Startech Environmental Corporation ("Debtor"). At issue is the $250,000.00 bid deposit made by LCY in connection with a bid that was properly withdrawn before a scheduled auction sale of the Debtor's assets. Debtor's counsel has argued that LCY's deposit should be declared forfeited, though no application seeking such relief is currently pending before the Court.

LCY maintains that it was entitled to withdraw its bid prior to the auction and prior to being selected as the "Prevailing Bidder" in accordance with the bidding procedures drafted by the Debtor and approved by the Court. LCY maintains further that the clear and express terms of the bidding procedures give LCY the right to make changes to the Asset Purchase Agreement ("APA") at the auction and that LCY would have made changes but for the Debtor's insistence that no auction was required because LCY was the sole bidder. Finally, LCY asserts further that it was the victim of actionable misrepresentations in connection with the auction process. If LCY's deposit is not

1

returned forthwith, LCY intends to file an Adversary Proceeding in which it will assert such claims and will seek to present evidence in support of these claims.

Accordingly, LCY maintains that the Court must deny the Debtor's request to forfeit LCY's deposit and order the deposit returned to LCY. Alternatively, LCY maintains that the Court should defer decision pending a full evidentiary hearing and a prior opportunity to conduct adequate discovery concerning the parties' competing claims and contentions of fact regarding the events surrounding the auction process as outlined herein.

## Factual Background

The Court's Amended Order authorizing an auction sale of assets of Debtor Startech set a deadline of January 19, 2011 at 5:00 P.M. to submit bids and scheduled an auction to take place in Court on January 25, 2011.

In the two-week period preceding the bid deadline, the Debtor's agent, Stephen Valentino ("Valentino") made material numerous misrepresentations of fact to LCY's employee, Raymond Choa ("Choa") concerning the sale and concerning the Debtor's assets. He repeatedly deflected LCY's requests for information to conduct due diligence and urged LCY to pay $5.5 Million to $6 Million for the assets to short-circuit a vaguely described bidding process through a "private placement offer." LCY was told that in the bidding process the price likely would be pushed even higher than $5.5 Million to $6 Million (Affidavit, ¶¶ 8-16; Attachments 1 and 2) LCY also was told that there would be other bidders for the assets. Choa, LCY's agent, was *not* told of the existence of an actual bid package and bidding procedures for the court-supervised auction until January 18, 2011, the day before the bid submission deadline. (Affidavit, ¶ 28)

On January 15, 2011, four days before LCY submitted its bid, Choa wrote to Valentino asking for documents and information on the Debtor, in particular detailed and current financial information.

2

(Affidavit, ¶ 16) However, the Debtor, through Valentino, continued to pressure Choa and LCY to move forward with a "private placement offer" in the amount of $5.5 Million to $6 Million and continued to refuse to provide LCY with any useful information. (Affidavit, ¶¶ 16-22; Attachments 3, 4 and 5)

Frustrated by the lack of information, on January 16, 2011 Choa sent an email to Startech's Vice President, Stephen Landa ("Landa") seeking to set up a meeting between Landa and Bowie Lee, LCY Chemical Group's chairman ("Lee"), on January 19th in New York City. After getting no response, the next day Choa sent an email to Valentino asking if he could attend a meeting with Lee in New York and also seeking clarification of the deposit for the auction. Valentino responded by asking Choa to send him a plane ticket to travel from California to New York and telling Choa he would need to provide the Court with a letter of proof for $2 Million to "even enter the biding process." (Affidavit ¶¶ 23-26; Attachments 6, 7 and 7).

On January 18, 2011, Choa was advised *for the first time* by Landa that he could request a bidding package with precise bidding procedures from General Capital Partners. (Affidavit ¶¶ 28-30; Attachment 9) Landa sent a second email on January 18th, to Valentino with a copy to Choa, stating: "Please let Raymond know that a $250,0000 deposit must be in tomorrow or we will be talking about something other than the Startech assets." (Affidavit ¶ 33; Attachment 10)

Thus, the squeeze play was on. In order to "get in the game," and get access to confidential information, LCY was required to submit an executed bid package with a bid deposit and a signed confidentiality agreement. The purpose of Landa's message clearly was to pressure LCY into submitting a bid even though Landa knew that LCY never received the due diligence information it had been seeking. Moreover, despite Choa's repeated attempts to set up a meeting between Landa and Lee, Landa failed to confirm a date and the requested meeting never occurred. (Affidavit ¶¶ 35;

3

Attachment 9)

On January 19, 2011, Choa contacted Sean Donlin ("Donlin") of General Capital Partners and requested a bid package. Donlin sent an email back to Chao that day which contained the APA and a Court Order containing the bidding procedures. The email explicitly referenced "the $250,000 refundable deposit." It was Choa's understanding that submission of a bid to qualify for the auction would not obligate LCY to purchase the Debtor's assets at auction, nor would it obligate the Debtor to accept LCY's bid, even if it was the highest bid. (Affidavit ¶ 38; BP, § 8(b)(iv); 8(b)(v))

On January 22, 2011, after LCY's bid package had been received, Valentino arranged a meeting between himself and Lee. At the meeting he represented: (1) there were other bidders who did not meet the January 19, 2011 deadline but would appear at the auction requesting permission to bid; (2) there was more than $300,000,000 in federal grants pending in connection with the assets being auctioned; and (3) another bidder was prepared to pay LCY $10,000,000 for the assets once LCY completed the auction.

Following the meeting and review of the information in Startech's on-line information room, LCY determined that the entire transaction had been misrepresented and the assets could not be reasonably valued at $2,000,000. (Affidavit, ¶ 59) Additionally, based on the express terms of the bidding procedures and representations made, LCY believed: (1) it would be informed within a day after submitting its bid whether it was a "Qualified Bidder" (Bidding Procedures, ¶ 7); (2) its deposit was refundable at least up to the point that the auction was conducted (Affidavit, ¶ 42; Attachment 13); (3) it would be permitted to conduct due diligence regarding the assets and could withdraw its bid up to the time of the auction (Id.; Affidavit ¶¶ 45-47; BP, ¶ 7(v)); and (4) its would be permitted to change the terms of the Asset Purchase Agreement at the auction, including changes that the Debtor may find unacceptable (BP, ¶ 7(v)).

On January 24, 2011, LCY communicated the withdrawal of its bid to the Debtor through its counsel. Up to that point, LCY had never been informed that it was a "Qualifying Bidder," the auction had not started, there had been no identification of a "Prevailing Bidder" and there was no executed APA. (Affidavit, ¶ 63) LCY's counsel was then advised that LCY was the only bidder and that the Debtor intended to proceed with the auction. (Affidavit, ¶ 64)

LCY determined that if the auction proceeded it would it would exercise its right to modify the APA, including modifications conforming to the representations made to LCY to induce LCY to tender the bid deposit, such as: (1) the right to conduct due diligence prior to the auction; (2) the right to withdraw without penalty and receive the return of its deposit if LCY was not satisfied with the results of its due diligence; and (3) the right to make other changes to the Purchase Agreement at the auction, including the price term or other concessions to appropriately reflect the value of the assets and a commercially reasonable transaction. (Affidavit, ¶ 65)

The bid package reflects a complex transaction, involving cutting edge technology, trade secrets and other intellectual property, defaulted leases, hazardous substances and assumption of liability for possible environmental contamination, the seller's renunciation of any obligation to ensure that the assets could remain at their current location, coupled with clear indications that the physical assets may suffer harm if disassembled and moved.

Key provisions of the Court's Orders and the bidding instructions inject a measure of commercial reality that made it feasible for LCY to continue with what would otherwise have been a foolhardy endeavor, given these complexities and unresolved issues. The Court's Order approving the bidding procedures and scheduling the auction approved the APA "in form only." Further, while the form of the APA identified numerous complexities and loose ends there was a provision in the bidding procedures that would be essential to any rational bidder under such circumstances, which

stated:

> Any Qualifying Bidder may make modifications to the Purchase Agreement during the Auction, provided that the Debtor reserves the right, in its business judgment, to determine whether such bid represents the highest and best offer for the Assets.

APA ¶ 8 (b) (v). Thus, the bidders' right to change the APA is counterbalanced by the Debtor's right to reject bids that materially and disadvantageously alter the terms of the APA.

Applying this clearly stated provision in the context of the entire bid package and procedures, would be reasonable for a bidder to conclude that submission of a bid package is an expression of serious interest in the assets and that there would be an opportunity for further discussion of final terms between the bidder and the Debtor. This provision protects both the bidders and the Debtor in the event the bidder concludes that the terms of the APA are unreasonable and makes changes to the APA.

The bidding procedures contain additional provisions that indicate a fluid process, including the Debtor's right to determine "in its business judgment," whether a bid constitutes a higher bid and better offer than other bids received for the assets" and the Debtor's right, any time prior to the Sale Hearing, to "continue the Auction from time to time, adjourn the Auction, and reopen the Auction, upon notice to qualifying bidders, without further notice to the Bankruptcy Court." (Bidding Procedures, ¶ 8 (b) (iv) and 8 (b) (vii)). The bidding procedures provide that the deposit will be returned to all bidders except for a "Qualifying Bidder whose offer is selected as the Prevailing Bid" after the auction is concluded. (Bidding Procedures, ¶ 10(b))

Choa and LCY relied on these provisions. But for the representation that the deposit was refundable and these terms of the bidding procedures, LCY would not have submitted a bid or a bid

deposit. (Affidavit, ¶¶ 43-47)[1]  On the present fact, there was no auction and therefore no opportunity for a bidder to make changes to the APA and for the Debtor to consider those changes. Thus, the conditions that would allow a forfeiture do not exist.

## ARGUMENT

### A.    LCY'S BID DEPOSIT IS NOT SUBJECT TO FORFEITURE.

LCY's bid deposit is not subject to forfeiture as a matter of law. First, "courts have consistently held that forfeitures are not favored" and therefore "such provisions should be explicitly and clearly stated." In re: Crown Corp., 679 F.2d 774, 776 (9th Cir. 1982) citing Borndt v. Southern Pacific Co., 327 F.2d 18, 20 (9th Cir. 1964); United States Fidelity and Guaranty Co. v. Winkler, 351 F.2d 685, 687 (8th Cir. 1865).

In the context of a Bankruptcy Court auction, a forfeiture provision in an auction sale must be clear and unambiguous to provide adequate notice to potential bidders. In re: Crown Corp., 679 F.2d at 777; see In re WPRV-TV, Inc., 983 F.2d 336 (1st Cir. 1993) (finding that bid instructions "became an integral part of the sale agreement").

The present facts fail to meet this standard, for several reasons. First, in this case, LCY is not a Qualifying Bidder under the terms bidding procedures, which state, in pertinent part:

---

[1] Moreover, neither the APA nor the bidding procedures state that the $250,000 deposit would be forfeited if LCY withdrew its bid before the auction. Rather, without ever mentioning the term "forefeiture" the APA provides for liquidated damages in the event that the purchaser thereunder defaults. Clearly, there is no contract in existence between LCY and the Debtor and therefore the remedies for breach of the contract do not apply. There could be no contract until the Debtor selected a Prevailing Bid and the Court authorized the Debtor to proceed with a sale to LCY.

The bidding procedures create a possibility of forfeiture of a bid deposit, but only *after* the auction at which a bidder has the right to change the APA, and *after* the Prevailing Bidder has been selected and approved by the Court. (Bidding Procedures, ¶ 10. The right to demand a forfeiture assumes that an auction has been conducted in accordance with the bidding procedures and Court approval of the sale terms.

7

> Within one (1) business day after the Bid Deadline, the Debtor shall review each bid for the Assets and determine, in its business judgment, whether such bid constitutes a Qualifying Bid, as defined herein. The Debtor shall notify each party that submits an offer whether its offer is a Qualifying Bid.

BP, ¶ 7.

As noted above, LCY was *never* notified that it was "Qualifying Bidder." (Affidavit, ¶ 48). Moreover, because the BP provides that only "Qualifying Bidders" may participate in the auction (BP, ¶ 8), at the time LCY expressed its desire to withdraw its bid, on January 24, 2011, it did not even have the right – and had never been notified of its right – to participate in the auction.

Second, no auction sale has been held, there was no opportunity for LCY to submit changes to the APA at the auction, no bid has been identified as the "Prevailing Bid" in accordance with the bidding procedures, and no APA has ever been executed by the Debtor. .

Third, LCY continued to insist throughout the entire period before the bid deadline and beyond that it would need to conduct due diligence in order to determine whether it would tender a bid and the Debtor and its agents led LCY to believe it could conduct such due diligence.

Based on the foregoing provisions of the BOP and controlling principles of law, LCY's bid is not subject to forfeiture. The process established by the bidding procedures was fluid and reasonably in accord with the commercial realities and complexities of the proposed asset sale. Bidders could examine the assets, look into environmental and other issues and then propose changes to the terms of the APA. In a process with multiple bidders, the bidder who presented a final package that was most attractive and beneficial, in the Debtor's business judgment, would prevail.

All of that changed – or, the Debtor would like to see it change – when the Debtor found that no one, save LCY had submitted a bid. The Debtor then sought to turn a rational sale process on its head, reading out of the process clearly articulated and critical terms of the bidding procedures that the Debtor itself had drafted.

If the assets were reasonably worth $2 million or more "as is, where is," with all of the burdens imposed on the purchaser by the form of the APA as presented, then why did no one else bid? Better still, why would the Debtor seek to hold LCY to what amounted to a blind bid dictated by the manner in which the Debtor withheld information until a bid deposit was in hand?

The motivation is simple and it is set forth in the Motion to Sell. The Debtor is in default under its leases and in dire need of cash to avoid being evicted by its landlords. Clearly, had there been multiple bidders and had they made changes at the Auction, as was there right to do, the Debtor would not be taking the position it now assumes. The Debtor would have considered the changes to the APA made by the bidders and designated the most attractive bid the "Prevailing Bid."

The bidding procedures were drafted by the Debtor, approved by the Court approved and relied upon by LCY. They cannot properly be changed merely because LCY was the sole bidder.

**B.   DUE PROCESS REQUIRES THAT LCY BE PERMITTED TO CONDUCT DISCOVERY AND HAVE AN EVIDENTIARY HEARING <u>BEFORE THE COURT, BEFORE ITS DEPOSIT MAY BE FORFEITED</u>.**

As noted above, if the Court does not conclude that LCY is entitled to a return of its bid deposit as a matter of law, LCY must be permitted to conduct discovery and hold an evidentiary hearing or trial to vindicate its due process rights in connection with its deposit. At such a hearing or trial, parol evidence would be admissible and the Debtor would bear the burden of proof that it is entitled to retain LCY's deposit as a forfeiture. See <u>In re Fountain Imaging of North Miami Beach, LLC</u>, 39 B.R. 508 (S.D. Fla. 2008) In order to ensure to ensure that LCY is allowed to exercise its due process rights in connection with its deposit, including its right to conduct discovery and depositions, present evidence, cross-examine the debtor and its agents and have a full trial before the court on numerous issues of material fact.

Fundamental fairness and principles of equity absolutely require that LCY be permitted to

9

pursue its claims in an Adversary Proceeding to vindicate its rights in connection with its $250,000 deposit, or, at a minimum, to conduct an evidentiary hearing before the Court which is preceded by the opportunity to conduct full and adequate discovery in order to safeguard its due process rights in its deposit.

## Conclusion

For all of the foregoing reasons, the court should deny the debtor's request that the deposit be forfeited, or, alternatively, decline to address it pending the conclusion of an Adversary Proceeding or other adequate process, which includes discovery and an evidentiary hearing, in order to allow LCY the opportunity to protect its due process rights in its deposit and to resolve issues of material fact.

Respectfully Submitted,

By: _____
Isaias T. Diaz
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
E-Mail: idiaz@tnrdlaw.com
Fed Bar No. ct27842
Attorney For LCY Investment Corporation

## CERTIFICATION

I hereby certify that on February 7, 2011, a copy of the foregoing Brief was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

By: _____
Isaias T. Diaz
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
E-Mail: idiaz@tnrdlaw.com
Fed Bar No. ct28112